JUDGE RAKOFF

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA             :

           - v. -                          :

CAROLE ARGO,                         :

              Defendant.           :

- - - - - - - - - - - - - - - x

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: JUL 2 5 2007
```

INDICTMENT

07 Cr.

**07CRIM.  683**

## COUNT ONE

### (Conspiracy To Commit Securities Fraud)

The Grand Jury charges:

### RELEVANT PERSONS AND ENTITIES

1.    At all times relevant to this Indictment, SafeNet, Inc. ("SafeNet" or the "Company"), formerly Information Resource Engineering, Inc. ("IRE"), was a corporation organized under the laws of the State of Delaware with its headquarters in Belcamp, Maryland.

2.    At all times relevant to this Indictment, SafeNet's common stock was listed on the NASDAQ National Market System, an electronic securities market, under the symbol "SFNT." During the relevant time period, significant institutional investors in SafeNet securities maintained offices in New York, New York.

3.    From in or about June 1999 through in or about June 2004, CAROLE ARGO, the defendant, served as Senior Vice President and Chief Financial Officer ("CFO") of SafeNet.  From

in or about June 2004 until her resignation in or about October 2006, ARGO served as SafeNet's President and Chief Operating Officer ("COO").  From in or about April 2006 until October 2006, ARGO also acted as SafeNet's interim CFO.

4.    Prior to joining SafeNet, ARGO served as CFO of a company with publicly-traded securities for approximately one year, and before that she served as vice president of finance and operations of a privately-held company for approximately eight years.  ARGO is a certified public accountant ("CPA"), and has seven years of public accounting experience.  Prior to leaving public accounting, ARGO was an audit manager at a "Big Four" accounting firm.

## BACKGROUND

### SafeNet's Business

5.    At all times relevant to this Indictment, SafeNet developed, marketed and sold hardware and software information security products and services designed to protect and secure digital identities, communications and applications.  SafeNet distributed products and provided services worldwide to customers in a variety of markets, including financial, healthcare, enterprise, technology and government.  SafeNet derived revenue primarily from software and technology licenses, product sales, maintenance (post-contract customer support), and services.

**Stock Options**

    6.    A stock option typically gives its holder the right to buy a share of stock on a future date at a set price, known as the "exercise" or "strike" price. Companies frequently grant stock options to employees as a retention measure and performance incentive. More specifically, granting employees stock options provides them with an incentive to, among other things, (1) help boost the company's share price, and (2) remain at the company through the vesting period. Typically, when a company grants stock options to employees, the employee cannot exercise the option until the end of a "vesting period." When the holder of an option exercises it, he or she purchases the stock from the company at the exercise price.

    7.    The exercise price of an option is typically the price at which the underlying stock trades in the market (*i.e.*, the fair market value) on the date of the option grant. Options with an exercise price equal to the current trading price of the underlying stock are commonly referred to as being "at-the-money"; options with an exercise price below the current trading price of the stock are "in-the-money."

    8.    Stock option grants were a substantial and important component of ARGO's compensation at SafeNet. While she was employed by SafeNet, ARGO received a total of 335,000 options on eleven grant dates. She exercised 58,500 of these options for

a total gain of more than $1.1 million.  During this same period,
ARGO's base salary was less than $200,000 per year, except for in
2004 and 2005 when she received annual base salaries of
approximately $271,000 and $315,000, respectively.

## Certain Relevant Reporting Requirements and Accounting Principles

9.    As a company with shares registered with the
United States Securities and Exchange Commission ("SEC") pursuant
to Section 12(g) of the Securities Exchange Act of 1934, SafeNet
was required by federal law to periodically report the financial
results of its operations.  Such reports typically take the form
of financial statements that include both an Income Statement and
a Balance Sheet.  A company's Income Statement reports, among
other things, revenue recognized, expenses incurred, and income
earned during a stated period of time -- usually for a fiscal
quarter or a fiscal year.  Within an Income Statement, certain
costs or expenses are generally subtracted from revenues to
calculate net income or earnings.

10.    At times relevant to this Indictment, SafeNet
claimed in its public filings with the SEC that it followed
Accounting Principles Board Opinion No. 25, Accounting for Stock
Issued to Employees ("APB 25"), when accounting for the costs
associated with granting stock options to its employees.  APB 25
required companies to record an expense -- a charge against, or
reduction of, its earnings -- for the "intrinsic" value of an

employee stock option on its "measurement date," which is the
date that the authorized agents of the company issue a specified
number of options to specified recipients at a known price.  As a
result, under APB 25 a company was required to take a
compensation expense for any options issued "in-the-money," *i.e.*,
with an exercise price lower than the fair market value of the
stock on the measurement date.  Like cash compensation, option-
related compensation expense -- which is apportioned over the
vesting period of the options -- reduces net income in each such
period.  Under APB 25, a company was not required to deduct from
revenue any compensation expense for granting options priced "at-
the-money," *i.e.*, with an exercise price equal to the fair market
value of the stock on the measurement date.  In an Annual Report
for 2001 on a Form 10-K filed with the SEC (which was signed by
ARGO), SafeNet stated "[u]nder APB 25, if the exercise price of
the employee stock options equals the estimated fair value of the
underlying stock on the date of grant, no compensation expense is
recognized."

### SafeNet's Option Granting Process

11.  SafeNet granted options pursuant to various stock
option plans ratified by its Board of Directors and approved by
its shareholders.  Relevant plans stated that the purpose of
SafeNet's stock option program was "to promote the long-term
growth and profitability of SafeNet . . . by (i) providing key

people with incentives to improve stockholder value and to contribute to the growth and financial success of the Corporation, and (ii) enabling the Corporation to attract, retain and reward the best available persons for positions of substantial responsibility." In public proxy filings with the SEC (which were signed by ARGO), SafeNet stated that "[g]rants of stock options are designed to align the executive's interest with that of the stockholders of the Company." SafeNet further stated:

> No gain to the options is possible without stock price appreciation, which will benefit all shareholders. If the stock price does not increase above the exercise price, compensation to the named executive will be zero.

