UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA        :   Case No. 07-CR-00683 (JSR)
    *Electronically filed*

                       :

    vs.                   :

CAROLE ARGO,             :

          Defendant.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### SENTENCING MEMORANDUM
### IN AID OF CAROLE D. ARGO
### (Sentencing Date: January 28, 2008)

Paul A. Engelmayer (PE-6760)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
399 Park Avenue
New York, New York 10022
Tel: (212) 230.8800
Fax: (212) 230.8888
Paul.Engelmayer@wilmerhale.com

Matthew B. Holmwood (Pro Hac Vice)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
1875 Pennsylvania Avenue
Washington, D.C. 20006
Tel: (202) 663.6449
Fax: (202) 663.6363
Matthew.Holmwood@wilmerhale.com

*Counsel for Defendant Carole Argo*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................ ii

Overview of This Submission ..........................................................................1

I.     Carole's Offense and Her Acceptance of Responsibility ...................................2

II.    Carole's Life and Character and The Vital Role She Plays in the
       Lives of Her Nuclear, Extended and Adopted Families. ...................................10

       A.     Carole's Immediate Family.....................................................................10

       B.     Carole's Devotion to Her Extended Family.........................................15

       C.     Carole's Private Generosity ...................................................................18

       D.     The Thoughts of Carole's Former Colleagues at SafeNet ...................21

       E.     Making the Best of the Situation and Moving Forward After SafeNet .................23

Conclusion ...........................................................................................................25

# TABLE OF AUTHORITIES

## CASES                                                  Page(s)

*United States v. Galante,* 111 F.3d 1029, 1032, 1034 (2d Cir. 1997) ...........................................10

*United States v. Johnson,* 964 F.2d 124, 129 (2d Cir. 1992) ........................................................10

*United States v. McGee,* 802 F. Supp 843, 844 (E.D.N.Y. 1992)................................................10

*United States v. Olis,* Criminal No. H-03-217-01, 2006 WL 2716048, at *9
    (S.D. Tex. Sept. 22, 2006) ...................................................................................8

*United States v. Rose,* 885 F. Supp 62, 63 (E.D.N.Y. 1995) ........................................................10

*United States v. Rutkoske,* 506 F.3d 170, 179 (2d Cir. 2007)........................................................8

*United States v. Sclamo,* 997 F.2d 970, 972 (1st Cir. 1993)........................................................10

*United States v. Spero,* 382 F.3d 803, 805 (8th Cir. 2004)..........................................................13

## STATUTES AND GUIDELINES

18 U.S.C. § 3553(a) (Supp. 4 2000) ..............................................................................1, 2, 5, 25

18 U.S.C. § 3553(a)(1) (Supp. 4 2000).................................................................................1, 10

18 U.S.C. § 3553(a)(2)(A) (Supp. 4 2000) ........................................................................6, 7, 8

18 U.S.C. § 3553(a)(6) (Supp. 4 2000).....................................................................................6

United States Sentencing Commission, *Guidelines Manual*, §5H1.6 (Nov. 2007)...................2, 10

United States Sentencing Commission, *Guidelines Manual*, §2B1.1 n.3(B) (Nov. 2007)..............8

## ORDER

*United States v. Reyes,* No. 3:06-cr-00556-CRB, Order re Sentencing Guidelines, slip op.

   at 7, 10, 11 (N.D. Cal. Nov. 27, 2007).......................................................................... 6, 9

## OTHER AUTHORITIES

APB Opinion No. 25...............................................................................................................2, 5, 7

Complaint at ¶ 7, *SEC v. Alexander,* 2006 WL 3043892 (E.D.N.Y. Aug. 9, 2006)

   (Case No. 1:06-CV-03844)..................................................................................................9

Litigation Release No. 20003, *SEC v. Brant,* Case No. 07-CV-1075, 2007 WL 470385, at *1

   (S.D.N.Y. Feb. 14, 2007)....................................................................................................9

Sentencing Transcript at 4 , *People v. Brant,* (N.Y. Sup. Ct. Aug. 1, 2007)

   (Indictment No. 644-2007)..................................................................................................5

Sentencing Transcript at 9, *United States v. Sorin,* (E.D.N.Y. May 10, 2007)

   (Case No. CR-06-723)........................................................................................................5

**Overview of This Submission**

We write to present our views as to an appropriate sentence for our client, Carole Argo, in light of the factors set forth in 18 U.S.C. § 3553(a). Based on the indictment and guilty plea, one might view Carole as, simply, "The Options Backdater." But Carole is so much more than that. Since her plea, we have been deluged by letters from Carole's family, friends, and co-workers. Together, these letters (many detailed and moving, and all heartfelt) paint a portrait of a textured, purposeful, charitable, energetic, and other-directed life.[1] Carole is the glue binding her immediate family of five; the rock on whom her widowed sister and ill mother rely and, functionally, a second parent to that sister's two children; a generous friend and caregiver, providing key support to a friend and her paraplegic daughter; an active contributor to her community and church; and a warmly remembered colleague whom her former SafeNet co-workers still revere for her devotion, leadership by example, and mentoring.

This submission is in two parts. First, we discuss Carole's offense. Our points here are that (1) as Carole's actions show, she has, to an unusual degree, accepted responsibility for this lapse in an otherwise admirable life; and (2) Carole's offense, while serious, should be viewed in context, and in favorable contrast to the paradigmatic crimes charged as securities fraud. Second, we describe Carole's "history and characteristics" (§ 3553(a)(1)). We focus on the extraordinary extent to which others depend on Carole. To its credit, the Government left open

---

[1]    This submission has three appendixes. Appendix I contains letters that we received on Carole's behalf. Those we regard as most important are behind Tab A; the remainder, behind Tab B. Appendix II contains a report from an expert, Laura Stamm ("Stamm Rpt."). Ms. Stamm concludes that the conduct charged in the indictment cannot reliably be said to have affected SafeNet's stock price. This issue is relevant in assessing the gravity of the offense under § 3553(a) and to whether restitution to shareholders is merited. Appendix III contains our letter responding to the Probation Department's draft pre-sentence report ("PSR Ltr."). We include it to amplify on the synopses of our responses which are contained in the final PSR.

Carole's right to move for a downward departure based on family responsibilities.  Here, the needs of others, whether measured under U.S.S.G. § 5H1.6 or more broadly under § 3553(a), favor a non-custodial sentence.  We conclude by explaining why such a sentence is consistent with the goals of general and specific deterrence and properly balances the § 3553(a) factors.

