UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA       :    Case No. 07-CR-00683 (JSR)
*Electronically filed*

:

     vs.                        :

CAROLE ARGO,               :

               Defendant.      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**APPENDIX II TO
SENTENCING MEMORANDUM
IN AID OF CAROLE D. ARGO
(SENTENCING DATE: JANUARY 28, 2008)**

Paul A. Engelmayer (PE-6760)
WILMER CUTLER PICKERING
      HALE AND DORR LLP
399 Park Avenue
New York, New York 10022
Tel: (212) 230.8800
Fax: (212) 230.8888
Paul.Engelmayer@wilmerhale.com

Matthew B. Holmwood (Pro Hac Vice)
WILMER CUTLER PICKERING
      HALE AND DORR LLP
1875 Pennsylvania Avenue
Washington D.C. 20006
Tel: (202) 663.6449
Fax: (202) 663.6363
Matthew.Holmwood@wilmerhale.com

Counsel for Defendant Carole Argo

# Report

## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

### *United States of America v. Carole Argo*

---

### REPORT
### OF
### LAURA B. STAMM

January 11, 2008

---

## I.     Introduction

### A.     Assignment

1. I have been retained by counsel for defendant Carole Argo to supply expert analysis in this matter. I understand that Ms. Argo has pleaded guilty to securities fraud charges related to the backdating of employee stock option ("ESO") grants while she was an officer of SafeNet, Inc. ("SafeNet" or "the Company"). Counsel for Ms. Argo has requested that I prepare this report to summarize research and analysis I have done. My research and analysis relates to the issue of whether SafeNet's stock price was affected by the incorrect accounting that resulted from the backdating of ESOs. I understand that this research and analysis may be relevant to two issues at Ms. Argo's sentencing. These are (a) the extent, if any, which shareholders of SafeNet are properly regarded as having been harmed by the improper accounting for the Company's ESO grants; and (b) whether it is appropriate to award restitution to shareholders of the Company. Specifically, counsel has asked me to address these two questions:

   - Is it likely that SafeNet's stock price was inflated during the course of the alleged scheme as a result of the Company's improper accounting treatment of ESO grants in its financial statements?

   - Does SafeNet's 22% stock price decline on May 19, 2006, following the Company's announcement of Justice Department and Securities and Exchange Commission investigations into backdating and other alleged accounting improprieties, provide a reliable basis upon which one can reasonably estimate shareholder loss, if any, attributable to the Company's improper accounting treatment of ESO grants in its financial statements?

**B.    Summary of Conclusions**

2.    The error in SafeNet's accounting was that the Company reported no compensation expenses for its ESO grants, whereas, under APB 25, for certain ESO grants, it was required to report a compensation expense keyed to the options' "intrinsic value." This value is measured as the difference between the exercise price chosen for the stock option and the higher stock price that existed on the APB 25 "measurement date" (the date on which the decision to issue a particular number of options at a particular price was made by the body authorized to grant such options), multiplied by the number of options so affected. The Government has calculated a compensation expense understatement of $13.7 million over a period of more than five years. The magnitude of this misstatement is relatively small compared to SafeNet's total operating expenses (just under 4%).

3.    In my opinion, it is very unlikely that SafeNet's stock price was inflated as a result of the failure to report any intrinsic value for these ESOs. I base this conclusion on the following findings, on which I elaborate later in this report:

- "Intrinsic value" compensation expense for ESO grants under APB 25 is a non-cash expense, one which is measured according to an accounting convention which has little relationship to the company's actual performance. Unlike revenues and cash expenses, such "intrinsic value" expense calculations demonstrably appear to have had little significance to analysts and investors:

  - In instances in which accounting errors have been determined to have inflated a company's stock price, the accounting variable that has been improperly reported is generally one that affects the "fundamentals" of the company on which stock market experts focus (*e.g.*, overstatement of revenues or understatement of cash expenses).

  - The intrinsic value of stock options under APB 25 is not such a variable. It does not reflect a current cash expense nor is it a good proxy for some future cash expense associated with the discounted sale of stock. Analysts that followed SafeNet, like those that followed other companies, consistently focused their analyses of the Company's performance on measures of "pro-forma" operating income that specifically excluded non-cash or non-recurring expenses.

  - Consistent with this, following the adoption in January 2006 of FAS 123R, which, effectively superseded APB 25 and required companies to account for the "fair value" of ESOs as a compensation expense, analysts of SafeNet (and other companies) specifically

*excluded* compensation expenses under FAS 123R from their calculations of earnings per share (EPS) and other analyses of the Company's income, performance and valuation.

- Based on my review of hundreds of analyst reports relating to SafeNet, analysts of SafeNet rarely discussed compensation expenses or options-related expenses prior to the May 18, 2006 disclosure of federal criminal and SEC investigations into options backdating and other accounting issues. Even after that disclosure, the analyst reports for the Company addressing this disclosure and subsequent events, while extensively discussing the impact of the newly disclosed investigations on the Company's stability and future, did not suggest that the Company's inherent financial position was weaker than had been perceived before the understatement of ESO expenses came to light.

- SafeNet was acquired in 2007, and for purposes of determining a fair price for the Company, investment bankers for both the acquirer and SafeNet used a measure of income that excluded ESO expenses.

- ESO grants may affect a company's value in two ways:  (a) by affecting cash flow at the time of exercise, and (b) by diluting stock ownership, also upon exercise.  Assuming that analysts and investors had been interested in how these factors might one day be affected by the company's ESO grants at issue, the data necessary to make such assessments (*e.g.,* exercise prices, vesting periods and expiration dates) were accurately disclosed in the footnotes to SafeNet's financial statements.  In the most simple terms, the backdating did not mislead the market as to the exercise prices of the options granted.

4.  In my opinion, the one-day 22% drop in SafeNet's stock price on May 19, 2006 following the company's announcement of Justice Department and SEC investigations is not a reliable measurement of the loss to shareholders, if any, attributable to SafeNet's accounting misstatements relating to ESO grants.

- The one-day drop is itself not evidence that there previously had been inflation in the stock price as a result of the company's incorrect accounting for the "intrinsic value" of ESOs.

