UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

                              :

UNITED STATES OF AMERICA

                              :           07 Cr. 683 (JSR)

         - v. -

                              :

CAROLE ARGO,

                              :

              Defendant.

                              :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## SENTENCING MEMORANDUM

 

MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
Attorney for the United States
of America

JOSHUA A. GOLDBERG
DEIRDRE A. McEVOY
Assistant United States Attorneys,
     Of Counsel.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                                 :

UNITED STATES OF AMERICA

                                                 :          07 Cr. 683 (JSR)

            - v. -

                                                   :

CAROLE ARGO,

                                                 :

                      Defendant.

                                                 :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## SENTENCING MEMORANDUM

Defendant Carole Argo is scheduled to be sentenced on January 28, 2007 at 10:00 a.m. The Government respectfully submits this Memorandum in response to Argo's January 16, 2008 Sentencing Memorandum, and, in particular, to address two issues raised by Argo:  (1) whether Argo should receive a downward departure for extraordinary family circumstances; and (2) how the Court should calculate loss and, in turn, whether the Court should order restitution.

This Memorandum also sets forth the Government's view of the Guidelines and provides the Court with relevant facts.  The Government takes no position regarding Argo's sentence, but submits this Memorandum to provide the Court with relevant information so that the Court can exercise its discretion in fashioning an appropriate sentence.

## FACTS

The following facts are from the PSR and the Indictment:

**A.**     **The Offense Conduct**

From in or about June 1999 through in or about October 2006, Argo worked at SafeNet, Inc., a then-publicly traded company.  Argo served as SafeNet's Chief Financial Officer ("CFO")

from in or about June 1999 through in or about June 2004, and as President and Chief Operating

Officer ("COO") from in or about June 2004 until her resignation in or about October 2006.

From in or about April 2006 until October 2006, Argo also acted as SafeNet's interim CFO.

Between 2000 and 2006, Argo and others engaged in an illegal scheme to deceive

SafeNet's Board of Directors, shareholders, and auditors, as well as securities analysts, the SEC,

members of the investing public and others, concerning SafeNet's systematic backdating of

options grants and SafeNet's failure to record and report compensation expense in connection

with those backdated stock option grants.

In furtherance of the scheme, between 2000 and 2005, Argo and her accomplices

routinely looked back in time to select "grant dates" based on historical dates when SafeNet's

stock price had closed at or near the low point.  With the benefit of hindsight, Argo created an

opportunity for herself and others at SafeNet to reap substantial benefits by awarding herself and

others backdated option grants with particularly advantageous exercise prices.  As a result, a

substantial number of SafeNet's option grants during this time period were "in-the-money" on

the day they were granted and therefore had an immediate compensatory and expense component

and value to the recipient.  During the relevant time period, applicable accounting principles

required SafeNet to record a compensation expense, and reduce its earnings accordingly, where

employee stock options were issued in-the-money.  To avoid these expenses, Argo and others at

SafeNet backdated options grants by papering them as if they had been issued on dates in the past

on which SafeNet's stock price had been at a periodic low point.  By failing to record a

compensation expense for these option grants as required, Argo and her accomplices caused

SafeNet to report materially false and misleading financial results in public filings with the SEC

for the period from at least in or about 2000 through in or about mid-2006.

During the period of the backdating scheme, Argo had numerous interactions with SafeNet's independent auditors and discussed various accounting issues with them, including issues related to accounting for options. Argo failed to disclose that she and others routinely looked back to select grant dates with low stock prices. Nor did she disclose that the dates on Unanimous Written Consents ("UWCs") for numerous option grants did not correlate to dates on which the Compensation Committee approved the grants. Moreover, beginning in the fourth quarter of 2000 through the second quarter of 2004, and in her capacity as SafeNet's Interim CFO beginning in the first quarter of 2006, Argo signed management representation letters that asserted to SafeNet's auditors that Argo was unaware of any ongoing fraud at SafeNet.

## B.     Particular Grants

### 1.     April 3, 2001 Grant

On January 19, 2001, the Compensation Committee met and agreed to grant the then-CEO of SafeNet (the "Former CEO") 25,000 options. Members of SafeNet's Board of Directors ratified the Former CEO's option grant three days later. In March 2001, SafeNet's stock price began to fall dramatically. On April 16, 2001, Argo sent an e-mail to another individual saying "I would like to have the option stuff approved today." At Argo's direction, a UWC for the Former CEO's grant was prepared and sent to the Compensation Committee, with a date of April 3, 2001. By using April 3, 2001 as the grant date instead of January 22, 2001, the day on which the Board of Directors approved the grant, the value of the Former CEO's option grant increased by almost $940,000 (more than $37 per share).

2.    **October 1, 2001 Grant**

In or about late October 2001, members of the Compensation Committee approved a grant of 50,000 options to the Former CEO and 20,000 options to Argo.  The final UWC for this grant was signed on or about October 28, 2001, but the grant was backdated to October 1, 2001, thereby obtaining a strike price of $5.85 per share, the low price for the fiscal quarter.