12. SafeNet's stock option plans were administered by a committee of independent SafeNet directors, referred to as the Compensation Committee, which had authority to grant option awards. The relevant stock option plans provided that the exercise price on an option grant "shall be determined by the Committee, but in no event shall be less than 100% of the fair market value of the Common Stock on the Grant Date." The "Grant Date," in turn, was defined as "the date on which the Committee formally acts to grant an Option to a grantee or such other date as the Committee shall so designate at the time of taking such formal action."

13.   During the relevant time period, the Compensation Committee approved option grants primarily through unanimous written consent forms ("UWCs") signed by Committee members. Although the Compensation Committee had authority to administer SafeNet's stock option programs under the relevant stock option plans, ARGO generally initiated and oversaw the option grant process, provided the names of option recipients and the number of options granted, selected grant dates (and thereby exercise prices), and facilitated the approval process for option grants, by, among other things, obtaining and directing others to obtain the consent of the Compensation Committee for option grants. Members of the Compensation Committee relied on ARGO and others to conform the grant process to the applicable stock option plans and to properly account for stock option grants in SafeNet's books and records and in all public filings.

## THE SCHEME TO DEFRAUD

### Introduction

14.   As set forth more fully below, from in or about 2000 through in or about 2006, CAROLE ARGO, the defendant, and others known and unknown, engaged in an illegal scheme to deceive SafeNet's Board of Directors, shareholders, and auditors, as well as securities analysts, the SEC, members of the investing public and others, concerning SafeNet's systematic backdating of options

grants and SafeNet's failure to record and report compensation expense in connection with those backdated stock option grants.

15.    In furtherance of the scheme to defraud, from in or about 2000 through in or about 2005, ARGO and others known and unknown routinely looked back in time to select grant dates based on historical dates when SafeNet's stock price had closed at or near the low point.  With the benefit of hindsight, ARGO created an opportunity for herself and others at SafeNet to reap substantial benefits by awarding herself and others backdated option grants with particularly advantageous exercise prices.  As a result, a substantial number of SafeNet's option grants during this time period were in-the-money on the day they were granted and therefore had an immediate compensatory and expense component.  Instead of disclosing this information and properly expensing the in-the-money portion of those option grants, ARGO and her co-conspirators -- by backdating options and failing to record and report an expense for those options -- used options as "free" compensation that did not result in a reduction in the company's earnings.

16.    In order to perpetuate the scheme, ARGO and others known and unknown backdated documents to conceal from SafeNet's shareholders and auditors, as well as securities analysts, the SEC, members of the investing public and others, that SafeNet was issuing in-the-money grants.

17.   Further, by failing to record a compensation expense for these option grants as required, ARGO and her accomplices caused SafeNet to report materially false and misleading financial results in public filings for the period from at least in or about 2000 through in or about mid-2006. These public filings created the false impression that SafeNet did not grant in-the-money options and that it was properly accounting for its option grants.  Proper accounting and reporting of these in-the-money options would have alerted regulators, investors, SafeNet's auditors and others of the backdating.  Proper accounting and reporting also would have materially impacted SafeNet's financial statements and altered, among other things, SafeNet's reported income or loss and earnings per share, thereby affecting analysts and investors' views of the financial health of the Company.  In addition, properly accounting and reporting in-the-money grants would have impacted ARGO's compensation, because compensation for ARGO and other members of SafeNet's senior management was tied to performance.  By perpetuating the backdating scheme, therefore, ARGO and her co-conspirators not only reaped the benefits of receiving in-the-money options, but also misled the public about the financial well-being of the Company.

### Backdating of Options

18.    SafeNet's option grants fell into three categories:  (i) options granted to newly hired employees and new employees from SafeNet's acquisition of other companies ("New Hire Grants"); (ii) options granted to existing employees, including senior management and rank and file employees, in connection with promotion, retention and productivity goals ("Replenishment" or "Refresher Grants"); and (iii) options granted to SafeNet's directors ("Director Grants").  From in or about 2000 through in or about 2005, ARGO backdated and directed others to backdate numerous Refresher Grants and New Hire Grants, including valuable in-the-money option grants to herself and other members of SafeNet's senior management team.

19.    Before ARGO oversaw the option grant process, option grants at SafeNet were generally awarded by the Compensation Committee when it convened during regularly scheduled meetings of SafeNet's Board of Directors.  On these occasions, option grants were made at-the-money, with the exercise price set on the date that the Compensation Committee formally approved the option grant.  In or about 2000, however, SafeNet's practices regarding option grants changed, with ARGO overseeing a scheme to regularly backdate options to achieve beneficial strike prices.

20.  In or about May and June 2000, ARGO and SafeNet's then-CEO (the "Former CEO") prepared and distributed a memorandum to the Compensation Committee seeking approval for a standardized option plan that would permit SafeNet's management to grant certain stock options without obtaining the approval of the Compensation Committee.  The proposed plan, which applied to both New Hire Grants and Refresher Grants, called for the Compensation Committee to establish guidelines with standard options grants for categories of SafeNet's employees.  Under the plan, management was not required to seek approval of the Compensation Committee if the number of options to be granted to an employee was equal or less than the number of options authorized for the employee's category under the guidelines.  In their memorandum, ARGO and the Former CEO stated that, because of "stringent" accounting rules concerning stock option compensation, SafeNet needed to establish procedures to ensure that stock options were issued "without a charge to compensation expense."  The proposed option plan did not purport to allow management to backdate option grants or to select exercise prices with the benefit of hindsight.

21.  During the same time period in which ARGO and the Former CEO were seeking approval of the proposed option plan, ARGO communicated with SafeNet's outside auditors about option grants, measurement dates, and compensation expenses.  Among

11

other things, the auditors advised ARGO in writing that "the stock price to use in measuring compensation expense . . . is the price in effect on the date the shareholders [or the Board of Directors, in cases in which they have authority] approve the award.  If the stock price has risen above the exercise price, *this would result in the need to recognize compensation expense*." (Emphasis added).  In an e-mail sent to ARGO on or about July 13, 2000, the auditors further explained, "if management has the authority to make the grants, the measurement date will be the date that you know:  who is receiving the options, the number of options they will receive and exercise price of the options."