## I.    Carole's Offense and Her Acceptance of Responsibility

Carole admitted before this Court that she backdated stock options and failed to account for these options properly in SafeNet's public filings.  Carole is deeply remorseful.  PSR ¶66.  She is embarrassed by her conduct, struggles to place it in the context of her overall life, and is rocked by the impact it has had on everyone who relies on her.  (Letter by Carole Argo.)

Carole's offense is simply described.  While she was SafeNet's CFO, Carole and others chose opportunistic prices for option grants often with the benefit of hindsight.  She was responsible for making sure that SafeNet correctly accounted for these options, which would have required recording an expense under APB 25 for the in-the-money amount.  She did not record such a charge.  The options affected included options for a wide range of officers and employees. (SafeNet issued grants to all employees.)  As the indictment notes, these included four such grants to Carole, which, at the time of issuance, had a potential in-the-money value of approximately $1.3 million. [2]

As Carole has agonized over how she came to commit this crime, she has focused on the October 1, 2001 grant.  On January 4, 2002, Carole received written approval from SafeNet's

---

[2]    Because Carole exercised only a portion of those options, she ultimately realized at most $236,000 of these potential gains.  *See* pp. 4-5 & n.3, and p. 9 n.9, *infra*.  Overall, according to a report provided to the defense by the Government, from 2000 through the second quarter of 2006, SafeNet understated its compensation expense under APB 25 for all of its option grants by a total of $13.7 million.  Of this in-the-money amount, SafeNet employees realized approximately $4 million by exercising options.  Stamm Rpt. ¶ 11.

Compensation Committee to issue options with the October 1, 2001 grant date to her CEO, herself and one other. She knew that these options had no connection to that grant date. Nonetheless, at her Former CEO's specific request, and with the Compensation Committee's permission, Carole used that grant date, on which the stock price was lower ($5.85) than on January 4, 2002 ($18.65). Not wanting to reveal the backdating, Carole then chose not to take the required compensation charge in SafeNet's filings. During the remainder of her tenure overseeing SafeNet's option granting, Carole fell into a pattern of selecting grant dates with low stock prices and not taking compensation charges. She sometimes justified this conduct to herself and others on the grounds that events on the nominal grant date supported the accounting, or that the Compensation Committee had signed off on that grant date. PSR Ltr. ¶ 14.

Carole's contemporaneous emails offer some insight into her motivation. She and SafeNet's other leaders believed that granting low-priced options helped SafeNet hire and retain talented people. She worried about morale if SafeNet's volatile stock price caused employees to receive options that were underwater by the time they were notified of the grant. In September 2004, she openly explained to her successor as CFO:

> Our past practice has been to aggregate options for performance awards or new hires in the quarter and pick the best price after the hire date. We then send the unanimous consent to the comp committee and the options are approved. *I think this is a good practice because of the volatility of our stock price. Who wants to have an option priced on your start date and then to have the option underwater a month later when you are notified of the award price.* (Emphasis added.)

Carole's actions since she was forced to resign from SafeNet in October 2006 demonstrate her exceptional acceptance of responsibility. First, SafeNet, at the time she resigned, was in the process of being sold to a private investor. Despite her departure, SafeNet's

board asked her to assist it with the sale. Dr. Shelley Harrison, a member of the board's Strategic

Committee, describes Carole's efforts:

> Carole was extremely devoted to that work. She worked almost full time as a point person between the company and its investment bankers Merrill Lynch, answering questions regarding operational and financial/accounting information, assisting and reviewing detailed support analyses, and discussions with potential buyers. She attended every due diligence meeting with Merrill Lynch and potential buyers during this period, often involving extensive travel. Although her departure had been officially announced, Carole remained dedicated to the company and was an integral part of the team that got the sale accomplished to the benefit of shareholders and employees alike. (Letter by Dr. Shelley Harrison.)

A Merrill Lynch investment banker who worked on the sale similarly writes that Carole's

"concern about the company's shareholders and her former colleagues was evident." (Letter by

Cavan Young.) And Christopher Nicholson, writing on behalf of the eventual buyer, states that

Carole was a "powerful and dedicated advocate" and that "without her involvement in the due

diligence process, I do not believe that Vector would have been able to offer SafeNet

shareholders the substantial premium price we ultimately did." (Letter by Christopher

Nicholson.) SafeNet was sold in April 2007 to Vector Capital for $28.75 per share. This was $9

a share *above* SafeNet's closing stock price on May 18, 2006, immediately before the stock

options accounting issue at SafeNet was first announced.

Second, in March 2007, well before indictment, as part of a settlement with SafeNet,

Carole voluntarily disgorged all her actual gains ($236,000) from exercising "in-the-money"

options. These gains were all attributable to the October 1, 2001 grant (the only grant in the

indictment from which Carole had exercised options). She also cancelled the remaining

unexercised options from this grant, and repriced all the options SafeNet asked her to, so as to

eliminate the "in-the-money" benefit.  As a result of these actions, the Government is not pursuing forfeiture.  PSR Addendum ("PSR Add.") at 36; PSR Ltr. ¶ 4. [3]

Third, as the Court is aware, Carole pled guilty promptly after indictment.  She did so after we were unable to persuade the Government to exercise its discretion not to pursue charges.  Her early guilty plea spared the Government and the Court substantial time and resources.

Carole's offense is undeniably serious.  But, in assessing the severity of the offense under § 3553(a), it should be kept in proper perspective.  Two points of reference are useful.

The first is to defendants in other options-backdating cases.  Carole will be the fourth such defendant to be sentenced for a felony.[4]  The first, former Comverse general counsel William Sorin, pled guilty to conspiracy to commit federal securities fraud and agreed to a guideline offense level of 33 after acceptance of responsibility, based on a loss calculation of more than $50 million.  *See* Sent. Tr. at 9, *United States v. Sorin*, Case No. CR-06-723 (E.D.N.Y. May 10, 2007).  He was sentenced by Eastern District Judge Garaufis to a year and a day.  The second, former Take-Two CEO and Chairman Ryan Brant, pled guilty to a New York State felony.  He received probation as part of an agreement with the District Attorney for New York County.  *See* Sent. Tr. at 4, *People v. Brant*, Indt. No. 644-2007 (N.Y. Sup. Ct. Aug. 1, 2007). The third, former Brocade CEO Gregory Reyes, was convicted last fall of 10 counts of securities

---

[3]    In settling, Carole acceded to SafeNet's determination of the APB 25 "measurement date" for the October 1 grant, even though she knew this determination was arguably incorrect in a way that disfavored her.  PricewaterhouseCoopers, SafeNet's auditors, later concluded that an earlier measurement date (more favorable to Carole) was merited for part of that grant. Accepting PwC's calculations, Carole over-disgorged to SafeNet by $72,109.  PSR Ltr. ¶ 14.