- As is reflected in subsequent analyst reports, the drop was instead brought about by other factors, including (i) primarily, market concern about potential fall-out from the government investigations, including concerns about the stability of the company and its executive team; and (ii) secondarily, market concerns about other (non-options) accounting issues that had been disclosed to be the subject of investigation, and which did potentially call into question the company's fundamentals.  An additional factor, also referenced in the analyst reports, was the series of negative announcements that preceded this disclosure.

- The announcement of the investigations itself contained no data whatsoever that would have permitted an analyst or investor to draw conclusions as to the extent to which SafeNet's ESO compensation expenses had previously been understated. Even if one were to assume that ESO "intrinsic value" was germane to the market's assessment of SafeNet's financial condition, and even if "confounding factors" like the disclosure of government investigations and possible "core" accounting errors were not present, the stock drop that day cannot be taken as a fair calibration of investor harm caused by the improper accounting, the scale and facts of which were only partially reported months later, and never fully reported.

- I understand that the Government has chosen to discount the stock drop on May 19, 2006 by two-thirds, attributing one-third to the options issue. I am unaware of the analytical basis for this approach. Discounting the drop, without a sound basis for the chosen discount, does not create a reasonable basis to allocate a stock movement among causes, which included the (assumed) inflation from the options issue; the uncertainty caused by the disclosure of possible options issues; the uncertainty caused by the disclosure of other possible accounting issues; and the cumulative effect of these disclosures combined with the overhang from a series of relatively recent negative news announcements.

**C.    Qualifications**

5. I am a Principal with Analysis Group, Inc., an economic consulting firm with offices in Boston, Chicago, Dallas, Denver, Los Angeles, Menlo Park, Montreal, New York, San Francisco, and Washington, D.C. I have managed numerous damage studies on a wide range of topics in a variety of industries. In particular, I have worked with clients to understand and assess the facts and circumstances in numerous finance-based litigations. I have consulted on numerous class action matters governed by Rule 10b-5 of the Securities Exchange Act of 1934, where I have provided analysis relating to the effect of alleged wrongdoings on a company's stock price. I have also managed cases in areas involving analyses of complex derivative securities, mergers and acquisitions, banking issues, and business valuations. I have testified on these issues in arbitrations, at civil trials, and at criminal hearings.

6. I received a B.A. degree from Williams College in 1984 and a Masters of Science in Management from the Sloan School of Management at M.I.T. in 1989. I am also a certified public accountant. Prior to joining Analysis Group, I spent several years in the Business Investigative Services Group at Coopers & Lybrand. A copy of my curriculum vitae is attached as Appendix A to this report.

II.     **Was There Inflation in the Stock Price As a Result of Failure to Record APB 25 Compensation Expense?**

    A.     **Background and Overview**

        1.     **The Indictment**

7.   The Indictment alleges a practice at SafeNet of backdating stock options, and describes in detail seven options grants to executives which occurred between April 2001 and June 2005 as to which there was backdating.  The Indictment alleges that these grants were awarded, among others, to SafeNet's Former CEO[1], SafeNet's New CFO[2], and Argo[3], with grant dates that were selected to obtain lower exercise prices, rather than the dates on which the Compensation Committee formally approved the grants.  My understanding is that most of the grants also included other recipients.  The Indictment alleges that SafeNet did not report, as it was required to under APB 25, an "intrinsic value" compensation expense in connection with these grants, because it wrongly reported as the purported "grant date" a past date on which the stock price was lower than it was on the actual date the option was formally approved.  Had the Company recognized the true grant dates, the Indictment alleges, there would have been a positive "intrinsic value" compensation expense because, on those dates, the stock price exceeded the chosen exercise price.

8.   For purposes of this report, I accept as accurate these factual allegations.  I understand that the Government has provided counsel for Ms. Argo a spreadsheet stating that SafeNet failed to report as an ESO stock option expense a total of $13.7 million between the fourth quarter of 2000 and the second quarter of 2006.  I also accept this allegation as accurate for purposes of this report.

9.   The Indictment contends that these accounting misstatements affected analysts' and investors' views of the financial health of the Company.  However, as recounted herein, I have not found evidence supporting this allegation.

---

[1]   The April 3, 2001 grant of 25,000 options, the October 1, 2001 grant of 150,000 options, and October 8, 2002 grants of 100,000 options were awarded to SafeNet's Former CEO, Anthony Caputo.

[2]   The July 28, 2004 grant of 100,000 options was awarded to SafeNet's New CFO, Kenneth Mueller.

[3]   The October 1, 2001 grant of 45,000 options, the February 27, 2003 grant of 40,000 options, the July 17, 2003 grant of 10,000 options, and the June 1, 2005 grant of 50,000 options were awarded to Ms. Argo.

### 2.    Magnitude of the Accounting Misstatements

10. As an initial matter, it is important to keep the $13.7 million figure in proper analytic perspective. Of this amount, $12.8 million would have been recognized through the end of 2005. Total operating expenses reported by the Company were $324.8 million for this period. Thus, the Company understated its expenses by slightly less than 4% during this period. (See Exhibit 1). One needs to proceed with caution in evaluating the     scale of these errors. I understand that the Government has calculated the ESO expense misstatement in a different manner, as a percentage of total operating income. This percentage ranges from 4% in 2000 to 2,169% in 2005. However, in my opinion, expressing the expense misstatement as a percentage of operating income is analytically problematic and can yield misleading results. A simple example illustrates the point. Suppose that a company essentially broke even, with operating income of $10,000 on revenues of $100 million. Suppose that this company had misstated compensation expense by $10,000 – a mere 0.01% of both revenues and expenses. As a percentage of income, the misstatement is 100%, but one would be unlikely to alter one's conclusion about the firm's financial condition as a result. Comparing the misstatement in an expense to the Company's overall total expenses provides a more relevant ("apples-to-apples") comparison.

11. It is also worth noting that not all of the backdated options were exercised. An option that expires unexercised has no cash impact on the company. However, under APB 25, there was no provision for a reversal of the previously recognized expense. (In contrast, an accrued compensation expense for a year-end cash bonus that is not paid because the employee has left the firm is reversed.) The total amount of realized gains from the exercise of backdated stock options up through the discovery of the backdating was less than $4 million. (See Exhibit 1).