The Former CEO was dissatisfied with the number of options he received and refused to sign his new employment contract.  As a compromise, on or about December 12, 2001, the Compensation Committee agreed to grant the Former CEO an additional 100,000 options.  On or about December 12, 2001, the Former CEO agreed to sign his employment contract, and SafeNet's Board of Directors approved the terms of his contract, including the 100,000 additional options.  Also on or about December 12, 2001, the Compensation Committee agreed to grant Argo an additional 25,000 options.

On or about January 4, 2002, Argo sent a letter to the members of the Compensation Committee attaching UWCs regarding the option grants for both Argo and the Former CEO, backdated to October 1, 2001.  Nothing material to these stock option grants occurred on October 1, 2001.  By January 4, 2002, the closing price of SafeNet's stock was $18.65, or almost $13 per share more than the exercise price that Argo obtained by backdating the options under consideration.  As a result of the backdating of these grants, Argo and the Former CEO received in-the-money option grants worth approximately $576,000 and $1.92 million, respectively.

On or about December 16, 2001, members of the Compensation Committee sent minutes to Argo related to the Former CEO's option grant for her review.  In those minutes, the Compensation Committee stated, "[a]s a signing bonus [for the Former CEO], the Committee

4

recommended 100,000 options."  In or about mid-January 2002, Argo altered the minutes to read, "[a]s a signing *incentive*, the Committee *previously approved a stock option grant for* 100,000 options." (emphasis added).  Argo's revision was incorporated into the final version of the minutes, which were then signed by the members of the Compensation Committee.  Argo's changes gave the false impression that the stock options granted to the Former CEO – and to her – had been approved by the Compensation Committee previously, when in fact the option grants were not approved until on or about January 4, 2002.

In or about 2004 and 2005, Argo exercised approximately 18,500 options from the October 1, 2001 grant.  Although Argo did not sell these shares before the backdating scheme was disclosed, she realized a benefit of approximately $236,000 upon her exercise of the options, because the shares were purchased from SafeNet at a discount from the price she should have paid if the exercise price had corresponded to the true measurement date for the grant.

### 3.    October 8, 2002 Grant

In October 2002, the Compensation Committee granted 100,000 stock options to the Former CEO to replace options that had expired.  The grant was dated October 8, 2002, but was not actually approved by the Compensation Committee until on or about October 24, 2002.  In an October 21, 2002 e-mail, Argo told members of the Compensation Committee, "we will be able to issue options to [the Former CEO] as of October 8th 2002.  The closing price was 13.75." Argo subsequently caused a UWC to be prepared dated October 8, 2002, which was executed by the Compensation Committee on or about October 24, 2002.

The closing price of SafeNet's stock on October 24, 2002 was $18.75.  By backdating the Former CEO's option grant to October 8, 2002, the Former CEO received an in-the-money

5

option grant worth approximately $500,000.  Although members of the Compensation Committee knew that they were selecting a prior grant date for this particular grant, they relied on Argo and others to properly account for it.  SafeNet did not, however, record or report a compensation expense for this grant, and Argo did not advise members of the Compensation Committee, SafeNet's outside auditors, or investors that SafeNet had failed to properly account for this grant.  Instead, in an Annual Report for 2002 on a Form 10-K filed with the SEC (which was signed by Argo), SafeNet stated "[n]o stock-based employee compensation cost is reflected in net income, as all options granted under [SafeNet's option] plans had an exercise price equal to the market value of the underlying common stock on the date of grant."

### 4.    February 27, 2003 Grant

On or about January 6, 2003, an assistant to the Former CEO sent a fax to the Board of Directors, which included a proposed compensation package for Argo, with a grant of 30,000 options.  On or about January 8, 2003, SafeNet's Board of Directors met and approved "all proposed compensation awards . . . for the Executive Offices *[sic]*."  The closing price of SafeNet's stock on January 8, 2003 was $26.49.  This grant included 100,000 options to the Former CEO and 40,000 options to a senior vice president ("SVP").  On or about January 13, 2003, Argo received an e-mail from a Compensation Committee member confirming that the Compensation Committee had approved the proposed compensation package.

On or about January 14, 2003, Argo received an e-mail from an individual in SafeNet's finance department asking Argo if he should "put together stock option agreements for" the Former CEO, Argo, and the SVP.  He then added, "[w]hat did you have in mind for these agreements (dates, prices, terms, etc.. *[sic]*)?"  In an e-mail sent minutes later, Argo replied, "no

we will wait on pricing."

Argo "pocketed" this grant as SafeNet's stock price fell during early 2003, hitting a quarterly low price of $16.47 on February 27, 2003 (the day SafeNet completed a significant acquisition), before starting to rise in March 2003.  Later, Argo with the benefit of hindsight looked back and selected February 27, 2003, to use as the "grant date" for the options awarded to herself, the Former CEO and the SVP.  Argo obtained the benefit of this "grant date," but there is no record of SafeNet's Compensation Committee or Board of Directors ever approving that grant date or the corresponding exercise price of $16.47.  When Argo received the agreement for this option grant, she backdated her signature on the agreement to "2/27/03."