22.  Days later, on or about July 19, 2000, SafeNet's Board of Directors approved the proposal by ARGO and the Former CEO and adopted a uniform option program under which the Board delegated to the Former CEO, ARGO, and SafeNet's Secretary, the authority to grant stock options to certain categories of employees in accordance with written guidelines.  For New Hire Grants, all options granted under the guidelines were to be priced "at the closing price on date of hire."  A grant within the guidelines did not require Compensation Committee approval, but any option grant that did not comply with the guidelines required unanimous written consent from the Compensation Committee.

23.  Notwithstanding the adopted policy that new employees' grants were to be priced as of the date of hire, ARGO and others working with ARGO and at her direction, backdated numerous New Hire Grants, selecting dates other than the employees' dates of hire.  To facilitate the scheme, ARGO and others known and unknown often waited until the end of a reporting period to issue New Hire Grants, allowing pending grants to accumulate so that ARGO could select grant dates with low exercise prices.  Once a date had been selected, ARGO directed someone to prepare a UWC for submission to the Compensation Committee that would list the date that ARGO and her co-conspirators had selected.

24.  Similarly, with regard to Refresher Grants, including substantial grants to ARGO and other members of senior management, ARGO, together with others, backdated stock option grants to days when SafeNet's stock was trading at or near periodic low points.  On certain occasions, after the Compensation Committee or Board of Directors had met and agreed to a grant and communicated to senior management the number of options to be granted to specific individuals, ARGO and others acting in concert with her "pocketed" the grant and then looked back to select a date with a particularly low share price.  By acting in this manner, ARGO and her co-conspirators manipulated

the "grant date" on the options to give the recipient a particularly fortuitous strike price.

25.    After selecting the "grant date" for option grants, ARGO directed others to prepare UWCs for members of the Compensation Committee to sign.  The top of the UWCs bore the dates that ARGO and her co-conspirators had selected for the option grants, but did not bear a signature date.  Nor did they reflect the dates on which the Compensation Committee executed the UWCs.  The UWCs generally stated that the exercise price for the granted options was "the last sale price of the Company's Common Stock on the NASDAQ National Market, on the above listed date."  These backdated UWCs created the false appearance that the dates reflected at the top of the UWCs were the actual dates on which the options were granted by the Compensation Committee.

26.    In cases in which ARGO and others backdated grants, the members of the Compensation Committee did not select the grant dates that were specified in the UWCs.  Nor did they approve the grants on the dates selected by ARGO and written at her direction on the UWCs.  By listing these dates on the UWCs, ARGO and her co-conspirators created the false impression that the dates on the top of the UWCs were the actual approval dates for the options granted.  ARGO did not disclose to members of the Compensation Committee that she routinely looked back to choose dates that coincided with particularly low stock prices, that she

was selecting prior dates to obtain fortuitous exercise prices, that she was causing SafeNet to issue in-the-money grants, or that SafeNet was failing to properly account for and report these grants.  In those instances in which members of the Compensation Committee were aware that ARGO and others had selected prior dates as the "Grant Date," Compensation Committee members relied on ARGO and others to properly account for these grants.

27.  Following her promotion to President and COO in 2004, ARGO explained her practice of backdating option grants to SafeNet's new CFO in an e-mail dated September 15, 2004:

> Our past practice has been to aggregate options for performance awards or new hires in the quarter and pick the best price after the hire date.  We then send the unanimous consent to the comp committee and the options are approved.  I think this is a good practice because of the volatility of our stock price.  Who wants to have an option priced on your start date and then have the option underwater a month later when you are notified of the award price.

28.  During the period in which ARGO and others conspired to perpetuate the backdating scheme, ARGO had numerous interactions with SafeNet's independent auditors and discussed various accounting issues with them, including issues related to accounting for options.  ARGO failed to disclose that she and others routinely looked back to select grant dates with low stock prices.  Nor did she disclose that the dates on the UWCs for numerous option grants did not correlate to dates on which the

15

Compensation Committee approved the grants. Moreover, beginning in the fourth quarter of 2000 through the second quarter of 2004, and in her capacity as SafeNet's Interim CFO beginning in the first quarter of 2006, ARGO signed management representation letters that asserted to SafeNet's auditors that ARGO was unaware of any ongoing fraud at SafeNet.

29.  ARGO benefitted from the backdating scheme in numerous ways. Most directly, ARGO received valuable in-the-money option grants from SafeNet, with low exercise prices that she manipulated through the option grant process. As explained below, ARGO exercised a portion of these options before the backdating scheme was exposed. During the relevant time period, ARGO also benefitted from the scheme through performance bonuses that she received from SafeNet, in part, because the Company met certain earnings goals that it would not have met if SafeNet had properly recorded and reported the compensation expenses arising from the issuance of in-the-money grants. From 2000 through 2004, ARGO's performance bonuses totaled more than $650,000. ARGO further benefitted from the scheme through sales of SafeNet stock during the relevant period. At the time of these sales, SafeNet's public filings contained material misstatements due to SafeNet's failure to properly record and report compensation expenses arising from the issuance of in-the-money options. Had SafeNet's public filings been accurate -- and had the public

known of the scheme by ARGO and others to backdate options -- it
is likely that the price of SafeNet's stock would have been
lower, resulting in less gain for ARGO.

30.   The following are examples of stock options grants
that ARGO and her co-conspirators backdated during the relevant
time period.

### April 3, 2001 Grant

31.   In 2001, SafeNet granted 25,000 options to the
Former CEO, with a grant date of April 3, 2001.  In fact, these
options had been approved by the Compensation Committee and
ratified by the full Board of Directors in or about January 2001,
and then "pocketed" until in or about late April 2001 as
SafeNet's share price dropped precipitously.  In late April, ARGO
and others repriced the option grant to April 3, 2001, so that
the Former CEO could receive a beneficial exercise price.

32.   In awarding the Former CEO's option grant, members
of the Compensation Committee noted that the option grant was, in
part, an award for the performance of SafeNet's stock.  In a
document dated January 16, 2001, a Compensation Committee member
noted that SafeNet's share price had increased from approximately
$21 to $47 over the prior year.  On January 19, 2001, the
Compensation Committee met and agreed to grant the Former CEO
25,000 options.  The closing price of SafeNet's stock on that
date was $46.81.  On January 22, 2001, members of SafeNet's Board

of Directors ratified the Former CEO's option grant.  The closing price of SafeNet's stock on that date was $46.12.