[4]    In the overwhelming number of cases in which public companies have disclosed (or restated for) backdating of stock options no criminal prosecution has been brought.  In addition to the felony sentences, two executives at Take-Two pled guilty in New York State court to misdemeanor charges of falsifying business records.  Each was sentenced to probation.

fraud in the Northern District of California.  As of this writing, he has not been sentenced – sentencing is scheduled for January 16 – but the court (Judge Breyer) preliminarily calculated his guideline range as 15-21 months, based in part on the court's decision to reject the Government's measure of shareholder loss.  *See United States v. Reyes*, No. 3:06-cr-00556-CRB, Order re Sentencing Guidelines, slip op. at 11 (N.D. Cal. Nov. 27, 2007).[5]  While every case has unique facts, together, these cases appear to reflect an early "common law" understanding of the relative severity of this type of offense, a factor relevant to §§ 3553(a)(2)(A) and (a)(6).[6]

It is also useful to compare Carole's offense with other securities fraud offenses.  In the paradigmatic securities fraud case involving knowingly incorrect accounting, shareholders are harmed because the accounting error (typically an overstatement of revenues or an understatement of expenses) affects the measures of "earnings per share" that are consequential to analysts and investors.  The motivation to commit such offenses is often to distort the basic economics of the company, by falsifying such recurring items as revenue or cash expenses, so as to enable the company to appear to meet quarterly or annual targets for "pro forma" or "operating" earnings.

This case does not neatly fit that paradigm.  First, SafeNet's backdating was motivated, as Carole's contemporaneous email demonstrates, by a desire to fashion options that more

---

[5]     Papers filed by the parties after Judge Breyer's ruling agree that the Court used the wrong base offense level.  The corrected range is 18-24 months.

[6]     The amount of SafeNet's compensation expense understatement ($13.7 million) and the amount of gain realized by its employees ($4 million), *see* note 2, *supra*, are far smaller than the comparable figures at Sorin's, Brant's, and Reyes' companies.  Comverse (Sorin) announced a $314 million restatement; Comverse employees captured $53 million of this potential in-the-money gain.  Take-Two (Brant) announced a restatement of $42.1 million net of taxes.  Brocade (Reyes), announced a restatement of approximately $351 million.  The facts relating to Carole's personal gain also compare favorably to those relating to Sorin and Brant.  *See* note 9, *infra*.

effectively recruited and retained talent. It was not a stratagem aimed at deceiving the market about SafeNet's fundamental business prospects or a means of realizing earnings goals.

Second, as to its impact, it is quite arguable that SafeNet's failure to report APB 25 compensation expenses did not affect investors' assessments of SafeNet or cause shareholders to buy SafeNet's stock at inflated prices. For this reason, we take issue with the central premise underlying the PSR's sentencing recommendation, to wit, that the offense caused widespread harm to SafeNet shareholders. *See* PSR ¶ 59; PSR Add. 34; PSR Ltr. ¶ 4. As our expert Laura Stamm explains, based on her review of hundreds of analyst reports, analysts of SafeNet (like those of many other companies), in calculating "pro forma" earnings per share, consistently *excluded* accounting charges like those relating to option-based compensation because they did not affect the business' core fundamentals. The performance measures to which these analysts looked, such as revenues and operating expenses, were unaffected by whether or not the company reported such a charge. While shareholders were undeniably misled, and while we cannot dispute that the APB 25 calculation mattered to some investors or potential investors, it is far from clear that the company's stock price was inflated at all by virtue of the improper accounting. *See* Stamm Rpt. ¶¶ 7-31.[7] The absence of demonstrable shareholder harm sharply distinguishes this case from the ordinary securities fraud case based on improper accounting and merits a far lesser assessment under § 3553(a)(2)(A) of the "seriousness of the offense." Apart from the current backdating cases, we are not aware of any accounting-fraud prosecution where

---

[7]     As Ms. Stamm further shows, SafeNet's financial statements fully disclosed the number of options outstanding and the exercise prices attached to those options. This enabled an investor who wanted to consider the "cash" issue implicated by options pricing – how much cost SafeNet would incur in the future when and if the options were exercised – to make his or her own calculations of this figure. *See* Stamm Rpt. ¶ 31.

the accounting error did not affect "cash" or "pro forma" earnings.  Indeed, the absence of demonstrable shareholder harm may explain why so few prosecutions for options-backdating have been brought, relative to the many companies that have disclosed pervasive backdating.

In entering into a plea agreement, the parties stipulated to a Sentencing Guidelines "loss" amount of between $1 million and $2.5 million, but we came to that amount by different routes. We believe this range, which incorporates Carole's $1.3 million potential "in-the-money" gain from her options referenced in the indictment, is a correct application of Note 3(B) to U.S.S.G. § 2B1.1, which makes a defendant's gain an alternative under 2B1.1 when "loss… reasonably cannot be determined."  PSR Ltr. ¶11.[8]  But it is critical under § 3553(a)(2)(A) to recognize that this mechanistic Guidelines measure overstates the actual harm caused by Carole's offense.

---

[8]     The Government, whose analysis the PSR adopts, reaches its "loss" calculation result by taking investor losses attributable to SafeNet's stock drop on May 19, 2006 and discounting these losses by two-thirds (66%).  *See* PSR ¶ 59; PSR Add. 34.  But, as Ms. Stamm's discussion explains, for a variety of reasons, the stock drop on May 19 cannot comfortably be attributed to the underlying fraud, and the two-thirds discounting by the Government, while welcome, does not make the resultant number more reliable or create confidence that the amount does not overstate harm caused by the offense.  *See* Stamm Rpt. ¶¶  32-55; *United States v. Rutkoske,* 506 F.3d 170, 179 (2d Cir. 2007) ("we see no reason why considerations relevant to loss causation in a civil fraud case should not apply, at least as strongly, to a sentencing regime in which the amount of loss caused by the fraud is a critical determinant of the length of a defendant's sentence.").  For much the same reasons, we disagree with the PSR (¶ 136; PSR Add. 35-36) that the stock drop can be used as a basis to determine that restitution to shareholders is merited.  As Ms. Stamm demonstrates, including based on her review of contemporaneous analyst reports, the stock drop reflects nothing about SafeNet's fundamentals, which were unaddressed in the SafeNet press release that precipitated the stock drop.  The drop is instead best understood as reflecting investor anxiety about the company's future in light of criminal and SEC investigations into SafeNet's accounting for options and other issues, which the press release had revealed, and the series of negative announcements SafeNet had made in the months preceding it.  *See* Stamm Rpt. ¶¶ 36-47; *see also United States v. Olis*, Crim. No. H-03-217-01, 2006 WL 2716048, at *9 (S.D. Tex. Sept. 22, 2006) (rejecting Government's loss calculation as "overly simplistic because it fail[ed] to attribute any amount of the price drops or the loss of market confidence that caused them either to [other negative news], or to the cumulative effect that the steadily increasing number of negative announcements on … different issues was likely to have had on the company's stock price").  SafeNet's stock price rebound over the next 90 days further