### 3.    My Analytic Approach

12. The first question that I have been asked to consider is whether SafeNet's stock price would have been lower during the period at issue if the Company had, consistent with APB 25, reported compensation expense reflecting the ESOs' "intrinsic value" at the date of the grant.[4] As a general matter, it is not unreasonable to hypothesize that the understatement of an expense might affect analysts' and investors' opinions of the financial condition and value of a company. Stock option expenses under APB 25, however, are a somewhat peculiar expense recognized in

---

[4]    The annual amount of this expense ranged, depending on the year, from $200,000 to $3.4 million.

accordance with accounting rules that bear little relationship to economic value. Thus, I begin my analysis with a review of the limitations of this measurement for evaluating company performance or value. I follow this discussion with an analysis of the hundreds of reports written by investment analysts, from which I conclude that SafeNet's stock option expenses demonstrably were not meaningful to those that followed the Company. These observations, and their relevance, are described in detail below.

**B.      Relationship between Expenses and Stock Prices**

13. In order for a stock price to be inflated by the understatement of an expense, that expense would have to influence an investor's valuation of the company. While accounting information is obviously read and analyzed by investors, a fundamental principle of corporate finance is that the value of a company (and, in turn, a company's stock price) is driven by expectations of its future cash flows. The distinction between accounting earnings and cash flow is illustrated in the following quote from Principles in Corporate Finance, a leading textbook on the subject, which addresses the "net present value" concept that underlies company valuations:

> The first and most important point: Net present value depends on future cash flows. Cash flow is the simplest possible concept; it is just the difference between cash received and cash paid out. Many people nevertheless confuse cash flow with accounting income.
>
> Income statements are intended to show how well the company is performing. Therefore, accounts *start* with "dollars in" and "dollars out," but to obtain accounting income they adjust these inputs....
>
> As a result of these adjustments, income includes some cash flows and excludes others, and it is reduced by depreciation charges, which are not cash flows at all. It is not always easy to translate the customary accounting data back into actual dollars – dollars you can buy beer with. If you are in doubt about what is a cash flow, simply count the dollars coming in and take away dollars going out. Don't assume without checking that you can find cash flow by routine manipulations of accounting data.
>
> You should also make sure that cash flows are recorded *only when they occur* and not when work is undertaken or a liability is incurred.[5]

14. The emphasis on future cash flows is not just a finance textbook concept. Investment analysts routinely construct models of future cash flows (called discounted cash flow or "DCF" models) to determine target prices for a firm and to evaluate the current stock price. While the focus of these DCF models is future cash flows, there is no doubt that an important input is a company's actual

---

[5]    Brealey, Richard; Myers, Stewart; and Allen, Franklin, Principles of Corporate Finance, New York: McGraw-Hill/Irwin; 8th edition (January 25, 2005). Emphasis in the original.

historical expenses. Current levels of expenses are often the best indication of future cash flow. In particular, an expense that represents a true economic cost to the company and is a good measure of future economic costs to the company is relevant to the valuation of a company. However, not all current expenses fall into that categorization. Truly one-time expenses are routinely eliminated from analyses of a company's future prospects and value, for example, costs associated with discontinuing an operation. Analysts typically also add back non-cash expenses such as depreciation and amortization because they are not useful for predicting future cash flows.

### C.    Limitations of Accounting Measurements of Option Expense

15. Public accountants have been grappling with the appropriate way to account for stock options grants for some time.[6] Inherent in this challenge is that employee stock options are much more complex than, for example, a cash payment delivered in a biweekly paycheck. When an employee gets a paycheck by direct deposit, the exchange from company to employee is immediate. The economic value is the cash value. In contrast, the source of economic value of ESOs is not the receipt of immediate cash, but the possibility of acquiring stock in the future at a discount from the future trading price. Options granted to employees typically have vesting requirements, which means employees are unable to realize the direct economic benefits of an options award until years after it was granted by a company. Further, the underlying stock price will change over that time, sometimes dramatically and sometimes negatively, so it is quite possible that an option grant will yield no future financial gain. The fact that there is considerable risk inherent in the value of stock options is also important because peoples' attitudes towards risk vary. As a result, different employees, as well as employers, value options differently (in contrast say, to $100 in cash). These types of complexities make valuing and, in turn, accounting for employee stock options a challenge.[7]

16. Starting in 1972, companies were required to account for ESO grants in accordance with APB 25. Under APB 25, option grants were accounted for based on a grant's "intrinsic value."[8] An

---

[6]    Chance, Donald M., "Expensing Executive Stock Options," mimeo at 3.
[7]    That a Nobel Prize was awarded to those that developed the principles behind valuing options is some indication of the magnitude of the complexities. See http://nobelprize.org/nobel_prizes/economics/laureates /1997/press.html.
[8]    Congressional Budget Office, "Accounting for Employee Stock Options" at 1. See http://www.cbo.gov/ftpdoc.cfm?index=5334&type=0, accessed December 19, 2007.

option's intrinsic value is the amount by which the stock price underlying the option exceeds the "strike" or "exercise" price specified as part of the terms of the option. If the stock price is equal to or less than the strike price, the intrinsic value is zero, and no expense is recorded.

17. The intrinsic value of an option, however, is widely recognized as a poor proxy for its economic value. An option with equal stock and exercise prices has no intrinsic value, but it clearly has economic value because of the possibility that the stock price will rise. There are other distortions. Consider two similar companies who issue similar ESOs with a strike price equal to the stock price. Neither would record an expense under APB 25. Three years later, one company's stock price has risen considerably, and all the options are exercised. The other's stock price has remained constant and the options are not exercised. Again, neither company records any expense associated with option exercise. The accounting for the ESOs for both companies was identical throughout, but the ultimate cash impacts to the company were considerably different. The same difficulty would arise if each company had issued in-the-money ESOs. Each would have recorded a non-zero compensation expense at the time of the grant, with no further accounting to reflect the ultimate exercise or expiration of the options.