### 5.    July 17, 2003 Grant

On or about September 15, 2003, Argo sent an e-mail to the Compensation Committee seeking approval for various option grants, including a grant of 10,000 options to Argo.  In connection with her request, Argo faxed a UWC to the Compensation Committee backdated to July 17, 2003.  On or about September 16, 2003, members of the Compensation Committee executed the UWC provided by Argo.

On September 16, 2003, the closing price of SafeNet's stock was $38.85.  On July 17, 2003, the grant date selected by Argo, the closing price was $31.35.  By backdating this grant, Argo increased the value of her options by $75,000.

### 6.    July 28, 2004 Grant

On or about June 29, 2004, Argo was named President and COO of SafeNet, and a new CFO (the "New CFO") joined SafeNet, with a hire date of June 28, 2004.  By Consent dated August 31, 2004, the Compensation Committee approved a grant of 100,000 options to the New

CFO in connection with his employment contract.

On or about September 15, 2004, Argo sent an e-mail to the New CFO in which she told the New CFO, "[o]ur past practice has been to aggregate options for performance awards or new hires in the quarter and pick the best price after the hire date."  Consistent with that "practice," a UWC dated July 28, 2004 was subsequently prepared for the Compensation Committee, which was signed and returned by the final member of the Committee on or about October 9, 2004.

The closing price of SafeNet's stock on July 28, 2004, was $22.19, the low price for the quarter.  By contrast, the closing price on October 9, 2004 was $28.45.  By backdating the grant to July 28, 2004, the New CFO received an in-the-money grant, valued over $1.1 million more than if the grant date had been the date that the Compensation Committee approved it.

### 7.    The Q3 and Q4 2004 Grants

During the first quarter of 2005, SafeNet granted a large number of options to various employees backdated to various dates in the third and fourth quarters of 2004 (the "Q3 and Q4 2004 Grants").  The Q3 and Q4 2004 Grants were not approved by the Compensation Committee until February 2005, with the final UWC signed on or about February 9, 2005, when the closing price for SafeNet's stock was $31.52.  By backdating these options, SafeNet granted valuable in-the-money options.  Initially, SafeNet failed to account properly for these grants.

In or about Spring 2005, SafeNet's outside auditors discovered that SafeNet had backdated the Q3 and Q4 2004 Grants, and directed SafeNet's in-house accountants to prepare a schedule of all options approved in early 2005 with earlier grant dates so that they could calculate the compensation expense that SafeNet would have to recognize.  At the auditors' direction, SafeNet then recorded and reported a compensation charge for the Q3 and Q4 2004 Grants.

Even after SafeNet's auditors discovered the backdating on the Q3 and Q4 2004 Grants and required SafeNet to record and report a compensation charge, Argo failed to disclose to the auditors that SafeNet had, in fact, backdated numerous other grants in prior years. Argo also failed to take any steps to correct material misstatements concerning SafeNet's financial results that were contained in public filings as a result of the backdating scheme.

### 8.    June 1, 2005 Grant

On or about June 1, 2005, SafeNet's Compensation Committee met and approved a broad-based option grant for several SafeNet employees, including Argo. The options were backdated to various dates, with most having a "grant date" of March 28, 2005. In connection with her employment agreement as president and COO, Argo received an in-the-money grant of 50,000 options backdated to September 27, 2004 (with a strike price of $25.16).

Unlike prior grants, this grant was approved during an actual meeting of the Compensation Committee. As a result, the backdating was evident on the face of the meeting minutes. SafeNet's in-house accountants caught the backdating and told senior management that SafeNet would have to record a compensation charge that would exceed $1.15 million. Faced with this information, in or about August 2005, SafeNet's Former CEO directed that all options granted on June 1, 2005 but backdated to earlier dates -- other than Argo's -- would be repriced as of June 1, 2005, so as to avoid a compensation charge. (Argo's option grant was ultimately priced as of June 28, 2004, with an exercise price of $26.75, and the company subsequently recorded a compensation expense for Argo's grant). The Former CEO did not seek consent from either the Board of Directors or the Compensation Committee to reprice these options.

C.    **Impact of the Scheme**

The Financial Statements filed with SafeNet's Forms 10-Q and Forms 10-K purported to disclose SafeNet's operating and net income for particular periods.  During the relevant period, however, SafeNet's Forms 10-K materially misstated SafeNet's operating and net income as a result of SafeNet's failure to record and report a compensation expense for backdated options:

*Operating Income*

| Year | Reported Operating Income (Loss) (in thousands) | Actual Operating Income (Loss) (in thousands) | Percentage Misstatement |
|------|------|------|------|
| 2000 | $5,940 | $5,286 | 3% |
| 2001 | ($1,445) | ($2,611) | 81% |
| 2002 | ($1,544) | ($3,772) | 144% |
| 2003 | ($5,277) | ($8,686) | 65% |
| 2004 | $1,077 | ($1,599) | 249% |
| 2005 | $146 | ($3,020) | 2,169% |