33.  In March 2001, SafeNet's stock price began to fall dramatically.  On April 16, 2001, ARGO sent an e-mail to another individual saying "I would like to have the option stuff approved today."  That day, SafeNet's stock closed at $12.03.  At ARGO's direction, a UWC for the Former CEO's grant was prepared and sent to the Compensation Committee, with a date of April 3, 2001.  By using April 3, 2001 as the grant date instead of January 22, 2001, the day on which the Board of Directors approved the grant, the value of the Former CEO's option grant increased by almost $940,000 (more than $37 per share).

### October 1, 2001 Grant

34.  During the Summer and early Fall of 2001, the Former CEO and SafeNet were involved in negotiations regarding compensation, including an option grant.  The Former CEO sought a grant of 200,000 options, but members of the Compensation Committee rejected this request as excessive.  In a memorandum dated September 13, 2001, members of the Compensation Committee recommended "an immediate grant of 50,000 options [to the Former CEO] upon signing of [a] contract extension."

35.  In or about late October 2001, members of the Compensation Committee approved by UWC a grant of 50,000 options to the Former CEO and 20,000 options to ARGO.  The final UWC was

18

not signed until on or about October 28, 2001, but the grant was backdated to October 1, 2001, resulting in a strike price of $5.85 per share, the low price for the fiscal quarter. The applicable closing price of SafeNet's stock on October 28, 2001 was $9.88.

36. The Former CEO was dissatisfied with his option grant and refused to sign his new employment contract. As a compromise, on or about December 12, 2001, the Compensation Committee agreed to grant the Former CEO an additional 100,000 options as an inducement for him to execute a new employment contract with SafeNet. On or about December 12, 2001, the Former CEO agreed to sign his employment contract, and SafeNet's Board of Directors approved the terms of his contract, including the 100,000 additional options. ARGO attended this Board meeting.

37. The contract, which was dated December 12, 2001, provided that the Former CEO "was issued 150,000 incentive options . . . issued at the fair market value of [SafeNet's] common stock as of the date of the grant." The 150,000 options referenced in the contract included the 50,000 options granted to the Former CEO by UWC on or about October 28, 2001. Also on or about December 12, 2001, the Compensation Committee agreed to grant ARGO an additional 25,000 options.

38. On or about January 4, 2002, ARGO sent a letter to the members of the Compensation Committee attaching UWCs

regarding option grants for both ARGO and the Former CEO. The option grants encompassed both the prior grants that had been backdated to October 1, 2001 and the additional grants that had been approved in mid-December 2001. In the cover letter, ARGO stated that she had "modified the initial grants made last quarter . . . to include this latest award." Included in the package sent by ARGO were UWCs for two newly hired employees and a grant for 10,000 options to SafeNet's then-controller, who reported to ARGO. The UWCs for the newly hired employees were dated November 29, 2001 and December 17, 2001, their respective dates of hire. In contrast, the UWCs for ARGO, the Former CEO, and the then-controller were backdated to October 1, 2001. Nothing material to these stock option grants occurred on October 1, 2001. By backdating this grant to October 1, 2001, ARGO again was able to take advantage of the low share price of $5.85. By January 4, 2002, the closing price of SafeNet's stock was $18.65, or almost $13 per share more than the exercise price that ARGO obtained by backdating the options under consideration. As a result of the backdating of these grants, ARGO and the Former CEO received in-the-money option grants worth approximately $576,000 and $1.92 million, respectively.

        39.    To further conceal the scheme, ARGO altered minutes of the Compensation Committee related to this grant. On or about December 14, 2001, members of the Compensation Committee

prepared minutes regarding their meeting on December 12, 2001 in which they had discussed the Former CEO's compensation.  In those minutes, the Compensation Committee stated, "[a]s a signing bonus [for the Former CEO], the Committee recommended 100,000 options." On or about December 16, 2001, those minutes were sent to ARGO for her review.  In or about mid-January 2002, ARGO altered the minutes to read, "[a]s a signing *incentive*, the Committee *previously approved a stock option grant for* 100,000 options." (emphasis added).  ARGO's revision was incorporated into the final version of the minutes, which were then signed by the members of the Compensation Committee.  ARGO's changes gave the false impression that the stock options granted to the Former CEO -- and to her -- had been approved by the Compensation Committee previously, when in fact as ARGO well knew the option grants were not approved until on or about January 4, 2002.

40.  As a result of the scheme to backdate the option grants dated October 1, 2001, ARGO, the Former CEO, and others at SafeNet received valuable in-the-money grants, backdated to a particularly low strike price.  SafeNet did not record or report a compensation expense for this grant.  Despite this failure to record or report a compensation expense, in an Annual Report for 2001 on a Form 10-K filed with the SEC (which was signed by ARGO), SafeNet stated that it accounted for "all stock-based compensation plans using the intrinsic value method prescribed

21

by" APB 25.  SafeNet further stated that "no compensation cost has been recognized for its options."

41.  In or about 2004 and 2005, ARGO exercised approximately 18,500 options from the October 1, 2001 grant. Although ARGO did not sell these shares before the backdating scheme was disclosed, she realized a benefit of approximately $236,000 upon her exercise of the options, because the shares were purchased from SafeNet at a discount from the price she should have paid if the exercise price had corresponded to the true measurement date for the grant.

### October 8, 2002 Grant

42.  In October 2002, the Compensation Committee granted 100,000 stock options to the Former CEO to replace options that had expired.  The grant was dated October 8, 2002, but was not actually approved by the Compensation Committee until on or about October 24, 2002.  In an October 21, 2002 e-mail, ARGO told members of the Compensation Committee, "we will be able to issue options to [the Former CEO] as of October 8th 2002.  The closing price was 13.75."  ARGO subsequently caused a UWC to be prepared dated October 8, 2002, which was executed by the Compensation Committee on or about October 24, 2002.