This case entails far less injury to a corporation than the paradigmatic one in which the defendant has wrongly "gained" or misappropriated $1.3 million.  First, even if Carole had actually pocketed that sum, which she did not, her backdating cannot be cast as a theft or embezzlement from SafeNet.  That is because, whether or not the members of SafeNet's Compensation Committee appreciated that the company's accounting for these options was wrong, the Compensation Committee clearly approved the option grants, knowing the amount of options per recipient as well as the designated grant date (and therefore the exercise price).  This data was also reported in the company's financial (and proxy) statements.  Second, any gain to Carole was contingent on uncertain events well into the future – that the stock would hold its value, that Carole would still be employed as of the vesting date, and that Carole would exercise the option while it remained in-the-money.[9]

---

suggests that the price drop on May 19 was an "extreme reaction" even to the disclosure (of the government investigations) that *was* made.  *See* Stamm Rpt. ¶ 48-53; *Reyes*, Order re Sentencing Guidelines at 7.

[9]     Nor did Carole use her options as a get-rich-quick scheme.  During her seven years at SafeNet, Carole exercised just 58,500 of the 335,000 options she received, and the majority of those options (40,000) came from the grant she received in connection with her initial job acceptance, which is not part of the indictment.  The other 18,500 options she exercised came from the October 1, 2001 grant.  She used her own money to pay for the exercise of those options and then held the stock as an investment (rather than liquidating it).  As we have noted, Carole long ago disgorged these gains.  By contrast, in the other backdating cases discussed above:  Ryan Brant granted options to himself and others without any board approval, exercised all the options he received, and sold the shares underlying the options; he ultimately disgorged gains of $4,118,093.  *See* Lit. Rel. 20003, *SEC v. Brant*, Case No. 07-CV-1075, 2007 WL 470385, at *1 (S.D.N.Y. Feb. 14, 2007).  William Sorin realized over $14 million from the sale of stock underlying his backdated options.  *See* Compl., *SEC v. Alexander*, Case No. 1:06-CV-03844, 2006 WL 3043892, at ¶ 7 (E.D.N.Y. Aug. 9, 2006).  As for Gregory Reyes, the Government alleged at sentencing that he had gained over $5 million from a backdated grant, but Judge Breyer held that the Government had not established that that grant had, in fact, been backdated.  *See Reyes*, Order re Sentencing Guidelines at 10.

II.    **Carole's Life and Character and The Vital Role She Plays in the Lives of Her Nuclear, Extended and Adopted Families**

In this section, we focus on the parts of Carole's life that are particularly important to assessing her "history and characteristics" under § 3553(a)(1): her devotion to her family; her deep-seated generosity and desire to help others; the loyalty she inspired among her colleagues at SafeNet; and her commitment to make the best of her current situation and to use it constructively. We also address Carole's close bond with her three children, Michael (age 15), Peter (age 12), and Alexandra (age 10), and, in particular, the critical role she plays in addressing Michael's anxiety disorder. We also address the unique role she plays in the lives of her widowed sister, Cynthia Jones, and Cynthia's children, Nick (age 15) and Lena (age 13); and in supporting her friend, Jennifer Brown, and Jennifer's children Olivia (age 14) and Tom (age 12). As a result of Carole's vital, irreplaceable contributions to these three families, we ask the Court to depart downward pursuant to U.S.S.G. § 5H1.6, or, alternatively, to consider these facts as mitigating "history and characteristics" meriting a non-custodial sentence under § 3553(a)(1).[10]

A.    **Carole's Immediate Family**

Carole's parents met while her father, an American, was working for a defense contractor in the Philippines. Her father's parents shunned him for marrying outside his race. Carole's

---

[10]    Downward departures are appropriate to reflect "extraordinary" or "exceptional" family responsibilities. *See United States v. Johnson*, 964 F.2d 124, 129 (2d Cir. 1992); *United States v. Galante*, 111 F.3d 1029, 1034 (2d Cir. 1997). Courts have granted departures because of the hardship the defendant's absence would cause extended family, *see Galante*, 111 F.3d at 1032 (upholding departure based in part on care defendant provided to disabled father); *United States v. Rose*, 885 F. Supp. 62, 63 (E.D.N.Y. 1995) (departing because defendant acted as a surrogate father and role model for four second cousins); *United States v. McGee*, 802 F. Supp. 843, 844 (E.D.N.Y. 1992) (departing based in part on defendant's care for 11-year-old nephew), as well as non-family members, s*ee United States v. Sclamo*, 997 F.2d 970, 972 (1st Cir. 1993) (upholding departure for defendant who had "special and crucially important relationship" with girlfriend's 12-year-old son and was essential to his continued progress in treatment for ADHD).

immediate family was all she had; from that, Carole learned that "blood is thicker than water." (Letter by Cynthia Jones.) Carole has lived by that mantra. Many letters describe Carole as the "glue" and "rock" behind her family (Letters by Sylvia Francis; Patrick Gillis; Paul Ahn; Annette Argo O'Brien; Francoise Blaise), and Carole's siblings, Cynthia Jones and Charles Jones, note that this was true even when she was a child. (Letters by Cynthia Jones; Charles Jones.)

Carole is now 46 years old. She has been married happily to Stephen Argo, for almost 25 years, and they have three school-age children. Carole and Stephen met in college at the Wendy's where Carole worked nights to pay for school. (Letter by Stephen Argo.)

Even though Carole built a successful career, her family was "her top priority and then came SafeNet." (Letter by Diane Bush.) No matter what, Carole "would take time off from work to attend one of her children's school activities or get a phone call from one of her children…." (Letter by John Cetrone.) As the Argos' former nanny, Pamela Jester recalls:

> [Carole] would go on trips and call [her children] everyday she was away, no matter how little the time. She wanted to know all about their day and they loved to share with her. She always took time to talk with them and spend time listening to them eating up each moment. (Letter by Pamela Jester; *see also* Letter by Cara Cline-Thomas.)