18. In order to address the shortcoming of the intrinsic value method, the Financial Accounting Standards Board ("FASB"), the successor to the APB, issued Statement 123 ("FAS 123"), which modified how companies accounted for employees stock option grants. FAS 123, which took effect in 1996,[9] encouraged companies to account for options based on their "fair value." A stock option's fair value is an estimate of its market value, a value that reflects both the probability of future exercise and the uncertainty in the future stock price.[10] Companies that continued to use APB 25, as SafeNet did, were required to report, in notes to their financial statements, earnings as calculated based on the fair value method. Companies were also required to describe other details of their options grants, including the assumptions underlying their fair value estimates. The FASB later revised FAS 123 ("FAS 123R"), which was implemented in 2005.[11] FAS 123R eliminated the choice of accounting for options grants under the intrinsic value method, leaving the fair value method as the only permitted alternative.

---

[9]  See http://www.fasb.org/st/status/statpg123.shtml, accessed December 18, 2007.
[10]  Congressional Budget Office, "Accounting for Employee Stock Options" at 2-3. An example can highlight the difference between an option's fair value and intrinsic value. An option where the stock price and exercise price are equal has no intrinsic value, but still has a positive fair value because it may be worth something to its holder if the stock price goes up.

19. Although the fair value approach required by FAS 123 has its strengths, it also includes a number of widely observed flaws. Central among them is the unreliability and, to some degree, subjectivity inherent in estimating the fair value of option grants. This point is illustrated in the following passage:[12]

> Initially, the FASB seemed to believe that this [estimating the fair value of options grants] could be done rather easily through use of the Black-Scholes or binomial models. But as they have gathered more information on the accuracy and effectiveness of those models -- particularly Black-Scholes -- the FASB has appeared to back away from mandating the use of any particular model. In a meeting on September 10, 2003, the Board reaffirmed its determination to require the expensing of options in financial reports issued in 2005 but removed the reference to Black-Scholes or the binomial method from SFAS 123. In doing so, the Board stated that "the use of any specific option-pricing model would not be precluded."

> ...[A]s Charles Calomiris and Glenn Hubbard discussed in their 2003 paper "Options Pricing Models and Accounting Practice," there is significant uncertainty about the proper formula or method for valuing employee stock options.

> ...If financial economists are still uncertain about how to value the options, the FASB will undoubtedly have difficulty specifying a method. The essential difficulty is that there are many competing valuation candidates -- each with pros and cons -- that produce widely varying results depending on the specific circumstances of individual firms.

20. As the FASB recognizes, there is considerable subjectivity to the choice of model, and the choice can significantly effect the value of the option expense reported by a company. For example, a Black-Scholes estimate might yield a $5 per share option value while an estimate based on a binomial tree model might yield a $3 per share estimate. Thus, two companies with substantially similar operations could issue the same ESOs on the same terms but recognize very different expenses. The FAS 123R method continues to have the same limitation as the intrinsic value method in that the expense is recorded as the value as of the date of the grant. At that date, and that date only, notwithstanding estimation issues, the FAS 123R expense is a good measure of future cash costs. However, the ESO fair value may be wildly different at the time the financial statements are issued or read by an investor, in large part because the current stock price is an important predictor of the future stock price, and the current stock price may differ markedly from the stock price on the earlier "grant date." In assessing the potential cash flow impact of SafeNet's outstanding options, investors would have cared about the current stock price, which

---

[11]  See http://www.fasb.org/st/status/statpg123r.shtml, accessed December 20, 2007.
[12]  Hassett, Kevin A. and Wallison, Peter J., "A troubling requirement: Why should the FASB require the expensing of options if it has no idea how it should be done?" *Regulation*, Spring 2004.

*was* readily available.  But a historical stock price, such as that associated with a particular grant date, would already have been outdated by the time that SafeNet released its financial statements to the public, implying that the valuation of the ESO is also outdated.  Again, distortions across companies are likely to result.  For example, two similar companies can issue similar options and record a similar expense.  If good fortune befalls one before year-end, there may be very different expectations about the options exercise and value.  Not surprisingly, as a result of the FAS 123R limitations, analysts often compare earnings across firms excluding FAS 123R expense.

21. Prior to 2005, almost all companies issued ESOs with strike prices equal to the stock price on the grant date, and therefore recognized no compensation expense under the intrinsic value method. Obviously, sophisticated investors and analysts were not being duped into believing that issuing ESOs was a "free" undertaking by a company.  I will discuss later how footnote and proxy disclosures give investors all the information they needed to make their own conclusions about future cash flow impacts.  My point here, though, is simply to dispute the notion that analysts, in considering the economic value of the company, cared whether the "intrinsic value" (revealing as it did only what the price had been on an earlier grant date) was zero or something else.

**D.    Analysis of SafeNet Analyst Reports**

22. In order to assess whether or not compensation expense under APB 25 would have affected investors' views as to SafeNet's value, I reviewed several hundred analyst reports written by investment analysts that tracked the company before and after the May 18, 2006 disclosure. These reports are distributed to investors and describe the Company's investment prognosis.  Of the 371 reports reviewed, 290 (or 78%) were issued before the Company's public announcement following the close of the markets on May 18, 2006 of governmental investigations.

23. My review of these analyst reports focused on three topics:  (i) What discussion of stock options or compensation is included? (ii) How did analysts treat options expense after SafeNet adopted FAS 123R?  And, (iii) How did analysts treat other expenses that could be considered analogous to APB 25 expense?

24. My review of these reports revealed that prior to the May 18, 2006 announcement, analysts rarely discussed stock option grants and compensation expense.  To analyze the content of the reports in a systematic and objective way, I conducted a content analysis.  A content analysis is a methodology commonly used in the social sciences to quantify the content of communication.  It is based on the premise that the importance of a topic can be measured by the frequency with which it occurs relative to other topics.  The content analysis I conducted was simple in design.  I

counted the number of times certain ESO-related terms appeared in the analyst reports. I chose the terms: "compensation," "stock options," "options expense," and "options cost."[13]

25. The analysis revealed that these ESO-related terms were rarely mentioned prior to the May 18, 2006 disclosure. The term "options cost" never appeared. The term "compensation" is used only three times: once in the context of a SafeNet product ensuring "fair compensation" for intellectual property; once in the context of consideration for an acquisition that contained an earn-out; and once in the context of disclosing that the non-GAAP EPS number being discussed did not include amortization of unearned compensation.