*Net Income*

| Year | Reported Net Income (Loss) (in thousands) | Actual Net Income (Loss) (in thousands) | Percentage Misstatement |
|------|------|------|------|
| 2000 | $5,757 | $5,553 | 4% |
| 2001 | ($3,562) | ($4,728) | 33% |
| 2002 | ($4,739) | ($6,744) | 42% |
| 2003 | ($6,088) | ($8,263) | 36% |
| 2004 | $2,183 | $631 | 71% |
| 2005 | $3,028 | $1,432 | 53% |

After the close of business on May 18, 2006, SafeNet announced that it had received a

10

subpoena from the Government related to stock options and an informal inquiry from the SEC

"requesting information relating to stock option grants to directors and officers of the Company,

as well as information relating to certain accounting policies and practices."  The closing price of

SafeNet's stock on May 18, 2006 was $19.21.  The following day, May 19, 2006, shares of

SafeNet fell $4.28, or 22 percent, on heavy trading to close at $14.93.

## DISCUSSION

### A.    Procedure for Determining Argo's Sentence

In *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005), the Second Circuit explained

that district courts should engage in a three-step sentencing procedure in light of *United States* v.

*Booker*, 543 U.S. 220 (2005).  First, the court must determine the applicable Guidelines range,

and in so doing, "the sentencing judge will be entitled to find all of the facts that the Guidelines

make relevant to the determination of a Guidelines sentence and all of the facts relevant to the

determination of a non-Guidelines sentence."  *United States* v. *Crosby*, 397 F.3d at 112.  Second,

the court should consider whether a departure from the Guidelines range is appropriate.  *Crosby*,

397 F.3d at 112.  Third, the court must consider the Guidelines range, "along with all of the

factors listed in section 3553(a)" and determine the sentence to impose.  *Id.* at 113.

Section 3553(a) provides that the sentencing "court shall impose a sentence sufficient but

not greater than necessary, to comply with the purposes set forth in paragraph (2) of this

subsection," and then sets forth seven specific considerations, including (1) the nature and

circumstances of the offense and the history and characteristics of the defendant; (2) the need for

the sentence imposed — (A) to reflect the seriousness of the offense, to promote respect for the

law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal

11

conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range established [in the Sentencing Guidelines]; (5) any pertinent policy statement [issued by the Sentencing Commission]; (6) the need to avoid unwarranted sentence disparities; and (7) the need to provide restitution to any victims of the offense.

In deciding upon a sentence, the determination of the Guidelines range continues to be a part of a sentencing judge's analysis. *Crosby*, 397 F.3d at 113. Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall* v. *United States*, 128 S. Ct. 586, 594 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceeds. *Id.* at 596; *see also United States* v. *Rattoballi*, 452 F.3d 127, 133 (2d Cir. 2006) (the Guidelines "'cannot be called just 'another factor' in the statutory list, 18 U.S.C. § 3553(a), because they are the only integration of the multiple factors and, with important exceptions, their calculations were based upon the actual sentences of many judges.'") (quoting *United States* v. *Jiminez-Beltre*, 440 F.3d 514, 518 (1st Cir. 2006) (en banc)); *Kimbrough* v. *United States*, 128 S. Ct. 558, 574 (2007). Thus, while the Guidelines no longer play a mandatory role at sentencing, they nevertheless continue to play an important role in trying to achieve the "basic aim" that Congress tried to meet in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar ways." *United States* v. *Booker*, 543 U.S. 220 (2005). In furtherance of that goal, judges are required to "consider the Guidelines 'sentencing range established for . . . the applicable category

12

of offense committed by the applicable category of defendant,' § 3553(a)(4), the pertinent

Sentencing Commission policy statements, the need to avoid unwarranted sentencing disparities,

and the need to provide restitution to victims, §§ 3553(a)(1), (3), (5)-(7) (main ed. and Supp.

2004)." *Id.* at 764. A failure to consider the Guidelines range and to simply select a sentence

without such consideration is error. *Id.* at 115.

**B.    Guidelines Analysis**

The parties have stipulated that Argo's sentencing range under the Guidelines is 97 to 121

months' imprisonment (prior to any potential departure for extraordinary family circumstances),

based on a total offense level of 30, calculated as follows: Pursuant to U.S.S.G. § 2B1.1(a)(1),

the base offense level is 7; pursuant to U.S.S.G. § 2B1.1(b)(1)(I), the offense level is increased

by 16 levels because the loss from the offense exceeded $1 million but was less than $2.5

million; pursuant to § 2B1.1(b)(2)(C), the offense level is increased by 6 levels, because the

offense involved more than 250 victims; pursuant to § 2B1.1(b)(15), the offense level is

increased by 4 levels, because at the time of the offense, Argo was an officer of a publicly traded

company; and pursuant to U.S.S.G. §§ 3E1.1(a) and 3D1.1(b), Argo is entitled to a 3-level

reduction for acceptance of responsibility.

**C.    Argo Should Not Receive a Downward Departure**

Argo moves for a downward departure based on extraordinary family circumstances. In

making this motion, Argo relies on her responsibilities to her immediate family, her widowed

sister's family, and her friend, Jennifer Brown. The Government concedes that Argo has put

forth a compelling case regarding her strong devotion to her family and her community. The

Government further agrees that the Court should consider Argo's achievements and history of

good deeds, along with all other evidence, in determining her sentence under Section 3553(a).
The Government does not, however, believe that Argo is entitled to a downward departure. Put
simply, Argo's personal responsibilities and acts of charity towards others do not constitute
extraordinary family circumstances that would warrant a downward departure.