43.  The closing price of SafeNet's stock on October 24, 2002 was $18.75.  By backdating the Former CEO's option grant to October 8, 2002, the Former CEO received an in-the-money

option grant worth approximately $500,000.  Although members of the Compensation Committee knew that they were selecting a prior grant date for this particular grant, they relied on ARGO and others to properly account for it.  SafeNet did not, however, record or report a compensation expense for this grant, and ARGO did not advise members of the Compensation Committee, SafeNet's outside auditors, or investors that SafeNet had failed to properly account for this grant.  Instead, in an Annual Report for 2002 on a Form 10-K filed with the SEC (which was signed by ARGO), SafeNet stated "[n]o stock-based employee compensation cost is reflected in net income, as all options granted under [SafeNet's option] plans had an exercise price equal to the market value of the underlying common stock on the date of grant."

### February 27, 2003 Grant

44.  On or about January 2, 2003, members of the Compensation Committee participated in a telephonic meeting with the Former CEO.  According to an e-mail dated January 3, 2003, during this meeting the Compensation Committee "reviewed the CEO's recommendations for bonus and salary treatment of senior officers, approved them, and [decided to] present them to the Board."  On or about January 6, 2003, an assistant to the Former CEO sent a fax to members of the Board of Directors, which included a proposed compensation package for ARGO, with a

proposed grant of 30,000 options.  On or about January 8, 2003,
SafeNet's Board of Directors met and approved "all proposed
compensation awards . . . for the Executive Offices [sic]."  ARGO
attended this meeting.  The closing price of Safenet's stock on
January 8, 2003 was $26.49.  This grant included 100,000 options
to the Former CEO and 40,000 options to a senior vice president
("SVP").  On or about January 13, 2003, ARGO received an e-mail
from a Compensation Committee member confirming that the
Compensation Committee had approved the compensation package
proposed by the Former CEO and saying, in substance, that no
substantive changes had been made to ARGO's proposed option
grant.

        45.  On or about January 14, 2003, ARGO received an e-
mail from an individual in SafeNet's finance department asking
ARGO if he should "put together stock option agreements for" the
Former CEO, ARGO, and the SVP.  He then added, "[w]hat did you
have in mind for these agreements (dates, prices, terms, etc..
[sic])?"  In an e-mail sent minutes later, ARGO replied, "no we
will wait on pricing."

        46.  ARGO "pocketed" this grant as SafeNet's stock
price fell during early 2003, hitting a quarterly low price of
$16.47 on February 27, 2003 (the day SafeNet completed a
significant acquisition), before starting to rise in March 2003.
At a later point in time, ARGO, with the benefit of hindsight,

looked back and selected February 27, 2003, to use as the "grant date" for the options awarded to herself, the Former CEO and the SVP. ARGO obtained the benefit of this "grant date," but there is no record of SafeNet's Compensation Committee or Board of Directors ever approving that grant date or the corresponding exercise price of $16.47.

47. To further conceal her scheme, when ARGO received the agreement for this option grant, she backdated her signature on the agreement to "2/27/03." By backdating her signature, ARGO gave the false impression that the stock options she received had been approved by the Compensation Committee on that date. In fact, as ARGO well knew, the option grant was not approved on February 27, 2003, and the "grant date" was not selected until later, using the benefit of hindsight.

48. By dating the grant as of February 27, 2003, ARGO, the Former CEO, and the other recipients received a strike price of $16.47. By April 23, 2003 (the day on which another grant recipient signed and dated his grant agreement), SafeNet's stock price had risen to $23.90, more than $7 per share more than the price ARGO selected. ARGO and the others therefore received a valuable in-the-money grant through the backdating of this option grant. SafeNet did not properly account for or report this grant. On the contrary, in a Quarterly Report for the first quarter of 2003 on a Form 10-Q filed with the SEC (which was

signed by ARGO), SafeNet stated that it "records compensation expense for all stock-based compensation plans using the intrinsic value method prescribed by" APB 25, and that "[a]ll options granted under" SafeNet's option plans "had an exercise price equal to the market value of the underlying common stock on the date of the grant." Similarly, in an Annual Report for 2003 on a Form 10-K filed with the SEC (which was signed by ARGO), SafeNet claimed that it accounted for options pursuant to APB 25, but stated that "[n]o stock-based employee compensation cost is reflected in the statements of operations, as all options granted under [SafeNet's stock option] plans had an exercise price equal to the market value of the underlying common stock on the date of grant."

### July 17, 2003 Grant

49. On or about September 15, 2003, ARGO sent an e-mail to the Compensation Committee seeking approval for various option grants, including New Hire and Refresher Grants and a grant of 10,000 options to ARGO. In connection with her request, ARGO faxed a UWC to the Compensation Committee backdated to July 17, 2003. On or about September 16, 2003, members of the Compensation Committee executed the UWC provided by ARGO.

50. On September 16, 2003, the closing price of SafeNet's stock was $38.85. On July 17, 2003, the grant date selected by ARGO, the closing price was $31.35. By backdating

this grant, therefore, ARGO increased the value of her options by $75,000, giving her (and others who received options as part of this grant) an in-the-money grant for which SafeNet should have, but did not, record and report a compensation charge.

51.  In a proxy statement that was filed with the SEC on or about April 29, 2004, SafeNet stated that, with regard to the options granted to ARGO, the Former CEO and others in 2003, "[n]o gain to the options is possible without stock price appreciation, which will benefit all shareholders."

### July 28, 2004 Grant

52.  On or about June 29, 2004, ARGO was named President and COO of SafeNet, and a new CFO (the "New CFO") joined SafeNet, with a hire date of June 28, 2004.  On June 28, 2004, the closing price of SafeNet's stock was $26.75.  By Consent dated August 31, 2004, the Compensation Committee approved a grant of 100,000 options to the New CFO in connection with his employment contract.  On that date, the closing price of SafeNet's stock was $28.45.

53.  On or about September 15, 2004, ARGO sent an e-mail to the New CFO describing SafeNet's practice of backdating options.  *See* Paragraph 27, above.  ARGO instructed the New CFO to price the New CFO's options before the end of the quarter.  A UWC dated July 28, 2004, was subsequently prepared for the Compensation Committee, which was signed and returned by the

final member of the Compensation Committee on or about October 9, 2004.