Carole has always been an active parent, immersing herself in her children's lives and organizing the household. For example, in 2004, Carole started and ran a Cub Scout troop at her church because Peter wanted to be scout. (Letter by Monsignor Armstrong.) Carole now serves, among other things, as a volunteer substitute teacher at her church, as a Parent Representative at Peter's school doing "often thankless tasks with enthusiasm," and as a volunteer in the bookstore at Michael's school. (Letters by Monsignor Armstrong; W. Brooks Paternotte; Ellen Brinkley.) One friend calls Carole the "perpetual volunteer." (Letter by Susan Roswell.) Another describes

Carole "organiz[ing] snack schedules and provid[ing] rides and refreshments for players" on her children's teams. (Letter by Mary and Scott Daugherty; *see also* Letter by Susan Roswell.)

Even when she was working, Carole single-handedly organized her household, taking "care of all the kids' plans, schooling, activities, medical needs and others." (Letter by Pamela Jester; *see also* Letters by Stephen Argo; Cynthia Jones.) A friend describes how Carole put together a binder of events and directions to help Stephen and her navigate a recent weekend full of activities and appointments – although Stephen still got lost finding Alex's soccer field and called Carole for guidance. (Letter by Kelly Pickard; *see also* Letter by Cynthia Jones.)

To Carole, the one good thing that has come from her current situation is that she has been able to spend more time with her children. She has a special bond with each of them.

> [Carole] showed a tremendous amount of love to all three children, Michael, Peter, and Alexandra, who is my Godchild. Needless to say that her children returned her love tenfold. Besides her great love for the children she also taught them compassion for others and always a sense of fairplay. She would always manage to communicate life lessons while playing the simplest of board games. She had quite a unique gift for this. (Letter by Arthur Gormley; *see also* Letter by Laurie McCuskie.)

Michael (age 15) is Carole's oldest child. He is smart, studious, sensitive, and polite with adults. However, as a result of being bullied and systematically ostracized at school, he suffers from anxiety disorder, as well as ADHD, and avoids social interaction with peers. He chooses to bury himself in the library and to "sit[] alone in the classroom, physically separated from his classmates." (Letter by Lisa Countess; *see also* Letter by Sue Schneckloth.) In the rare circumstance when he tries to socialize with peers, "Michael finds it difficult to recognize appropriate boundaries. He can take a joke too far, and result in being insensitive or insulting to his peers." (Letter by Lisa Countess.)

Carole is Michael's best friend and his strongest champion. When Carole discovered how bad Michael's situation was, she found him a new school. When he did not improve on his own, Carole sought out a psychologist. Dr. Mark Reader, who has written on Michael's behalf, confirms that Carole has been "the chief architect in facilitating" Michael's improvement.

As Dr. Reader's letter explains, Carole is "critical" to helping Michael learn to interact normally with his peers before the time comes for him to leave the Argo home.[11] (Letter by Dr. Reader.) Therapy is not enough. Rather, "the prognosis for [Michael's] type of situation is guarded at best if there is not a parent on the front lines to assist in reinforcing what is being learnt in therapy." (Letter by Dr. Reader.) In Michael's case, that parent must be Carole. Michael is uniquely responsive to Carole's guidance, and Carole is uniquely capable of being a constant, full-time coach for Michael. As Dr. Reader explains:

> [I]t is Michael's unique relationship with his mother that allows her (*and no one else*) to serve as a coach without any type of backlash. She is the primary person he can confide in as well as take advice from when it comes to dealing with these social issues. He really is receptive to her feedback and does not take it as criticism, as is often the case with adolescents. (Emphasis added.)
>
> ***
>
> By continually talking with him about this topic, "tweaking" his behavior so that it is more inviting to others…, helping him make sense of reported social situations, and nudging him to make plans, Mrs. Argo has helped Michael as he has gradually started to come out of his shell and move in the right direction. (Letter by Dr. Reader.)

Michael's teachers confirm Carole's vital help. Lisa Countess, Michael's Latin teacher, describes watching Carole guide Michael on a school trip: "When Michael made a social gaffe,

---

[11]    *See United States v. Spero*, 382 F.3d 803, 805 (8th Cir. 2004) ("When one parent is critical to a child's well-being, as in this case, that qualifies as an exceptional circumstance justifying a downward departure").

his mom patiently and lovingly tried to help him to recognize why his remarks may have been inappropriate, and to develop empathy for others.  When Michael preferred to cling to the adults, she gently nudged him to interact with the other student[s].”   (Letter by Lisa Countess.) Michael's advisor, Sue Schneckloth, explains that Carole supported her suggestion that Michael join the track team and then took up running as a hobby and joined Michael in a ten-mile race last spring.  (Letter by Sue Schneckloth.)

    Like Carole, Ms. Countess, Ms. Schneckloth and Dr. Reader all worry about what will happen to Michael without Carole's friendship, support, and involvement.  Without Carole, Dr. Reader fears that Michael “will not only stop making progress but that he will also lose whatever gains he has made socially and retreat back into a fantasy world.”  (Letter by Dr. Reader.)  Time is short, as Michael is a high-school sophomore.  As Dr. Reader explains, if Michael is ever to conquer his social anxiety, he must do so before college.  (Letter by Dr. Reader.)

    Peter (age 12) is Carole's middle child.  He is a gregarious and active boy who has recently started acting out.  In response, “Carole has worked closely and supportively with [Peter's school] to help Peter become a better citizen.”  (Letter by Rich Zielaskiewicz.)  Carole also recognized that Peter's test scores for reading skills had slipped, and she worked with the school's learning specialist to map out an improvement program.  Characteristically, it is Carole who is helping Peter address his reading difficulties.  As his father explains, Peter refuses to read with him, too self-conscious to display weakness in front of his father.  (Letter by Stephen Argo.) One of Peter's teachers writes that he is “more worried about Peter than Carole.”

> Socially, he seems to be straddling the proverbial fence right now. Academically, he has newly diagnosed learning issues. Consequently, Peter will need strong, comprehensive support, … particularly from his mother, in order to ensure a positive course. (Letter by Rich Zielaskiewicz; *see also* Letter by W. Brooks Paternotte.)