26. The terms "stock option" and "option expense" appeared slightly more frequently, particularly after the adoption of FAS 123R. Four occurrences of "stock option" were in the context of acquisitions – one in particular was a discussion of stock options being used as part of a retention package.[14] Two references were in the context of operating cash flow generated from the exercise of stock options, as opposed to the accounting expense. Such discussions are consistent with the notion that analysts were concerned with the economic value of options stemming from the future cash flow effect from exercise, not the current accounting expense at issuance.

27. The remaining references to "stock option" or "options expense" (approximately nine instances) are all in connection with the FAS 123R expense. However, the mentions are *not* in connection with a discussion about the amount of the expense, but rather they are in the context of the analyst noting that his or her earnings estimate did not reflect the impact of stock option expense. Similarly, and importantly, during this time period, the DCF models contained in the analyst reports generally use a measure of operating expenses that *excludes* FAS 123R expense.

28. Additional insight follows from the analysis of investment bankers retained to assist with the sale of the SafeNet, which ultimately occurred in April 2007. Two investment banks — one hired by the acquirer, one by SafeNet – provided detailed analyses of the proposed transaction including

---

[13]  For the word pairs, the search criteria was that the two words appeared within 5 words of each other. Further, I considered content that could reasonably be considered the text of the report, *i.e.*, I did not count words found in legal disclaimers or words included in tables.

[14]  Academic research has shown that employee stock options expense has a positive effect on firm value for computer software firms, where the market appears to value the investment in the intellectual capital of employees as an intangible asset. See Bell, Timothy B. et al., "The Valuation Implications of Employee Stock Option Accounting for Profitable Computer Software Firms," *The Accounting Review*, Vol. 77, No. 4, October 2002, pp. 971-996.

valuation analyses done using several different methodologies.[15]  I reviewed these analyses and found that the cash flow and earnings measures used as a basis for the valuation of SafeNet all are specifically noted to exclude FAS 123R expense.  Notably, these analyses were undertaken long after the issues of options backdating at SafeNet had been disclosed in May 2006.

29. Backing out stock option expenses is consistent with how SafeNet analysts treat non-cash expenses, generally.  Almost all of the analysts following SafeNet made adjustments to the earnings measure they focused on in their discussions and in their tables and valuation analyses. In fact, these adjustments are quite large.  Exhibit 2 highlights how the expenses excluded by analysts consist largely of non-cash accounting expenses associated with amortization and "write-offs" that do not reflect contemporaneous cash outlays by SafeNet, and other non-recurring expenses such as integration costs.[16]   The reasoning for excluding these expenses is straightforward: these types of accounting expenses, like ESO expenses, do not have any type of direct impact on cash flows.  Consider, for example, amortization expenses for acquired intangible assets.  These expenses amount to several million dollars per year – more than the compensation expense at issue.  The expense arises after a transaction has been entered into whereby SafeNet purchased intangible assets (e.g., patents or trade secrets) in exchange for cash or stock.  At the time of the transaction, no expense is recognized for the purchase.  Instead, the purchase price is allocated, or amortized, over the life of the assets, and an expense taken in years subsequent to the purchase.  But, the expenses do not reflect out-of-pocket cash payments.  While analysts clearly care about the financial impact of purchasing such assets; they back out the non-cash amortization expenses reflected in SafeNet's public filings because they do not reflect any cash flow impact underlying the company's stock price valuation.  Similarly, with ESO grants, analysts do care about the costs that the company incurs to retain good management, and they need to understand how the options will affect future cash flows to the company, but as with amortization expense, the accounting expense for compensation under APB 25 will not help them understand these key economic issues.

30. In conclusion, my review of the analyst reports during the period of the options backdating confirms that analysts did not view ESO-related accounting expenses as relevant to their analysis

---

[15]    Exhibits 99.1 and 99.2 of SafeNet Form 8-K, April 2, 2007.
[16]    Exhibit 3 shows that only two analysts did not make significant adjustments to operating income, and among all the others, there was only some minor difference among analysts with respect to calculation.

of the Company's earnings before the May 18, 2006 announcement, and would not have viewed these expenses as relevant had they been properly accounted for.

### E.    Information Contained in the Notes to the Financial Statements

31. Notably, the data and other information in SafeNet's financial filings bearing on the actual future cash flow impact of its outstanding option grants was, apparently, entirely accurate. While backdating may have resulted in a lower exercise price than would otherwise have been used, the exercise price was publicly reported and known. Thus, analysts and investors who were interested in assessing the future cash flow impact of SafeNet's outstanding options were fully empowered to do so. Exhibit 4 includes an excerpt from the notes to the financial statements contained in SafeNet's 2001 10K to illustrate the type of information that was available. Specifically, Exhibit 4 includes information on the number of shares outstanding, the number of shares currently exercisable, the average option life, and the average exercise price figures for five group of options, categorized by exercise price. Exhibit 4 also lists assumptions made when calculating the fair value estimates of SafeNet's option grants (*e.g.*, stock price volatility, risk-free interest rates, dividend information). This disclosure supplied analysts and investors with the information they needed to the extent they might have sought to ascertain when employees might exercise options in the future and how much these options might be worth (*i.e.*, what the cash impact on the company would have been) when they did so. My review of analyst reports has not identified any that attempted to undertake this analysis of future cash flow. But the important point is that, had any analyst wanted to do so, SafeNet had furnished them with all the information to make such an assessment.

## III.    Does SafeNet's One-Day Stock Drop Supply A Reasonable Basis on Which to Calculate Investor Loss Attributable to the Company's Misapplication of APB 25?