The Guidelines discourage departures based on family ties and responsibilities. *See*
U.S.S.G. § 5H1.6. Such departures are available only in extraordinary situations in which "the
family was uniquely dependent on the defendant's ability to maintain existing financial and
emotional commitments." *United States* v. *Sprei*, 145 F.3d 528, 535 (2d Cir. 1998); *see also*
*United States v. Walker*, 191 F.3d 326, 338 (2d Cir. 1999) (family circumstances departures
"must be reserved for situations that are truly extraordinary").

In the absence of extreme hardships, even compelling relationships between a defendant
and her family do not warrant a departure. *See, e.g., United States* v. *Bahena,* 223 F.3d 797 (8th
Cir. 2000) (holding that circumstances were not extraordinary where defendant was sole provider
for family, raised teenage sons by himself, and sons were forced to live with mother in Mexico);
*United States* v. *Goff,* 20 F.3d 918, 921 (8th Cir. 1994) (reversing downward departure where
defendant was primary source of family income for wife and three sons); *United States* v.
*Malpeso,* 943 F. Supp. 254, 257 (E.D.N.Y. 1996) (denying departure despite signs of emotional
distress in defendant's young children, evidence of financial difficulties, and evidence that
spouse could not work because of child care obligations), *aff'd,* 126 F.3d 92 (2d Cir. 1997).
Indeed, departures are regularly denied even to single parents who are solely responsible for
raising young children. *See, e.g., United States* v. *Sweeting,* 213 F.3d 95, 101 (3d Cir. 2000)
(reversing downward departure where defendant was single parent providing for five children,

14

one of whom had substantial neurological defect); *United States* v. *Leandre,* 132 F.3d 796, 807-08 (D.C. Cir. 1998) (defendant's status as single father of young children who would possibly be placed in foster care upon defendant's incarceration did not present extraordinary circumstances); *United States* v. *Gallegos,* 129 F.3d 1140, 1146 (11th Cir. 1997) (downward departure reversed although defendant was sole support for her six-year old son and partial support for her parents); *United States* v. *Archuleta,* 128 F.3d 1446, 1451 (10th Cir. 1997) (downward departure reversed although defendant was sole caretaker for two minor children and elderly diabetic mother who required round-the-clock care).

The factor that repeatedly has been held to distinguish truly extraordinary family hardship from the burden ordinarily visited upon a defendant's family as a result of the defendant's incarceration is the absence of adults available to act as caretakers for the defendant's dependents in her stead. *See, e.g., Sprei*, 145 F.3d at 535 (requiring "unique" dependence on defendant); *United States* v. *Jaderany,* 221 F.3d 989, 996 (7th Cir. 2000) ("a defendant's ability to rely on a supportive spouse or other relatives to look after his children makes his case for a downward departure less compelling"); *United States v. Faria,* 161 F.3d 761, 763 (2d Cir. 1998) (reversing departure where defendant's children lived with former wife); *United States* v. *Dyce,* 91 F.3d 1462, 1467-68 (D.C. Cir. 1996) (reversing departure for single mother with three children under the age of four years old, including infant who was breast fed, where other adults were available).

Based on these standards, the Second Circuit has cautioned that there is nothing extraordinary about a convicted defendant's incarceration causing some hardship to his family. *See United States* v. *Smith*, 331 F.3d 292 (2d Cir. 2003); *United States* v. *Madrigal*, 331 F.3d 258 (2d Cir. 2003). As the Second Circuit has explained:

15

> Unfortunate as the circumstances described by the court are, they are not
> extraordinary. They are the common collateral damage of imprisonment and are
> far enough removed from those circumstances that existing case law has found
> exceptional that we must conclude that the district court acted outside of
> permissible limits in granting the downward departure for family circumstances.

*Madrigal*, 331 F.3d at 260.

In this case, Argo has submitted a compelling record of her devotion and loyalty to others, but she has not demonstrated that her family or friends are uniquely dependent on her to maintain existing financial and emotional commitments, or that the hardship others would suffer from her incarceration would be "extraordinary." On the contrary, the considerable – and impressive – collection of letters from friends and family members establishes that Argo's loved ones have a comprehensive support network that could fill the void in Argo's absence. Nor has Argo established that any dependents face intractable difficulties or serious disabilities that could not be addressed by others. Argo and her family have considerable means and the ability to adjust to whatever sentence she receives. For this reason, Argo and her dependents are far better off – and have far greater advantages – than most of the defendants who appear for sentencing.