54.    The closing price of SafeNet's stock on July 28, 2004, was $22.19, the low price for the quarter.  By contrast, the applicable closing price on October 9, 2004 was $28.45.  By backdating the grant to July 28, 2004, the New CFO received an in-the-money grant, valued over $1.1 million more than if the grant date had been October 9, 2004, the date the Compensation Committee approved it.  SafeNet did not record or report a compensation expense for this grant.  In an amended Annual Report for 2004 on a Form 10-K/A filed with the SEC on April 29, 2005 (which was signed by the New CFO), SafeNet stated "[n]o gain to the options is possible without stock price appreciation, which will benefit all shareholders.  If the stock price does not increase above the exercise price, compensation to the named executive will be zero."

### The Q3 and Q4 2004 Grants

55.    During the first quarter of 2005, SafeNet granted a large number of options to various employees backdated to various dates in the third and fourth quarters of 2004 (the "Q3 and Q4 2004 Grants").  Most of these grants were backdated to September 27, 2004, when the closing price for SafeNet's stock was $25.16.  ARGO was involved in the process of issuing these grants and in selecting the grant dates.  The Q3 and Q4 2004

Grants were not approved by the Compensation Committee until in or about February 2005, with the final UWC signed on or about February 9, 2005, when the closing price for SafeNet's stock was $31.52. By backdating these options, therefore, ARGO and others granted valuable in-the-money options. Initially, SafeNet failed to account properly for these grants.

56. In or about Spring 2005, SafeNet's outside auditors discovered that SafeNet had backdated the Q3 and Q4 2004 Grants by selecting a grant date (and corresponding exercise price) prior to when the Compensation Committee actually approved the grants. The outside auditors directed the accounting department at SafeNet to prepare a schedule of all options approved in early 2005 with earlier grant dates so that they could determine the amount of the compensation expense that SafeNet would have to recognize. At the auditors' direction, SafeNet then recorded and reported a compensation charge for the Q3 and Q4 2004 Grants.

57. Even after SafeNet's auditors discovered the backdating on the Q3 and Q4 2004 Grants and required SafeNet to record and report a compensation charge, ARGO (and her co-conspirators) failed to disclose to the auditors that SafeNet had, in fact, backdated numerous other grants in prior years. Nor did ARGO (or her co-conspirators) disclose to the auditors or investors that she had routinely looked back to choose dates that

coincided with particularly low stock prices, that she was selecting prior dates to obtain fortuitous exercise prices, that she was causing SafeNet to issue in-the-money grants, or that SafeNet was failing to properly account for and report these grants. ARGO also failed to take any steps to correct material misstatements concerning SafeNet's financial results that were contained in public filings as a result of the backdating scheme.

### June 1, 2005 Grant

58.    On or about June 1, 2005, SafeNet's Compensation Committee met and approved a broad-based option grant for several SafeNet employees, including ARGO. The closing price of SafeNet's stock on June 1, 2005 was $31.78. ARGO was involved in discussions about the grant. The options were backdated to various dates, with most having a "grant date" of March 28, 2005 (with a strike price of $28.95). In connection with her employment agreement as president and COO, ARGO received an in-the-money grant of 50,000 options backdated to September 27, 2004 (with a strike price of $25.16).

59.    Unlike prior grants, this grant was not approved by UWC but rather during a meeting of the Compensation Committee. As a result, on the face of the meeting minutes it was clear that these grants had been backdated. Members of SafeNet's accounting department noticed the backdating and advised senior management that SafeNet would have to record a compensation charge in

connection with this grant given the prior grant dates.  The
accounting department calculated that this expense would exceed
$1.15 million.  Faced with this information, in or about August
2005, SafeNet's Former CEO directed that all options granted on
June 1, 2005 but backdated to earlier dates -- other than ARGO's
-- would be repriced as of June 1, 2005, so as to avoid a
compensation charge.  (ARGO's option grant was ultimately priced
as of June 28, 2004, with an exercise price of $26.75, and the
company subsequently recorded a compensation expense for ARGO's
grant).  The Former CEO did not seek consent from either the
Board of Directors or the Compensation Committee to reprice the
options that had been granted on June 1, 2005.

　　　　60.  Once again, despite the discovery by the
accounting department that the June 1, 2005 options had been
backdated, neither ARGO nor her accomplices disclosed to the
auditors or investors that she had routinely looked back to
choose dates that coincided with particularly low stock prices,
that she was selecting prior dates to obtain fortuitous exercise
prices, that she was causing SafeNet to issue in-the-money
grants, or that SafeNet was failing to properly account for these
grants.  Nor did ARGO or others take steps to correct the
material misstatements concerning SafeNet's financial results
that were contained in public filings.

## FALSE STATEMENTS IN PUBLIC FILINGS

61.   To sell securities to members of the public and to maintain public trading of its securities in the United States, SafeNet was required to comply with provisions of the federal securities laws, including the Securities Exchange Act of 1934, and rules and regulations promulgated thereunder, which were designed to ensure that the company's financial information was fairly and accurately recorded and disclosed to the public.

62.   Under these regulations, SafeNet was required to, among other things:  (a) file with the SEC annual financial statements audited by an independent accountant; (b) file with the SEC quarterly updates of its financial statements that disclosed its financial condition and the results of its business operations for each three-month period; (c) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that the company's transactions were recorded as necessary to permit preparation of financial statements in conformity with Generally Accepted Accounting Principles and other applicable criteria; and (d) make and keep books, records, and accounts that accurately and fairly reflected the company's business transactions.

63.   At all times relevant to this Indictment, CAROLE ARGO, and other SafeNet employees, participated in preparing, reviewing and certifying consolidated financial statements for

SafeNet that purported to conform with applicable regulatory requirements (hereinafter, the "Financial Statements").

64.  The Financial Statements accompanying SafeNet's Forms 10-K for years 2000 to 2006 stated that SafeNet accounted for its options grants in accordance with APB 25.  In truth and in fact, as ARGO and her co-conspirators well knew, SafeNet systematically backdated options and failed to record and report compensation expense for in-the-money options, as required by APB 25.  As a result, SafeNet's compensation expense was materially understated during the period 2000 through 2006.

65.  The Financial Statements accompanying SafeNet's Forms 10-Q and Forms 10-K purported to disclose, among other things, SafeNet's operating and net income for particular periods.  In truth and in fact, SafeNet's Forms 10-Q and 10-K materially misstated SafeNet's operating and net income as a result of SafeNet's failure to record and report a compensation expense for backdated options.