- 14 -

Alexandra (age 10) is Carole's only daughter; even for mothers and daughters they are extremely close.  A former colleague remembers Carole taking Alex to an employee's wedding so that they could spend the afternoon together, dancing and laughing.  (Letter by Cara Cline-Thomas.)  Stephen Argo explains:  "They have already developed a relationship where they talk about things that ten-year olds consider important and that men don't like to talk about."  (Letter by Stephen Argo.)  The director of Alex's school explains that "Alex and her mother have an incredible bond" and addresses the impact Carole's situation has already had on Alex:

> Until this turn of events for the Argo family, Alex could be described as a very confident, relaxed and independent girl. Lately, Alex has become clingy to her teacher and tearful at the slightest disappointment.…  During the day, at lunch or recess, this little girl who is usually vivacious and self sufficient has been seen with tears in her eyes and needing additional support from her friends and teachers.…  Family is at the core of what makes this little girl special and what keeps her grounded.  Her mom's absence would be devastating for Alex.  (Letter by Linda Butler.)

### B.    Carole's Devotion to Her Extended Family

Carole's extended family – her widowed sister and her two school-age children, Carole's brother and his wife and children, and Carole's mother – are also focal points of her life, and Carole is central to theirs.  Carole's siblings and her sister-in-law speak lovingly of Carole's enthusiasm for family and her willingness to help whenever it is needed.  (Letters by Cynthia Jones; Charles Jones; Erika Jones.)

Carole has always been extremely close to her older sister, Cynthia Jones.  In fact, Carole and Cynthia planned their first children together so that they, too, would be close.  Over the years, Carole has chosen to live near and with Cynthia.  Carole has traveled around the world to visit Cynthia and her (now deceased) husband, Colonel Jon Jones, wherever they were stationed.

Carole traveled to Georgia to be with Cynthia and Cynthia's children, Nick (age 15) and Lena (age 13), when Jon was deployed in the Iraq war. (Letters by Cynthia Jones; Stephen Argo.)

Jon's tragic death from brain cancer, however, 12 days after he returned from the Iraq war, devastated Cynthia and altered her relationship with Carole. Starting June 6, 2004, Cynthia's family became the second family for whom Carole plays a critical and irreplaceable role. Carole was by Cynthia's side during Jon's medical treatment and supported her when Jon went back to war despite treatment. And, after he died, Carole put aside her own grief and handled everything for Cynthia. She organized and paid for Jon's funeral receptions; she packed up Cynthia's house and moved them back to their permanent home in Washington, D.C. Carole collected Jon's things to give to Nick one day. (Letters by Cynthia Jones; Stephen Argo; Kim Cincotti; Elizabeth Lewis; Ronald Seldon.) A friend describes Cynthia's emotional reliance on Carole during this period: "As much as she did [to organize the memorials], the thing that I remember most was that [Carole] was never far away from her sister. I would see Cynthia look up from time to time searching the room and when her eyes landed on Carole it was as if she could take a deep breath and move on." (Letter by Shannon Doerer.)

After Jon's death, Carole supported her sister financially, allowing Cynthia to be a stay-at-home mother and to remain in the house she bought with Jon in Washington D.C. Cynthia initially tried to work, but gave up after her father passed three away months later. "I couldn't stand the thought of not being there for my children for their games, field trips[,] all those things. It was my sister who said [']whatever you want to do for you and the kids don't worry about money[.] I'll take care of you.[']" (Letter by Cynthia Jones.)

More importantly, Carole is the person Cynthia's looks to for support as she tries to deal with her husband's passing and raise her children. Francoise Blais, Cynthia's friend, explains:

> I have seen Cynthia become very overwhelmed when day to day minor annoyances all collide and become one huge stressful cluster and even though I was standing right there, Cynthia picks up that phone, pushes speed dial and Carole is on the phone calming her down and saying – ok, this is what we are going to do.  (Letter by Francoise Blais.)

Cynthia herself realizes the lasting effect of Jon's death and how she has come to rely on Carole. "I am not the person I was before my husband died and I'm just not capable of doing what were once routine things.  I depend so completely on my sister to help in decision making, financial decision, day-to-day dealings with the world, everything."  (Letter by Cynthia Jones.)

Cynthia's primary concern, though, is the effect this will have on her two children, with whom Carole is very close.  Carole is their second parent, a confidant, and a source of fun and joy, especially since they lost their father suddenly at such an impressionable age.  A close friend explains that "Carole has become a parental figure of strength and wisdom, which Nick and Lena are very fortunate to have.  She is certainly a crucial source of care and compassion in their lives…."  (Letter by Ronald Seldon.)  Another writes:

> Carole is the one who has taken the children shopping to buy their mother's Christmas and birthday presents, and she is the one holding their mother's hand and helping her cheer when Lena and Nick graduate, score a goal, or take a bow.  Quite simply, it seems to me that Carole is fundamental, on a daily basis, to the healing and well-being of a wounded family that has already been stressed too far.  (Letter by Elizabeth Lewis.)

Numerous additional friends confirm Carole's critical role as Cynthia's rock and her children's second parent.  (Letters by Francoise Blais; Sylvia Francis; Patrick Gillis; Mary Landrieu.) Many letters state their fear about what will happen to the Joneses if Carole is absent from their lives. (Letters by Sylvia Francis; Julia C. Hufstedler; Mary Landrieu.)  Ronald Seldon expresses that concern:  "The idea of losing their connection with their Aunt Carole, and the fact that they are so close, is a burden that they very well may not be able to bear."  (Letter by Ronald Seldon.)

Carole is also very close to her mother and is actively involved in her life. When Carole's father died in 2004, a few months after Jon, Carole was the sibling who traveled to Florida to sort out the estate and the family's bills. To this day, Carole oversees her mother's bills and finances, completes her taxes, and takes her to doctor's appointments. Carole's mother has not written to the Court because her health is poor, and, in response to previous family traumas, she has suffered serious psychological breakdowns. As a result, Carole and her siblings have made the difficult choice not to tell her about the indictment, the guilty plea, and the sentencing until they know its outcome. (Letters by Stephen Argo; Cynthia Jones; Erika Jones.)