### A.    Background

32. On May 18, 2006, SafeNet announced the following after the close of business:

> ...it received a subpoena from the office of the United States Attorney for the Southern District of New York related to the Company's granting of stock options. The Company also announced that it has received an informal inquiry from the Securities and Exchange Commission requesting information relating to stock option grants to directors and officers of the Company, as well as information relating to certain accounting policies and practices. The Company is actively engaged in

responding to these requests, and will cooperate fully with both offices.[17]

33. Following the May 18 disclosure, SafeNet's stock price fell by $4.28 in after-hours and next day trading – from a closing price of $19.21 on May 18 to a closing price of $14.93 on May 19. This drop was a decline of 22%, for a loss in market capitalization on that single day of $117.9 million.[18] A comparison of SafeNet's stock price to relevant stock indices shows that this stock drop was a response to the announcement, as opposed to reflecting broader market movements that day.

34. I understand that the Government has decided to use the one-day May 19, 2006 stock price drop to measure the harm caused to shareholders by the improper accounting of backdated stock options at SafeNet. The Government measured this harm as approximately $2.2 million dollars. To reach this conclusion, the Government allocated two-thirds (66%) of the drop to issues unrelated to options backdating, and the rest to the backdating.[19] I am unaware of how the Government came to use this measure. In my opinion, the nature of the disclosure and the subsequent announcements do not permit one reliably to apportion the drop among its causes, even assuming, for argument's sake, that the drop to some degree reflected reversal of stock-price inflation previously caused by the understatement of ESO compensation expense.

## B.    Overview of Analysis

35. The stock price drop on May 19, 2006 raises two questions. First, what accounts for the large stock price drop that day? In particular, if investors did not care about APB 25 compensation expenses in valuing the company, as I have concluded above was the case, can some other factor or factors be identified to explain the large stock-price drop that day? Second, assuming (purely for argument's sake) that SafeNet's stock price had been inflated as a result of the Company's

---

[17]  "SafeNet Receives Stock Options Related Inquiries," Business Wire, May 18, 2006 16:59. (See Exhibit 7).

[18]  Exhibit 5 shows the historical stock price of SafeNet from 1999 through 2007. Although large, a drop of 22% was not particularly unusual in the history of the Company; SafeNet's stock price was relatively volatile. For example, as Exhibit 6 shows, SafeNet's stock dropped by 15.2% (a market capitalization change of $125 million) on February 3, 2006 and by 19.3% (a market capitalization change of $128 million) on April 7, 2006.

[19]  I understand that the Government calculates the total loss on shares sold on May 19 as the difference between the May 18 closing price and the selling price. While that methodology is also questionable, I focus instead on the apportionment of the price drop.

inaccurate APB 25 accounting, is there a reliable way, using the May 19, 2006 stock drop, to reasonably estimate the amount of that inflation?

**C.    This Case Does Not Lend Itself to Traditional Stock-Drop Analysis.**

36. Often in class action securities cases, the abnormal return following a "corrective disclosure" is viewed as evidence of prior inflation in the stock price, and is used to calculate investor losses. Consider the simple example where a company must restate its prior period revenues and earnings downward. The corrective disclosure that contains the company's true financial results causes investors to realize that the business is not as strong as they had previously believed and to re-value the company accordingly. Had the contents of the corrective disclosure, *i.e.*, the true revenues and earnings, been reported originally, it can be assumed that the investors would have valued the company in the same way that they valued it after the corrective disclosure. The stock price drop can be interpreted as the change in value attributable to the corrected financial results, and during the interim period, when investors were relying on false financial information, the stock price was inflated by an amount equal to the stock price drop after the corrective disclosure.

37. However, the case at hand is different from that simple example. The disclosure on May 18 did not simply correct past option expense accounting. (Indeed, it contained no such correction at all.) Instead, the company announced the existence of governmental investigations into wrongdoing, and it also disclosed that one component of the government investigations – the SEC's request for information relating to certain accounting policies and practices – was not specifically associated with option grants. As I will discuss below, at least some analysts interpreted this aspect of the announcement as indicating a broader investigation. A common challenge in conducting an event study is interpreting the results in the presence of such "confounding information." The observed abnormal return results from the market's simultaneous interpretation of the multiple pieces of information disclosed in the announcement. It is common for companies to make announcements that include multiple discrete pieces of information. To the extent that some of those pieces are unrelated to the disclosure whose influence one is seeking to measure, one must explore whether there are ways to disaggregate the impact of each of those pieces on the stock price.

38. In this case, the heart of SafeNet's press release was the fact of government investigations – one a criminal investigation, the other by the SEC. As I detail below, analyst reports commenting on the Company's disclosure make clear that the announcement increased greatly the uncertainty surrounding the Company's future, both in terms of expenses related to the investigation, the

distraction and potential turnover of top management, and the subsequent disruption to the business. This uncertainty was exacerbated by a recent history of the Company failing to deliver on promises made to the market. Investors react to increased uncertainty by demanding a price discount for the increased risk.[20]

39. I understand that the Government, apparently believing that part of the stock drop does reflect error correction while acknowledging the presence of some confounding factors, has discounted the May 19, 2006 stock drop by two-thirds in order to approximate the harm attributable to the prior faulty accounting under APB 25. With respect, I do not see how one could reliably come to such a determination that the remaining one-third of the stock drop is a fair measure of the amount (if any) attributable to correction of the Company's underlying accounting. Even accepting (purely for argument's sake) that there had been some degree of prior stock-price inflation due to the failure to record APB 25 compensation expenses and that the May 19 drop reflected in part a correction of this inflation, because the May 18 announcement did not include any true financial information, I do not believe that there is an analytically sound way to apportion the drop between the possible contributing causes – the assumed inflation from the backdating; the economic effect of the other issues; the uncertainty caused by the announcement, as it relates to the backdating; the uncertainty caused by the announcement, as it relates to the other issues; and, finally, the cumulative effect of this disclosure in combination with a series of recent prior negative announcements that had resulted in significant stock price drops. Similarly, even if the Government's argument is that the defendant is legally responsible for both the assumed inflation and the uncertainty resulting from the announcement of an investigation into backdating, I do not believe there is any way to divide the uncertainty between its various causes, including the other issues referred to in the SEC announcement and the cumulative effect of the prior announcements.