Indeed, none of the relationships detailed by Argo warrants a downward departure either individually or collectively. Argo is not a single parent, or the mother of a child with a serious disability. Her children are not facing poverty as a result of her conviction, or the possibility of being removed from their home. Nor are they facing the possibility of losing health care coverage, being forced to drop out of school, or being forced to make decisions that could jeopardize their own futures. Her children (and husband) will undoubtedly suffer financially and emotionally from whatever sentence Argo receives, but this is a result of Argo's criminal conduct, not the resulting punishment. In this respect, the hardship faced by Argo's children

appears to be all too common.  Argo's younger two children reportedly have had some modest disciplinary and emotional issues since her arrest, which would be expected in this situation. Argo's eldest son, Michael, reportedly suffers from anxiety disorder and attention deficit hyperactivity disorder (ADHD) (a common childhood behavioral disorder), but he enjoys a strong network of support that includes his father, siblings, teachers and faculty at a private school, extended family members and friends, and professional therapists.  None of this is meant to minimize the impact Argo's sentence may have on Michael or his siblings, but the fact is that Argo's children will suffer no more than most children – and less than many children – who have a parent who has committed a crime.

Along the same lines, Argo's admirable support of her sister and her kindness to her friend Jennifer Brown do not warrant a downward departure.  To be sure, Argo has shown both her sister and Ms. Brown – and their respective children – benevolence and generosity.  Her support of each of them should be considered by the Court in fashioning a sentence.  That support does not, however, rise to the level of extraordinary family circumstances.  In each case, Argo provides support, but she is not the primary caregiver or sole source of emotional and financial well-being.  In the case of her sister, Argo's primary role appears to have been to help her sister (a capable adult in her own right) cope with the tragic loss of her husband.  Argo seems to have played a key role in providing her sister with this support, but at the same time her sister appears to have significant additional support from other family members, friends, and military officials.  In the case of Ms. Brown, Argo apparently provided Ms. Brown with occasional (and well-welcomed) assistance with Ms. Brown's children, and especially her daughter Olivia.  Argo is not, however, a primary caregiver for either of Ms. Brown's children, and it cannot be said that

her sentence would cause either Ms. Brown or her children extraordinary hardship.  Again, this is

not meant to denigrate or trivialize Argo's efforts.  Nor is it meant to suggest that the Court

should not consider those efforts in weighing the relevant factors under Section 3553(a).  Those

efforts do not, however, qualify Argo for a downward departure.

**D.    The Court Should Calculate Loss and Order Restitution Based on Shareholders'
Losses After the Fraud was Disclosed**

As explained above, the parties have stipulated that the loss in this case is between $1

million and $2.5 million.  Argo reaches this amount by looking at the in-the-money portion of the

backdated option grants Argo received, which Argo calculates as $1.3 million.  The Government

believes that the proper measure is the loss to shareholders after the fraud was disclosed, which

the Government calculates as $2.2 million.  This dispute does not impact Argo's Guidelines

analysis, but it does affect restitution and how the Court assesses the seriousness of the offense.

In determining the amount of loss resulting from a fraud offense, the sentencing court is

not required to compute the loss "'with precision.'"  *United States* v. *Jacobs*, 117 F.3d 82, 95 (2d

Cir. 1997) (quoting U.S.S.G. § 2F1.1, cmt. n.9 (1987)):

> The court need only make a reasonable estimate of the loss.  The sentencing judge
> is in a unique position to assess the evidence and estimate the loss based upon that
> evidence.  For this reason, the court's loss determination is entitled to appropriate
> deference.

U.S.S.G. § 2B1.1, cmt. n.3(C); *see also United States* v. *Bennett*, 252 F.3d 559, 565 (2d Cir.

2001) (court need only make reasonable estimate of loss).

The Guidelines further provide that the "estimate of the loss shall be based on available

information, taking into account, as appropriate and practicable under the circumstances, factors

such as . . . [t]he approximate number of victims multiplied by the average loss to each victim[,]

[t]he reduction that resulted from the offense in the value of equity securities . . . [, or] [m]ore

general factors, such as the scope and duration of the offense . . . ."  U.S.S.G. § 2B1.1, cmt.

n.3(C).  As the Sentencing Commission explained, the reduction in value of equity securities

"was added to provide courts additional guidance in determining loss in certain cases,

particularly in complex white collar cases" and the loss table was increased, as well as other

enhancements added, to "punish adequately offenses that cause catastrophic losses of magnitudes

previously unforeseen" and "address congressional concern regarding particularly extensive and

serious [corporate] fraud offenses."  U.S.S.G. App. C, amend. 647.  The Guidelines provide that

the "court shall use the gain that resulted from the offense as an alternative measure of loss only

if there is a loss but it reasonably cannot be determined."  U.S.S.G. §2B1.1, cmt. n.3(B).

Recognizing these principles, courts frequently calculate loss in securities fraud cases by

relying on the change of market capitalization as a result of the disclosure of the fraud.  *See, e.g.,*

*United States v. Ebbers*, 458 F.3d 110, 126-127 (2d Cir. 2006) ("the loss is that suffered by those

investors who bought or held WorldCom stock during the fraud period either in express reliance

on the accuracy of the financial statements or in reliance on . . . the 'integrity' of the existing

market price."); *United States* v. *Moskowitz*, 215 F.3d 265 (2d Cir. 2000) (loss calculated based

on decline in market capitalization upon disclosure of fraud), *abrogated on other grounds by*

*Crawford* v. *Washington*, 541 U.S. 36 (2004); *United States* v. *Hedges*, 175 F.3d 1312 (11th Cir.