66.  In addition, during times relevant to this Indictment, ARGO and others made statements to the investing public, including on conference calls held with analysts and investors.  In these statements, ARGO and others made materially false statements concerning SafeNet's financial results, reported earnings, and operating performance and omitted to state facts necessary to make the statements that were made complete,

accurate and not misleading.

## THE CONSPIRACY

67.  From at least in or about 2000 through in or about 2006, in the Southern District of New York and elsewhere, CAROLE ARGO, the defendant, and others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, namely (a) to commit fraud in connection with the purchase and sale of securities issued by SafeNet, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5; (b) to make and cause to be made false and misleading statements of material fact in applications, reports, and documents required to be filed under the Securities Exchange Act of 1934 and the rules and regulations thereunder, in violation of Title 15, United States Code, Sections 78m(a) and 78ff; (c) to make and cause to be made false and misleading statements to SafeNet's auditors, in violation of Title 15, United States Code, Section 78ff and Title 17, Code of Federal Regulations, Section 240.13b2-2; and (d) to falsify books, records, and accounts of SafeNet, in violation of Title 15, United States Code, Sections 78m(b)(2)(A), 78m(b)(5) and 78ff, and Title 17, Code of Federal Regulations, Section 240.13b2-1.

## Objects Of The Conspiracy

### Fraud In Connection With The
### Purchase And Sale Of Securities

68.  It was a part and an object of the conspiracy that CAROLE ARGO, the defendant, and others known and unknown, unlawfully, willfully, and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, would and did use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities issued by SafeNet, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud; (b) making and causing to be made untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon the purchasers and sellers, in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

### False Statements In
### Annual And Quarterly SEC Reports

69.  It was further a part and an object of the conspiracy that CAROLE ARGO, the defendant, and others known and unknown, unlawfully, willfully, and knowingly, in applications,

reports, and documents required to be filed under the Securities

Exchange Act of 1934 and the rules and regulations thereunder,

would and did make and cause to be made statements that were

false and misleading with respect to material facts, in violation

of Title 15, United States Code, Sections 78m(a) and 78ff.

### False Statements to Auditors

70.    It was further a part and an object of the

conspiracy that CAROLE ARGO, the defendant, being an officer and

director of SafeNet, Inc., an issuer with a class of securities

registered pursuant to Section 12 of the Securities Exchange Act

of 1934 and obligated to file periodic reports pursuant to

Section 13(a) of the Securities Exchange Act of 1934, unlawfully,

willfully and knowingly, directly and indirectly, (a) made and

caused to be made materially false and misleading statements; and

(b) omitted to state, and caused others to omit to state,

material facts necessary in order to make statements made, in

light of the circumstances under which they were made, not

misleading to accountants in connection with (i) audits, reviews

and examinations of the financial statements of SafeNet, Inc.

required to be filed under the Securities Exchange Act of 1934;

and (ii) the preparation and filing of documents and reports

required to be filed with the SEC pursuant to rules and

regulations promulgated by the SEC, in violation of Title 15,

United States Code, Section 78ff, and Title 17, Code of Federal

Regulations, Section 240.13b2-2.

### False Books And Records

71.    It was further a part and an object of the conspiracy that CAROLE ARGO, the defendant, and others known and unknown, unlawfully, willfully, and knowingly would and did, directly and indirectly, falsify and cause to be falsified books, records, and accounts subject to Section 13(b)(2) of the Securities Exchange Act of 1934, namely books, records, and accounts of SafeNet, an issuer with a class of securities registered pursuant to the Securities Exchange Act of 1934, which SafeNet was required to make and keep, accurately and fairly reflecting, in reasonable detail, the transactions and dispositions of the assets of SafeNet, in violation of Title 15, United States Code, Sections 78m(b)(2)(A), 78m(b)(5) and 78ff, and Title 17, Code of Federal Regulations, Section 240.13b2-1.

### Means And Methods Of The Conspiracy

72.    Among the means and methods by which CAROLE ARGO, the defendant, and her co-conspirators would and did carry out the conspiracy were the following:

        a.   ARGO and her co-conspirators picked dates on which SafeNet's stock price was at or near its low over a certain period, usually within the prior quarter, and made it appear as if options were granted at fair market value on those dates, when in fact they were granted at a later date.

        b.   ARGO and her co-conspirators prepared and caused others to prepare unanimous written consents for the Compensation Committee's approval with backdated dates to make it appear as if the Compensation Committee had approved option grants on those dates.

        c.   ARGO and her co-conspirators ignored or modified existing option grants after the Compensation Committee had already executed unanimous written consents or otherwise approved option grants to take advantage of falling stock prices.

        d.   ARGO and her co-conspirators caused and directed false and misleading entries to be made in SafeNet's financial books and records, thereby falsely overstating SafeNet's publicly reported income during the period 2000 through 2006.

        e.   ARGO and her co-conspirators provided false and misleading information to SafeNet's auditors and concealed from those auditors material facts about SafeNet's systematic granting of in-the-money options during the period 2000 through 2006.

f.    ARGO and her co-conspirators caused SafeNet to file publicly with the SEC annual reports and quarterly reports that materially misstated, among other things, SafeNet's operating and net income during the period 2000 through 2006.

### Overt Acts

73.    In furtherance of the conspiracy and to effect its illegal objects, CAROLE ARGO, the defendant, and her co-conspirators committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a.    In or about July 2000, ARGO and her co-conspirators obtained authority from SafeNet's Board of Directors to grant options to new and existing employees within certain guidelines.

b.    In or about late April 2001, ARGO and her co-conspirators caused SafeNet to issue a grant of 25,000 options to the Former CEO backdated to April 3, 2001.

c.    In or about late October 2001, ARGO and her co-conspirators caused SafeNet to issue a grant of 50,000 options to the Former CEO and 20,000 options to ARGO backdated to October 1, 2001.

d.    In or about January 2002, ARGO and her co-conspirators caused SafeNet to issue an additional grant of 100,000 options to the Former CEO and 25,000 options to ARGO backdated to October 1, 2001.