### C.    Carole's Private Generosity

Many letter-writers have a story to share about Carole taking time out to help them. Each says that Carole never hesitated, but just jumped in to pick up wherever a hand was needed. Not one suggests that she expected anything in return. When her husband's uncle, Bobby Gormley, fell ill from a brain hemorrhage, and his family feared he would lose his tax consulting business, Carole stepped in and saw his clients on evenings and weekends. Mr. Gormley subsequently died, but the family, with Carole's help, was able to sell his business. (Letters by Alphonse and Alice Argo; Arthur Gormley.) When Carole's father-in-law fell and broke his back, she packed up Michael, then two months old, and traveled from Maryland to New York to help. (Letter by Alice and Alphonse Argo.) When a close friend was struggling with a family problem, Carole and Stephen "took me in for several days so that I could sort things out." (Letter by Greg Wade.) When another friend went through a period of depression, "Carole was there for me, offering me words of encouragement and advice." (Letter by Daniel Pisano.) When Stephen's sister had marital issues, Carole listened; and following the divorce, Carole and Stephen "helped move my

furniture with their small truck….”  (Letter by Annette Argo-O'Brien.)  Robert Rock, another friend, articulates the thoughts of many others:

> In every aspect of Carole's personal life with which I am familiar; her family, her friends, her co-workers, retail clerks, domestic and household workers, taxi drivers, even complete strangers; Carole has treated them with respect, integrity, kindness, fairness, and generosity.  She has always put the desires, comfort, happiness or welfare of others before herself, and I have seen this time and time again…. There is not a selfish or self-serving bone in her body. (Letter by Robert Rock.)

The most powerful example of Carole's selflessness is Carole's remarkable relationship with Jennifer Brown and her two children, Olivia (age 14) and Tom (age 12).  The Browns are the third family for whom Carole plays a critical, irreplaceable support role.  Jennifer and Carole became friends when they met at orientation for Tom's and Peter's kindergarten class.  Carole learned later that Olivia had suffered a great tragedy, and Carole has responded in an extraordinary way.  When Olivia was three, she suffered extensive brain damage as the result of seizures brought on by a high fever. Now age 14, and after numerous surgeries and medical crises, Olivia has the mental capacity of an infant, in the body of a 90-pound quadriplegic.

At first, Carole helped Jennifer with Tom.  When Jennifer and her husband were at the hospital with Olivia, Carole regularly provided him, in his mother's words, “a real family environment for a boy who had no idea which end was up, if his sister was going to live or die.” (Letter by Jennifer Brown.)  Jennifer believes Carole has taken Tom into her home for at least 15 to 20 days a year for each of the last 8 years.

More recently, after Carole left SafeNet, Carole became the first friend to ever offer to care for Olivia, allowing Jennifer, who works at home, the ability to travel for her job with peace of mind and then to take a long-needed vacation with her husband.  Jennifer's letter explains what it means to care for Olivia.

> Carole learned about all of [Olivia's] medications; learned how to feed her through her G-tube; learned to change her diapers; learned how to respond to seizures and emergencies; learned how to operate her oxygen machine; learned how to give her breathing and nebulizer treatments; learned how to transition her from her wheelchair to the lift or into bed; learned how to put Olivia into the van; and learned how to use the outside lift. (Letter by Jennifer Brown.)

More compelling, however, than the tasks Carole does is the loving way she does them.

> Carole treats my daughter like a PERSON. People look at children like Olivia without remembering that they need warmth, love, touch and intimacy in addition to medical and care-giving duties. Caregivers often ignore these kids. But Carole really cares about Olivia…. Carole CONNECTS with Olivia and Olivia responds to Carole -- they have a bond, a relationship. Carole reads to her, talks to her, fixes her hair and holds her. (Letter by Jennifer Brown.)

Characteristically of Carole, when our team has expressed amazement at Carole's contributions to the Browns, Carole has shrugged it off as nothing – just a thing a friend does for another.

Jennifer views Carole's contributions differently. In her letter, she concludes by discussing her continuing reliance on Carole:

> We will continue to count on Carole – Olivia will of course, get sick again; Tom will need a loving second-home again; and yes, we will despair again. I will continue to need someone to pitch in, to trust and to talk to everyday. I have no idea how I am going to get by if Carole is not here to help me. (Letter by Jennifer Brown.)

*       *       *

As the assembled letters demonstrate, Carole thus provides vital support to three families – her own, her sister's, and her friend's. (We therefore, respectfully, must strongly disagree with the PSR's statement that Carole, if incarcerated, could be replaced by Stephen Argo or "other people." PSR Add. 34.) For Michael and Peter, Carole is the critical person helping each deal with, and hopefully surmount, distinct developmental difficulties. While Stephen is a loving

father, his relationship with the children, and his need to support the family financially, do not permit him to help them in the way Carole does.[12]  For Cynthia, Carole is her foundation and source of guidance and clarity, and for her two children, Carole is the second parent and a constant source of joy.  As the letters make clear, no one else has provided Cynthia with this emotional support as she has struggled for more than three years to come to grips with her husband's death.  For Jennifer, no one else provides her the same peace of mind that her daughter will be treated well and with love.  No other friend has offered to help.  And, with the family's extensive medical bills, they cannot afford the kind of home care that Olivia needs, and Jennifer's father recently began cancer treatment, further limiting her parents' ability to assist.

### D.    The Thoughts of Carole's Former Colleagues at SafeNet

Many current and former SafeNet employees – including senior executives – have written on Carole's behalf.  What is most striking from their letters is their continuing admiration and fondness for Carole.  Some explicitly state that they would love the opportunity to work with her again, (Letters by Diane Bush; Prakash Panjwani; Diane Smith), others report how much she is missed.  (Letters by Andrew Gromada; Jill Pulliam; Phillip Saunders.)

When Carole joined SafeNet, it employed fewer than 150 people and had annual revenues of less than $20 million per year.  (Letter by Thomas France.)  Today, SafeNet employs 1,100 people in 21 countries and generates over $300 million in revenues.  (Letter by Prakash

---

[12]    It is unrealistic, as a practical matter, for Stephen to fill Carole's shoes.  Stephen needs to be the family's breadwinner.  Until recently, Stephen was a Vice President at Danaher Tool Group, responsible worldwide for Product Marketing, R&D, Brand Management and Business Development.  He lost his job as the result of a corporate restructuring.  Stephen must now focus his attention on finding a new job, which will likely require him to commute weekly to work out of state.  (Letter by Jeffrey Svoboda.)  The Argos cannot move because Michael, in particular, needs the stability of a consistent school environment and psychologist.