40. Put differently, in the simple example above, investors received all the information they needed to revalue the company based on its true financial condition. But in the case of SafeNet's May 18 disclosure, investors received only the fact that there *might* be an issue with options grant practices or other accounting policies. Thus, the re-valuation that followed the announcement is necessarily based on sheer speculation about what might be revealed in the future. Therefore, the stock price drop cannot be considered an accurate measurement of how SafeNet would have been

---

[20]    The price discount is often discussed as a risk premium on the required return.

valued had it been recognizing compensation expense under APB 25 consistent with the Government's calculation. In order for that to be the case, the Company would have had to release data permitting investors to measure the prior accounting errors, such as in the form of a restatement of past accounting information. In fact, such a disclosure was never made because the Company was taken private prior to the conclusion of any internal or external investigation.

### D.    Analyst Commentary on the May 18 Announcement

41. I reviewed the six analyst reports that were available to me that were issued immediately following the May 18 disclosure.[21] All six of the reports are quite short (one to two pages of substance). However, three common themes emerge from these reports:

- Uncertainty related to the investigation is the primary concern.

- Analysts assign an increased risk premium to the stock that is not the result of a change in perception about the Company's past profitability.

- The reaction to the announcement is influenced negatively by a string of past bad news announcements.

42. With headlines such as "Overhang likely to continue,"[22] all six of these analysts highlight concerns related to uncertainty. The following are comments from three of the analysts:

- "The latest news… is likely to continue to put an overhang on SafeNet's shares as investors look for further clarity."[23]

- "At this point, it is difficult to say for sure whether SafeNet is guilty of backdating stock option grants."[24]

- "We believe it is prudent to remain on the sidelines given the mounting uncertainties with respect to the Company."[25]

- "Risk Profile Increases Substantially."[26]

---

[21]    These were: Fishbein, Joel P., "Downgrade to NEUTRAL on Stock Option Inquiry Concerns", Janney Montgomery Scott. Glukhov, Andrey, "Federal and SEC Options Probe Create Cloud Over Shares; Lowering Rating to Hold", Brean Murray Carret. Hovis, Chris T., "Yet Another Issue; US Attorney & SEC Investigate Option Grants", Morgan Keenan. Ives, Daniel, "Receives Stock Options Inquiries from SEC; Risk Profile Increases Substantially—Downgrading from Outperform to Market Perform", Friedman Billings Ramsey. Raker, Todd, "Lowering target to $14", Deutsche Bank. Weller, Todd, "Stock Option Issues Represent Another Overhang; Maintain Hold Rating", Stifel Nicolaus.

[22]    Raker, Deutshe Bank.

[23]    Raker, Deutshe Bank, pg. 1.

[24]    Weller, Stifel Nicolaus, pg. 1.

43. The uncertainty stems from the limited amount of information in the announcement, leaving investors to guess at possible outcomes. For example, the report by Brean Murray poses the question, "What Are The Potential Consequences?," and lists the possibilities as "a charge, a delay in SEC filings, multi-year restatement, a criminal or a civil case, and senior management departures."[27] Analysts also cite possible risk to government purchase orders, the cost of the investigation, and the possibility of a broader investigation beyond just ESO grants.

44. What is noteworthy about the discussion is that *none* of the analysts express concerns related to past profitability data having been overstated. In fact, one analyst concludes the opposite while nonetheless lowering his opinion of the stock: [28]

- "While these issues do not impact the core business, we are compelled to lower the rating to Hold …"
- "At present we are not lowering our estimates, but our lowered target price of $21 represents a 30% discount to the group multiple … to account for heightened risk profile."
- "Investigation creates a cloud over the stock and in the near term, the stock will not likely trade on fundamentals."

45. This evident concern about risk from the investigation appears to have been exacerbated by the fact that it followed a string of bad news. In particular, for each of the previous four quarters – from the second quarter of 2005 through the first quarter of 2006 the Company either had missed the consensus forecast of earnings per share or revised its guidance downward. Exhibit 6 shows the stock price reaction to each of these announcements. With each subsequent piece of bad news, the negative reaction became larger. The cumulative effect is also evidenced by an increasing number of analyst downgrades over this time period. A consistent theme in the analyst commentary is a lack of management credibility. On April 7, 2006 the Company announced a restatement of prior quarter results, the identification of a material weakness in internal controls, that the CFO, Kenneth Mueller, was leaving, and that a planned acquisition would not go forward as a result of government intervention.

---

[25]    Ibid.
[26]    Ives, Friedman Billings Ramsey, pg. 1.
[27]    Glukhov, Brean Murray, pg. 1.
[28]    Ibid.

46. Concerns related to these past missteps demonstrably factored into the reaction of analysts, and the recent restatement and revelation of internal control weaknesses exacerbated concerns about a problem far broader than misapplication of APB 25:

- "We believe that persistent management credibility concerns along with the recent departure of its CFO will likely cause the market to look at the situation through a "worst-case scenarios" lens."[29]

- "Every time it appears the bad news is over with SFNT, there is yet another shoe to drop."[30]

- "With the recent fundamental mis-execution, executive management changes and now, an SEC inquiry on stock options backdating, we believe the shares could trade towards the low end of the group's valuation."[31]

- "SFNT: Yet Another Issue...  Coming off a disappointing Q1, a CFO turnover, and government intervention blocking a potential acquisition, SFNT was hit with another issue ..." [32]

- "After several quarters of poor earnings and inconsistent execution, we expect the shares of SafeNet to remain in the penalty box until it can show the street it can execute and get these inquiries behind the company."[33]

47. In summary,  three factors – uncertainty, confounding information, and an environment of repeated disappointments – appear to explain the extreme reaction of the market to the May 18 announcement.  Attributing the stock drop to those factors is, further, entirely consistent with my earlier conclusion that the misapplication of APB 25 had not caused inflation in SafeNet's stock price.   These three factors also complicate any analysis designed to isolate the amount of inflation, if any, caused by the understatement of APB 25 expense.