1999) (calculating loss by taking difference between average share price during fraud and share

price after disclosure of fraud and multiplying difference by total number of shares outstanding);

*United States* v. *Mooney*, 425 F.3d 1093, 1098-1101 (8th Cir. 2005) (en banc) (rejecting argument

that civil securities law standards should govern loss determinations for criminal sentencing

19

purposes and noting "good policy reasons" behind Guideline approach of providing "a clear and coherent brightline rule [and] eliminating the need for extensive factfinding").

Here, the Court should calculate loss based on the change of market capitalization after the backdating scheme was initially disclosed. On May 18, 2006, SafeNet disclosed that the Government and the SEC had opened an investigation into SafeNet's options practices and other accounting practices. Following this announcement, the next day SafeNet's share price plummeted, dropping 22 percent. Shareholders who held SafeNet stock prior to the announcement and then sold on May 19, 2006, suffered significant losses.

To calculate loss, the Government looked at shareholders who held SafeNet stock on May 18, 2006, and then sold on May 19, 2006, after the disclosure of the fraud. The Government excluded any investors who both bought and sold SafeNet shares on May 19, 2006. The Government then discounted this amount to account for various other factors, including the fact that (a) the announcement of the investigation into accounting practices was broader than simply stock options, (b) SafeNet had made various other announcements in the weeks and months before the disclosure of the fraud regarding earnings reports and other matters that bore on management's integrity, (c) the announcement came at a time when several other companies were disclosing potential problems related to the backdating of options, (d) there may have been other reasons why shareholders chose to sell on May 19, 2006, and (e) there may have been an overreaction by the market to the announcement. The Government also took into account the fact that Argo pled guilty prior to trial and entered into a stipulation regarding the Guidelines, thereby removing litigation risk related to both her conviction and her sentence. Based on this analysis, the Government discounted the total loss by 66%. The Government believes that this

was both appropriate and conservative, thereby resulting in a fair estimate of the loss in this case. Based on this calculation, the total loss in this case is approximately $2.2 million. A spreadsheet detailing the Government analysis is annexed as Exhibit 1.

In her sentencing submission, Argo criticizes the Government's analysis on several grounds. As an initial matter, Argo attempts to distinguish between this case and other cases in which the announcement of a fraud discloses that a company's inherent financial position was weaker than had been reported. *See* Argo Br. at 7-8; Stamm at 3. Argo makes this distinction in large part based on her expert's conclusion that analysts generally were not concerned with compensation expenses arising from option grants because such expenses are non-cash. *See* Stamm at 6-7. This argument should be rejected for several reasons.

First, the fact that analysts were not focused on compensation expenses prior to the disclosure of the fraud does not mean that analysts were unconcerned with how those compensation expenses would have impacted SafeNet's reported earnings. The very nature of the fraud in this case was that Argo and her accomplices backdated options for the purpose of avoiding compensation expenses. If such expenses were of little importance to investors, Argo would have had no reason to perpetuate the scheme. After all, Argo could have asked SafeNet's compensation committee to grant discounted options and then simply recorded and reported the resulting expense. The fact that Argo chose not to disclose the true value of the options belies her current argument.

Second, the argument that analysts were really only interested in SafeNet's "pro forma" numbers, which generally excluded option-based compensation charges, ignores the fact that SafeNet was under a legal obligation to file accurate and complete financial statements with the

21

SEC.  In those filings, SafeNet represented to the public that it complied with APB 25 and that

no compensation charge was taken on option grants because the exercise price on those grants

equaled the fair market value of the stock on the date of grant.  SafeNet also told the public that

option grants were used as an incentive for *future* performance and as a way to align

management's interests with that of shareholders.  Proper disclosure of the backdating would not

only have materially impacted SafeNet's reported earnings, but also put the lie to SafeNet's

public statements, thereby raising serious issues about management's integrity.  This, in turn,

unquestionably would have decreased the value of SafeNet's stock.  In this respect, by

perpetuating the backdating scheme, Argo was able to inflate SafeNet's stock.

Third, from the perspective of shareholders who lost money after the fraud was disclosed

the distinction drawn by the defense is immaterial.  Investors who sold shares on May 19, 2006 –

and thereby made less money because the market reacted to the disclosure of the fraud – suffered

real losses just like investors who sold stock after the fraud in a company such as WorldCom.

These are not theoretical losses based on complex economic models of how much the stock may

have been inflated; these are real losses suffered by real investors.  For this reason, Argo's claim

that there is an "absence of demonstrable shareholder harm," Argo Br. at 7, is simply wrong.