e.     In or about mid-January 2002, ARGO altered minutes of SafeNet's Compensation Committee to give the false impression that stock options granted to the Former CEO and to ARGO in early January 2002 but backdated to October 1, 2001, had in fact been granted previously.

f.     On or about January 29, 2002, ARGO and others provided false and misleading financial information to securities analysts and the investing public.

g.     On or about March 18, 2002, ARGO signed a management representation letter that asserted to SafeNet's auditors that ARGO was unaware of any fraud or suspected fraud at SafeNet.

h.     In or about late October 2002, ARGO and her co-conspirators caused SafeNet to issue a grant of 100,000 options to the Former CEO backdated to October 8, 2002.

i.     On or about February 6, 2003, ARGO signed a management representation letter that asserted to SafeNet's auditors that ARGO was unaware of any fraud or suspected fraud at SafeNet.

j.     On or about March 31, 2003, ARGO and others caused to be filed with the SEC an Annual Report for 2002 on a Form 10-K (that was signed by ARGO), in which SafeNet stated "[n]o stock-based employee compensation cost is reflected in net income, as all options granted under [SafeNet's option] plans had

40

an exercise price equal to the market value of the underlying common stock on the date of grant."

k.    In or about 2003, ARGO and her co-conspirators "pocketed" a previously authorized grant of 30,000 options to ARGO and then caused SafeNet to select a "grant date" of February 27, 2003, with the benefit of hindsight.

l.    On or about July 30, 2003, ARGO and others provided false and misleading financial information to securities analysts and the investing public.

m.    In or about September 2003, ARGO and her co-conspirators caused SafeNet to issue New Hire and Refresher Grants, including a grant of 10,000 options to ARGO, backdated to July 17, 2003.

n.    On or about January 27, 2004, ARGO and others provided false and misleading financial information to securities analysts and the investing public.

o.    On or about March 10, 2004, ARGO and others caused to be filed with the SEC an Annual Report for 2003 on a Form 10-K (that was signed by ARGO), in which SafeNet claimed that it accounted for options pursuant to APB 25, but that "[n]o stock-based employee compensation cost is reflected in the statements of operations, as all options granted under [SafeNet's stock option] plans had an exercise price equal to the market value of the underlying common stock on the date of grant."

41

p.    On or about April 29, 2004, ARGO and others caused to be filed with the SEC a proxy statement in which SafeNet stated that, with regard to options granted to ARGO, the Former CEO and others in 2003, "[n]o gain to the options is possible without stock price appreciation, which will benefit all shareholders."

q.    On or about September 15, 2004, ARGO sent an e-mail to the incoming CFO of SafeNet describing SafeNet's practice of backdating options.  The incoming CFO subsequently received a grant of 100,000 options, which was backdated to July 28, 2004.

r.    On or about February 1, 2005, ARGO and others provided false and misleading financial information to securities analysts and the investing public.

s.    In or about early 2005, ARGO and her co-conspirators caused SafeNet to issue various option grants backdated to dates in the third and fourth quarters of 2004.

t.    On or about April 10, 2006, ARGO signed a management representation letter that asserted to SafeNet's auditors that ARGO was unaware of any fraud or suspected fraud at SafeNet.

(Title 18, United States Code, Section 371.)

## COUNT TWO

### (Securities Fraud)

The Grand Jury further charges:

74.    The allegations contained in paragraphs 1 through 66 and 72 through 73 of this Indictment are repeated and realleged as if fully set forth herein.

75.    From in or about 2000 up through and including in or about 2006, in the Southern District of New York and elsewhere, CAROLE ARGO, the defendant, unlawfully, willfully and knowingly, directly and indirectly, by the use of the means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, used and employed manipulative and deceptive devices and contrivances, in connection with the purchase and sale of the securities of SafeNet, Inc., in violation of Title 17, Code of Federal Regulations, Section 240.10b-5 by (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon purchasers and sellers.

(Title 15, United States Code, Sections 78j(b) and 78ff;
Title 17, Code of Federal Regulations, Section 240.10b-5;
Title 18, United States Code, Section 2.)

## FORFEITURE ALLEGATION

76.  As a result of committing one or more of the
securities fraud offenses alleged in Counts One and Two of this
Indictment, in violation of Title 15, United States Code,
Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations,
Section 240.10b-5, CAROLE ARGO, the defendant, shall forfeit to
the United States, pursuant to Title 18, United States Code,
Section 981(a)(1)(C) and Title 28, United States Code, Section
2461, any and all property, real and personal, that constitutes
or is derived from proceeds traceable to the commission of the
offenses, representing the proceeds obtained as a result of the
charged securities fraud offenses alleged in this Indictment.

### Substitute Asset Provision

i.  If any of the above-described forfeitable
property, as a result of any act or omission of the defendant:

      a.  cannot be located upon the exercise of due
          diligence;

      b.  has been transferred or sold to, or deposited
          with, a third person;

      c.  has been placed beyond the jurisdiction of
          the Court;

      d.  has been substantially diminished in value;
          or

      e.  has been commingled with other property which
          cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 18,
United States Code, Section 982(b) and Title 21, United States

44

Code, Section 853(p), to seek forfeiture of any other property of

said defendant up to the value of the forfeitable property

described above.

    (Title 18, United States Code, Sections 981(a)(1)(C) and 982,
                Title 21, United States Code,
  Section 853, and Title 28, United States Code, Section 2461).


_____
FOREPERSON

_____
MICHAEL J. GARCIA
United States Attorney

45

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

### UNITED STATES OF AMERICA

- v. -

### CAROLE ARGO,

Defendant.

### INDICTMENT

07 Cr.

(18 U.S.C. § 371; 15 U.S.C. §§ 78j(b) and 78ff;
17 C.F.R. § 240.10b-5; 18 U.S.C. § 2)

MICHAEL J. GARCIA
United States Attorney.

**A TRUE BILL**

*[signature]*

Foreperson.

*[handwritten:]* 7/25/07 Ind Filed Sect 11-1-87. This case
is Assigned to Judge Rakoff for
All purposes. A/w order
Mag Judge Peck