Panjwani.)  Many credit Carole with SafeNet's significant growth and its current success.  Her presence helped change SafeNet from "a 'mom and pop' operation, to a solid, big-company operation."  (Letter by Kristin Diggs.)  Prakash Panjwani, SafeNet's Senior Vice President and General Manager of SafeNet's Commercial Security Division, writes:  "None of this – [the] company's growth, ability to employ several very talented and content professionals across the globe… – would have happened but for Carole's role and hard work over several years at SafeNet."  (Letter by Prakash Panjwani.)  Chris Fedde, the current President and Chief Operating Officer of SafeNet, echoes these sentiments, and emphasizes Carole's patriotism for energetically but discreetly tending to the needs of SafeNet's national security-related customers.  (Letter by Chris Fedde.)  Former Board member Shelley Harrison explains that, during much of the time Carole worked at SafeNet, she acted as "both the CFO and de facto COO" and that she was a "major contributor to the significant growth, success, and performance of SafeNet and ever responsive to the CEO Tony Caputo's strategies and direction."  (Letter by Shelley Harrison.)

Carole's contributions to SafeNet, however, were more than economic.  Carole's former Executive Assistant Jill Pulliam writes: "Carole has impacted numerous people in great ways with her management style, work ethic and care for employees.  I would hear this on a daily basis, even today."  (Letter by Jill Pulliam.)  Indeed, a number of people write about Carole's collegiality, loyalty to SafeNet's employees and compassion for others, as well as her passion for SafeNet and dedication to her job.  (Letters by Cara Cline-Thomas; Thomas France; Prakash Panjwani; Donna St. Germain.)  Many also write about how Carole's enthusiasm led them to work at SafeNet and how her mentorship improved their careers and positively affected the way in which they approach their jobs.  (Letters by John Cetrone; Kristen Diggs; Andrew Gromada; Jack Hembrough; Prakash Panjwani; Rhonda Wallace.)

Finally, her colleagues make it clear that Carole never asked for more compensation or acted with a sense of entitlement. The opposite was true. Dr. Harrison writes:

> Carole was a strong advocate for recognition of contributions and excellence of executives and employees alike. Early on I expressed to Carole and then [former CEO Tony] Caputo, on her behalf, that she was underappreciated in compensation and recognition of accomplishments. She rarely complained or asked anything for herself. Success of the company and its people and satisfaction of customers were always her primary concern. (Letter by Dr. Shelley Harrison.)

Carole argued for executive pay cuts and against executive bonuses. (Letters by Rick Geritz; Diane Smith.) She also regularly paid for executive meeting lunches out of her own pocket, (Letter by Diane Bush), and, famously, refused to fly business class. (Letters by Jill Pulliam; John Cetrone; Phillip Saunders.) As her assistant explains, "[s]he would have me find her the cheapest flights and get her a seat in 'COACH' at whatever airport was cheaper to fly from…." (Letter by Diane Bush.) One executive hoped this policy would change after he and Carole flew 15 hours from Hong Kong to Chicago, but "[s]he immediately responded – hey, we were in economy plus (which meant we had two extra inches!) – and that wasn't so bad; think of all the people who were in the back of the plane." (Letter by Prakash Panjwani.)

## E.    Making the Best of the Situation and Moving Forward After SafeNet

SafeNet's investigation for backdating, as well as Carole's subsequent indictment and guilty plea, has been front-page news in Baltimore since May 2006. (Letter by Ellen Brinkley.) But Carole has chosen not to hide. Rather, she has continued to move forward and make the best of things by using her time to help the Browns, to volunteer at her children's schools, by helping complete the sale of SafeNet, and by placing the interests of others first.

Carole has also increased her involvement in the community. She expanded her role with Family Tree, a Maryland non-profit organization focused on combating child abuse and neglect.

Last summer, Carole helped organize Family Tree's first community outreach program, attending meetings, raising money, recruiting volunteers, and identifying partners.  Carole then brought Michael to the event, "making and handing out cotton candy to throngs of children." (Letter by Ellen Brinkley; *see also* Letter by Douglas Brinkley.)  Family Tree asked her to chair the event in 2008, which she first agreed to do before concluding that her indictment precluded her from being a public face for Family Tree.

Throughout, "[Carole's] main concern has always been the impact that this will have upon her family," and Carole has remained publicly active to support them in their activities and to set a good example.  (Letter by Ellen Brinkley.)  "Despite scathing articles in the local paper, [Carole] has never missed a soccer game, a field hockey game, a school meeting or any obligation."  (Letter by Ellen Brinkley.)  Before Carole pled guilty, she went to each of her children's schools to explain the situation with the hope of setting up a support system for them. Michael's advisor, Ms. Schneckloth, describes Carole's honest focus and courage.

> Carole set up a meeting with myself, Emily Love (upper school counselor) and Peter Gilmore (upper school principal) on October 4, 2007.  At that time, she was very forthright about her situation, stating that she would be pleading guilty and sentenced in the beginning of next year.  She came to us with her concern for Michael's academic, mental and emotional well-being.  I must admit that I was truly impressed by the courage that it took for her to do this.  When the counselor asked if we should inform all of Michael's teachers about the situation, the principal quickly stated that he didn't feel that it was necessary.  He felt that this was a private, family matter and we could keep it as confidential as possible.  Carole quickly replied that this was not about her, but rather about Michael.   Anything that would help increase Michael's support system was what she wanted to do.  (Letter by Sue Schneckloth.)

Finally, as Carole writes, she has decided to use her situation to teach her children how to face up to one's mistakes.

- 24 -

> Now I have [a] very close lesson for my children: people make
> mistakes and what defines the person is how they handle the
> mistake and how, as a person, they right the wrong.  Do they hide
> behind excuses or do they stand up to face their mistakes, own
> them and then make atonements?  (Letter by Carole Argo.)

**Conclusion**

Section 3553(a) requires a "sentence sufficient, but not greater than necessary."  On the facts at hand, we submit that a sentence of probation is merited (with all conditions the court finds appropriate, which might include home confinement, extensive community service, and a bar on service as an officer or director of a publicly traded company).  Carole has already been punished and shamed.  This was her first offense, and she presents, we submit, no risk whatsoever of recidivism.  She has lost her career, and will not be an officer of a public company again.  Her prosecution (and those of others) has already sent a strong deterrent message that options backdating and accounting fraud generally are not tolerated.  Such a sentence, we submit, adequately balances the social need for punishment against her own character and contributions, her acceptance of responsibility, and the demonstrated needs of others.

Dated:  January 16, 2008
        New York, New York

                                     Respectfully submitted,

                              By:      /s/ Paul A. Engelmayer

                                     WILMER CUTLER PICKERING
                                          HALE AND DORR LLP
                                     Paul A. Engelmayer (PE-6760)
                                     Matthew B. Holmwood (Pro Hac Vice)
                                     *Counsel for Defendant Carole Argo*