**E.    Subsequent Price Movements in SafeNet's Stock Further Undermine Doubt on the Conclusion that the May 19, 2006 Drop Was One-Third Attributable to APB 25 Error Correction.**

48. Ensuing movements in SafeNet's stock price also undermine the Government's assumption that a third of the May 19 stock drop is attributable to the underlying erroneous accounting.  As the

---

[29]  Weller, Stifel Nicolaus, pg. 1.
[30]  Ives, Friedman Billings Ramsey, pg. 1.
[31]  Raker, Deutshe Bank, pg. 1.
[32]  Hovis, , Morgan Keenan, pg. 1.
[33]  Fishbein, Janney Montgomery Scott, pg. 1

Court is aware, the calculation of investor losses in class action litigations are governed by the PSLRA, which includes consideration of what is known as a 90-day bounce back period. Subsection (e) of the PSLRA provides that an award of damages to the plaintiff cannot exceed the difference between the purchase price paid and the mean trading price of that security during the 90-day period beginning on the date on which the information is disseminated to the market. My understanding of the motivation for the provision was the recognition that investors may initially overreact to the disclosure of adverse information, causing the stock price of the Company to drop excessively immediately following the disclosure.

49. SafeNet's stock price did in fact bounce back considerably in the period following the May 19 price drop. On August 18, 2006 (exactly 90 days later) the stock price went above $19.21 – the closing price on May 18 – for the first time. During that 90-day period, the average price was $16.44, a rebound of almost 50% of the initial one-day drop. Limiting the consideration of a bounce back to 90 days is arbitrary and in this case not consistent with the subsequent developments. Specific details came out slowly, so that uncertainty around the May 18 announcement remained for several months. For example, it was not until July 27 that the Company provided an estimate of the investigation costs and discussed the likelihood of a restatement. In late October, analysts complained that the Company was not reporting full financial results or providing EPS guidance for the fourth quarter as a result of the ongoing investigation.[34] Furthermore, new uncertainty was introduced following the May 18 announcement. Shareholder derivative lawsuits, a threat of delisting, and the possibility of an accelerated loan payment were all new concerns raised by analysts during the several months following May 18. Ultimately, the uncertainty was resolved with finality upon the acquisition of the Company on April 12, 2007. The acquisition price of $28.75 per share was well above the price when the initial announcement was made.[35]

50. In my view, even if one assumes that the initial stock drop was to some degree traceable to a "correction" of the earlier prior accounting, one would need to account for the stock's ensuing substantial rebound in measuring that correction. To the extent some of the negativity involving

---

[34]  See, e.g., "Glukov, Andrey, "Strong Revenue Momentum Underscores SafeNet; Recovery Even as Investigation Pressures EPS," Brean Murray Carret, October 26, 2006; Ives, Daniel, "Reports a Mixed Bag – Maintaining Market Perform," Friedman Billings Ramsey, October 26, 2006; Weller, Todd, "Solid 3Q Revenue Signal Improving Outlook; Reiterate Buy," Stifel Nicolaus, October 26, 2006.

[35]  "Stealth Acquisition Corp. Announces Successful Completion of Tender Offer for All Outstanding

SafeNet after May 18 reflected a loss of confidence in management or worry that the company's fundamentals might be weaker than previously thought, any positive news about the company's business would tend to diminish that uncertainty and the consequent discount of the stock price. In fact, the general upward trend of the Company's stock price throughout the months following the May 18 announcement is consistent with a view that the initial stock drop in large part reflected broad uncertainty about the company's future, which gradually dissipated as the Company reported continued solid performance.

51. Subsequent announcements can sometimes shed light on the apportionment of the confounding events from an earlier announcement. I examined over 20 subsequent announcements related to the ESO grants and investigation from May 18, 2006 through April 12, 2007 – the date that SafeNet was acquired and became a privately-held company – for evidence of whether subsequent stock movements prompted by other announcements about the stock option issues at SafeNet supplied a reliable way to allocate the movement between options-accounting and other issues (or, put differently, whether the subsequent events could help discern the amount of the May 19 stock drop attributable to the prior incorrect accounting). I concluded that this additional information does not provide a solid basis to make an apportionment of the initial stock price drop.

52. Most of the later announcements relating to the government investigations or the possibility of accounting restatements were coupled with disclosures about the Company's performance. For example, on July 27, 2006, SafeNet announced that it would restate at least one quarter of earnings. It also released information on the costs incurred, however the earnings news that was released exceeded expectations. The stock price rose $1.28, or 8.2%, following this announcement. As discussed above, it is reasonable to assume that positive information about the company's performance itself may tend to reduce the initially great uncertainty stemming from the announcement.

53. In sum, before one can attribute one-third of the May 19 stock drop to correction of the APB 25 accounting error, one would need to study closely the stock's subsequent movements and the events prompting those movements. On my initial review, these movements certainly do not appear to confirm (indeed, if anything they seem to belie) the Government's "one-third" causal

---

Shares of SafeNet, Inc.," BusinessWire, April 12, 2007.

assumption. A methodically sound review would need to be done before anyone could reliably substantiate that conclusion.

**F.    Conclusion**

54. In my opinion, the one-day stock drop is not evidence that SafeNet's prior accounting for stock options had caused inflation in SafeNet's stock. Rather, as ensuing analyst reports make clear, the stock drop reflected uncertainty over the company's stability and the future of its management team, in light of the newly-announced Government investigations into not only options issues but other accounting issues as well.

55. In my opinion, for related reasons, the May 19, 2006 stock drop cannot be used as a reasonable basis for measuring harm, even if one assumes (contrary to the evidence at hand) that some part of the drop might reflect a more negative reassessment of the company's economic performance based on the revelation of possible options backdating. The announcement that precipitated the drop announced governmental investigations but contained no data that would have permitted an analyst or investor to draw conclusions as to the extent, if any, to which SafeNet's ESO compensation expenses had previously been understated. It also followed a series of bad news disclosures and referred to issues other than financial statement errors for options expense. These issues caused uncertainty in the market (and the resultant price drop), and neither the announcement nor the ensuing analyst discussion can be used to segregate that uncertainty by issue. In addition, after May 19, there was a rebound over time bringing SafeNet's stock price equal to and then above the pre-announcement price. Thus, while experts are often capable of attributing loss among different causes, the nature of the disclosure, and subsequent announcements do not permit one to do so here. Assigning a one-third measure as the measure of the "true" stock drop (if any) attributable to the impact of the understatement of previously reported options expense is analytically unpersuasive.

Signed:

Laura B. Stamm

Dated:

Jan 11, 2008

Page 23