Argo also argues that the market capitalization analysis should be rejected because the

one-day drop in SafeNet's stock price does not necessarily reflect that the stock was previously

inflated.  Stamm at 3.  Rather, Argo argues, this discount reflected a "risk premium" based on

uncertainty about the company due to the May 18, 2006 announcement.  *Id.* at 17.  This argument

does not, however, undermine the Government's analysis; on the contrary, it supports it.  As

Argo concedes, the "risk premium" was a direct result of the disclosure of the fraud

investigation. *See* Stamm at 16-17. Argo further concedes that the decrease in SafeNet's share price was "a response to the announcement, as opposed to reflecting broader market movements that day." *Id.* at 15. That disclosure created uncertainty about the future of the company, and the seriousness of the allegations exasperated negative reaction to a string of prior bad news, which already had undermined management's credibility. All of these concerns tied directly to the announcement on May 18, 2006. But for Argo's participation in the fraud (and the subsequent disclosure) SafeNet's share price would not have reflected a "risk premium."

Argo further argues that the stock drop "reflects nothing about SafeNet's fundamentals," but "is instead best understood as reflecting investor anxiety about the company's future." Argo Br. at 8, n.8. Again, even if this is true, it does not undermine the Government's argument, because the "anxiety" about the company's future was created by Argo's criminal conduct. An investor who sold when the stock price reflected that anxiety suffered a quantifiable loss.

Finally, Argo criticizes the Government for the way in which it discounted the shareholder losses. Argo argues that the discount "while welcome, does not make the resultant number more reliable or create confidence that the amount does not overstate harm caused by the offense." Argo Br. at 8, n.8. The Government concedes that the discount is imprecise, but this works to Argo's benefit. The magnitude of the discount recognizes that there were other factors that may have impacted the value of the stock and that in this particular case the Government's loss analysis is imperfect. To address this, the Government took a conservative approach and applied a significant discount. The resulting amount is a reasonable estimate of the loss incurred by shareholders as a result of Argo's offense. The Court should adopt the Government's methodology and find loss based on the Government's analysis.

**E.    The Court Should Order Restitution**

Section 3553(a)(7) requires the Court to consider "the need to provide restitution to any victims of the offense" in fashioning a sentence.  Restitution for Argo is mandatory under 18 U.S.C. § 3663A because Argo was convicted of an offense against property under Title 18 and identifiable victims have suffered pecuniary losses.  *See* 18 U.S.C. § 3663A(c)(1).  Determining the amount of restitution and the process for enforcement of a restitution order is within the Court's discretion.  *United States v. Kinlock*, 174 F.3d 297, 299 (2d Cir. 1999).

Here, the Government proposes that the Court order restitution pursuant to the loss chart provided by the Government.  That chart lists each individual account holder who held SafeNet stock on May 18, 2006 and then sold on May 19, 2006, taking into account the discount proposed by the Government.  This results in a total restitution amount of $2,194,136.01.  If the Court agrees with this analysis, the Government will submit a proposed restitution order.

*                    *                    *

In exercising its discretion and imposing sentence, the Court should consider both the seriousness of the offense and Argo's impressive background, as well as the stipulated Guidelines range and the other factors enumerated in Section 3553(a).  On the one hand, this was a serious offense that was neither short-term nor impulsive.  This was a long-running scheme in which Argo played a central role and stood to gain millions of dollars if the scheme had not been disclosed.  Argo is a certified public accountant who received guidance from SafeNet's auditors and who knew that the backdating scheme was wrong.  The hefty Guidelines range reflects the seriousness of Argo's offense.

On the other hand, the Government concedes that Argo has presented the Court with a

24

compelling portrait of a woman who excelled in both her professional and personal life, and who gave generously of herself to her family, friends, co-workers and community.  In many ways, the image presented by the defense is incongruous with the crime Argo committed, and the Government has no reason to believe that Argo will commit further crimes in the future.

The Government is mindful of the impact Argo's sentence will have on the people who relied upon Argo, yet also recognizes that Argo's sentence may deter other business executives from committing similar crimes.  The Government also recognizes that other federal defendants who were convicted of participating in backdating schemes received prison sentences that were far below the Guidelines range in this case.  The Government takes no position concerning Argo's sentence, but simply urges the Court to consider these facts in imposing sentence.

## <u>CONCLUSION</u>

For all of the reasons stated, the Court should sentence defendant Carole Argo to a sentence sufficient but not greater than necessary to comply with 18 U.S.C. § 3553(a), and impose a restitution order in the amount of $2,194,136.01.

Dated:        New York, New York
              January 23, 2008

Respectfully submitted,

MICHAEL J. GARCIA
United States Attorney

_____
Joshua A. Goldberg
Deirdre A. McEvoy
Assistant United States Attorneys
(212) 637-2439/2309

<u>CERTIFICATE OF SERVICE</u>

JOSHUA A. GOLDBERG deposes and says that he is employed in the office of

the United States Attorney for the Southern District of New York,

And that on January 23, 2008, he caused a copy of the Government's Sentencing

Memorandum to be served electronically and by First Class Mail, upon:

Paul A. Engelmayer, Esq.
Wilmer Cutler Pickering Hale and Dorr LLP
399 Park Avenue
New York, New York 10022
Paul.Engelmayer@wilmerhale.com

I declare under penalty of perjury that the foregoing is true and correct, pursuant

to Title 28, United States Code, Section 1746.

Dated:          New York, New York
                January 23, 2008


_____
JOSHUA A. GOLDBERG