UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| UNITED STATES OF AMERICA | : Case No. 07-CR-00683 (JSR) |
| | *Electronically filed* |
| | : |
| vs. | : |
| CAROLE ARGO, | : |
| Defendant. | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**<u>CAROLE D. ARGO'S RESPONSE
TO THE UNITED STATES'
SENTENCING MEMORANDUM</u>**
**(Sentencing Date: January 28, 2008)**

Paul A. Engelmayer (PE-6760)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
399 Park Avenue
New York, New York 10022
Tel: (212) 230.8800
Fax: (212) 230.8888
Paul.Engelmayer@wilmerhale.com

Matthew B. Holmwood (Pro Hac Vice)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
1875 Pennsylvania Avenue
Washington D.C. 20006
Tel: (202) 663.6449
Fax: (202) 663.6363
Matthew.Holmwood@wilmerhale.com

*Counsel for Defendant Carole Argo*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

Preliminary Statement ........................................................................................................... 1

I.     Analysis of Two 18 U.S.C. § 3553(a) Factors – Deterrence and Sentence Disparities ....... 1

         A.     Achieving Deterrence (§ 3553(a)(2)(B)) ................................................................. 1

                 Specific Deterrence ................................................................................ 1

                 General Deterrence ................................................................................ 2

         B.     Avoiding Unwarranted Sentence Disparities (18 U.S.C. § 3553(a)(6)) ................... 3

II.    A Downward Departure for Family Circumstances is Legally Available. ......................... 5

III.   The Court Should Decline to Order Restitution to Shareholders ......................................... 7

- ii -

## TABLE OF AUTHORITIES

**CASES** **Page(s)**

*Gall v. United States*, 128 S.Ct. 586, 595 (2007)..........................................................................3

*Koon v. United States*, 135 L. Ed. 2d 392, 116 S. Ct. 2035, 2046-47 (1996)..................................7

*United States v. Collardeau,* 2005 U.S. Dist. LEXIS 45020, at *12-19 (D.N.J. April 25, 2005) .10

*United States v. Cummings,* 189 F. Supp. 2d 67, 72-73 & n.7, 76 (S.D.N.Y. 2002).................9, 10

*United States v. DeRiggi*, 893 F. Supp. 171, 182 (E.D.N.Y. 1995).....................................................6

*United States v. Galante,* 111 F.3d 1029, 1033, 1034-1036 (2d Cir. 1997) ...............................6, 7

*United States v. Link*, 122 F. Supp. 2d 907, 909 (N.D. Ill. 2000).......................................................6

*United States v. Olis*, 2006 WL 2716048 at *8-9 (S.D. Tex. Sept. 22, 2006) ...............................10

*United States v. Reyes*, 2007 U.S. Dist LEXIS 60003, at *6-12 (N.D. Cal 2007 Aug. 7, 2007).....8

*United States v. Rutkoske,* 506 F.3d 170, 179 (2d Cir. 2007)........................................................10

*United States v. Sclamo,* 997 F.2d 970, 972 (1st Cir. 1993)...........................................................6

*United States v. Silkowski*, 32 F.3d 682, 689 (2d Cir. 1994) .........................................................9

## STATUTES AND GUIDELINES

18 U.S.C. § 2 ....................................................................................................................... 10

18 U.S.C. § 3553(a) (Supp. 4 2000) ................................................................................. 1, 5

18 U.S.C. § 3553(a)(1)(A) (Supp. 4 2000) .......................................................................... 1

18 U.S.C. § 3553(a)(2)(B) (Supp. 4 2000) .......................................................................... 1

18 U.S.C. § 3553(a)(6) (Supp. 4 2000) ................................................................................ 3

18 U.S.C. § 3563(b)(2) ...................................................................................................... 10

18 U.S.C. § 3583(d) ........................................................................................................... 10

Sarbanes Oxley Act of 2002 (Pub. L. No. 107-204, 116 Stat. 745) ..................................... 2

United States Sentencing Commission, *Guidelines Manual*, §5B1.1 (Nov. 2007) ............ 5

United States Sentencing Commission, *Guidelines Manual*, §5H1.6 (Nov. 2007) ............ 6

## OTHER AUTHORITIES

APB Opinion No. 25 ..................................................................................................3, 5, 6, 8, 9

Business Wire, *Monster Worldwide Files Restated Historical Financial Statements*
   (Dec. 13, 2006). ...........................................................................................................4

*Executive Compensation: Backdating to the Future/Oversight of Current Issues Regarding Executive Compensation Including Backdating of Stock Options; and Tax Treatment of Executive Compensation, Retirement and Benefits*: Hearing Before the S. Fin. Comm., 110th Cong. 8, 14 (2006) (statement of Linda Thomsen, Dir., Div. of Enforcement, SEC) ............3

Financial Accounting Standards No. 123 (Rev. 2004) ....................................................................3

*SEC Settles Charges Against Former CEO of Monster Worldwide, Inc. for Stock Options Backdating*, SEC Release No. 2008-7 (Jan. 23, 2008) .....................................................................4

Sentencing Transcript at 1, 48, *United States v. Reyes,* (N.D. Cal. Jan. 16, 2008) (Case No. CR 06-0556)...........................................................................................................4

Sentencing Transcript, *United States v. Sorin,* (E.D.N.Y. May 10, 2007) (Case No. CR-06-723) ..............................................................................................................4

On behalf of Carole Argo, we submit this memorandum to respond to discrete points in the Government's Sentencing Memorandum ("G. Mem."), filed yesterday. In so doing, we wish to acknowledge the extraordinary quality of that submission. We also wish to commend the Government for its fairness and grace in repeatedly acknowledging Carole's deeds and character, and in recognizing the key role those characteristics play in the sentencing determination.

I.    **Analysis of Two 18 U.S.C. § 3553(a) Factors – Deterrence and Sentence Disparities**

   A.  **Achieving Deterrence (§ 3553(a)(2)(B))**

The Government's memo concludes by "recogniz[ing] that Argo's sentence may deter other business executives from committing similar crimes." (G. Mem. 25; *see also id.* at 11-12.) In so doing, the Government pointedly does not take a position as to the appropriate sentence (*id.* at 25), and it does not dispute (indeed, it often applauds) the various mitigating facts which we have cited in support of a sentence of probation, with conditions such as home confinement and community service.[1] However, to the extent that the Government's concluding statement may be taken to suggest that a prison sentence is necessary to the goal of deterrence, we disagree. While some prison time is often an important means of attaining specific and general deterrence in white-collar cases, here, it is not necessary to achieve those goals.

*Specific deterrence*: With respect to specific deterrence and the related goal of "just punishment," § 3553(a)(1)(A), Carole poses no threat of recidivism, whatever her sentence.

---

[1] These include: (a) Carole's prompt acceptance of responsibility for this, her only offense; (b) her pre-prosecution disgorgement to SafeNet of all gains; (c) her post-employment efforts to gain favorable terms for shareholders when SafeNet was sold; (d) the nature of her offense, relative to typical accounting-fraud offenses; (e) the sentences imposed to date in other options-backdating cases, which have mostly yielded probationary sentences and which all involved much larger misstatements; (f) Carole's history of selflessly helping others, as reflected in many letters; and (g) the needs of others who rely on Carole, including her children; the two children of her widowed sister Cynthia; Cynthia herself; Carole's mother; and the Brown family.

Other than this offense, she has led an upstanding life that reflects respect for law and morality. She has fully accepted responsibility for this one lapse, as her actions show. She has responded constructively, using her offense as a workshop to teach her children the value of taking responsibility, and using her "found time" to further contribute to her community and to assist others. She has already paid dearly for her offense, and will keep paying for it. She has been shamed in her community, where her offense continues to get wide publicity. At age 46, she has forfeited the business career she worked so hard to build. She has jeopardized her family's economic future, and that of her sister's family, whom she has supported. She is facing enforcement action by the Securities and Exchange Commission. She is a defendant in pending civil litigation. She will surely be barred from service as an officer or director of a public company. There is no need for a prison sentence to deter her from criminality.

*General deterrence*: Imprisonment here is not necessary to achieve the goal of general deterrence. There has been overwhelming publicity paid to the offense of options backdating. More than 200 companies have announced restatements of their financial statements; numerous enforcement investigations and actions have been initiated; numerous executives have been fired, forced to resign, or civilly sued as a result of options backdating; and a handful of cases, including Carole's, have resulted in criminal prosecutions. Any incremental deterrent message that might be driven home by imposition of a prison, as opposed to a probationary, sentence in this particular case would be asymptotic to zero. Further, as a practical matter, subsequent regulatory reforms have made options backdating all but impossible, as the SEC has publicly acknowledged.[2]

---

[2]    Options abuses are no longer likely to occur primarily for two reasons. First, Sarbanes-Oxley has mandated a two-day reporting requirement for options granted to executives. Second,

As to the need to send a broader message to "business executives" that white-collar crime is not tolerated, we respectfully submit that this message has been amply conveyed by a series of highly-publicized prosecutions over the past decade, of which the Court is familiar. A sentence that reflects the judgment that the equities and facts here favor a non-prison sentence, will not blunt this message. Further, a sentence of probation, with appropriately restrictive conditions, *has* a punitive effect, *see United States v. Gall*, 128 S. Ct. 586, 595 (2007), and can convey a deterrent message. Here, a non-prison sentence, properly explained, may even reinforce the value that our system of justice places on accepting responsibility and on assisting others.

### B. Avoiding Unwarranted Sentence Disparities (18 U.S.C. § 3553(a)(6))

The Government recognizes that other defendants who have been convicted of participating in backdating schemes have received prison sentences far lower than the Guideline range in this case. (G. Mem. 25.)[3] An additional case has now reached sentencing and the

---

the 2004 revision to Financial Accounting Standards No. 123 ("FAS 123R"), which replaced APB Opinion No. 25 ("APB 25") as the accounting rule for reporting options' based compensation expense in 2006, requires the grantee to record an expense regardless of whether the option was "in-the-money." *See* Stamm Rpt. ¶¶ 18-20 (explaining FAS 123R). As Linda Thomsen, Head of the Enforcement Division of the SEC, told Congress last year, these changes, along with the attention now given to options, has greatly reduced the opportunity and incentive to commit backdating. Thomsen testified: "Backdating is much less advantageous within a two-day window of opportunity…. Additionally, statement 123R greatly reduces companies' incentives to backdate options. I think that in combination with the change in the accounting rules has done a lot to reduce the opportunity for abuse of options by backdating." *See Executive Compensation: Backdating to the Future/Oversight of Comm. of Current Issues Regarding Exec. Compensation Including Backdating of Stock Options; and Tax Treatment of Executive Compensation, Retirement and Benefits:* Hearing Before the S. Fin. Comm., 110th Cong. 8, 14 (2006).

[3]     As of our memo, of the four persons to be sentenced for options-backdating offenses, three had been sentenced to probation, and a fourth, William Sorin, had been sentenced to a year and a day in prison. Sorin benefited far more substantially than Carole (he exercised options with $1 million worth of "in-the-money" gain), and the fraud in Sorin's case was far more pervasive than at SafeNet (Comverse restated earnings by $314 million, and its employees

outcome reinforces that pattern: On January 16, Brocade CEO Gregory Reyes was sentenced to 21 months imprisonment. When one takes into account the aggravating factors present in *Reyes* and the mitigating facts present here but not in *Reyes*, the sentence in that case is consistent with (indeed, it supports) the probationary sentence we urge.[4]

*First*, Reyes' sentence included a 6-month enhancement for obstruction of justice. Judge Breyer found that Reyes had signed a false affidavit, under seal, to support his co-defendant's successful severance motion. Without Reyes's obstruction, Judge Breyer stated, he would have imposed a 15-month sentence. *See* Sent. Tr., *United States v. Reyes* (N. D. Cal. Jan 24, 2008) (Case No. C-06-00556-1).

*Second*, unlike Carole, Reyes did not accept responsibility. He asserted his innocence, engaged in extensive motion practice, and went to trial, lasting eight weeks. Had Reyes pled guilty, he presumably would have received a lower sentence. The Guidelines supply one gauge

---

*exercised* options containing more than $51 million of in-the-money gain). *See* Argo Mem. 5-6 & nn. 4-6. Carole's "history and characteristics," and the needs of others who depend on her, supply a further basis for a markedly lower sentence than Sorin's. *See* Sent. Tr., *United States v. Sorin* (E.D.N.Y. May 10, 2007) (Case No. CR-06-723).

[4] An additional data point is supplied by the announcement yesterday by the U.S. Attorney's Office for the Southern District that it had entered into a deferred-prosecution agreement with Andrew McElvey, founder of Monster Worldwide, Inc. As reported, the decision not to prosecute McElvey reflected the fact that he has pancreatic cancer; under the agreement, McElvey acknowledged that he had intentionally backdated stock options and agreed to return approximately $276,000 to the company. As a result of McKelvey's actions, Monster restated its earnings by a total of approximately $339.6 million for fiscal years 1997 through 2005. *See SEC Settles Charges Against Former CEO of Monster Worldwide, Inc. for Stock Options Backdating*, SEC Release No. 2008-7 (Jan. 23, 2008); Business Wire, *Monster Worldwide Files Restated Historical Financial Statements* (Dec. 13, 2006*).*

of the significance of acceptance. A defendant who otherwise would be sentenced to 15 months, by application of the acceptance credit, might have been eligible for probation.[5]

*Third*, in important ways, Reyes's offense was more serious than Carole's: Brocade understated APB 25 expenses by $351 million, more than 25 times greater than SafeNet's $13.7 million understatement. Reyes also sat as a committee of one deciding option grants and practices, without Board oversight, whereas SafeNet's Compensation Committee approved the grants that Carole oversaw.

*Fourth*, apart from pleading guilty, Carole's pre-plea remedial efforts (*i.e.*, her early settlement, her assistance to SafeNet in its acquisition) favorably distinguish her case.

*Fifth*, while Reyes was lauded as a generous philanthropist, that generosity was made possible by his vast wealth. Carole has also been generous with money, including to support her sister's family. But, as the letters on her behalf attest, Carole has long given generously of her time and emotional commitment, to many people in her family, workplace, and community.

*Sixth*, the demonstrated needs of other persons, in Carole's case, are substantial.

Once these distinguishing facts are taken into account, Reyes's sentence is fully consistent with (indeed, it is most consistent with) a sentence here of probation with conditions.

## II.    A Downward Departure for Family Circumstances Is Legally Available.

The parties agree that Carole's family circumstances would support a downward variance under § 3553(a), but disagree whether, viewed within the Guidelines, these circumstances, as a

---

[5]    For a defendant with a pre-acceptance offense level of 13 (12-18 months, with 15 as the midpoint), a 3-level reduction for acceptance of responsibility would yield a 6-12 month sentencing range (Zone B), for which probation is authorized; and a 2-level reduction would yield an 8-14 month range, for which a split sentence including probation would be authorized. *See* U.S.S.G. § 5B1.1.

matter of law, can be found "extraordinary" to support a downward departure under § 5H1.6. (G. Mem. 13-18.) The Government emphasizes that (1) Carole is neither a single parent nor the mother of a child with a serious disability, and (2) Carole's children would not face poverty or be forced to drop out of school were she incarcerated. (*Id.* at 16.) But the law is more capacious than that. A defendant need not be a single parent, or have a disabled child, or be destitute, for a §5H1.6 departure to be permissible,[6] and it is appropriate to consider the aggregated needs of multiple persons, including non-family members, in deciding whether to depart.[7] Furthermore, a downward departure can be sustained where a defendant supplies vital and unique emotional support to a child.[8] Here, the letters we have supplied demonstrate that Carole supplies such support to multiple people in her family, Cynthia's, and the Browns. For this reason, the Government's observations that Carole has "considerable means" and a "comprehensive support network that could fill the void" in her absence (G. Mem. 16) are, respectfully, non-responsive.

---

[6] *See, e.g., United States v. Sclamo*, 997 F.2d 970, 972 (1st Cir. 1993) (upholding departure to assist 12-year-old son of defendant's girlfriend who suffered from ADHD and had developed a special relationship with the defendant; court imposed sentence of probation conditioned on six months home confinement).

[7] *See United States v. Galante*, 111 F.3d 1029, 1034-36 (2d Cir. 1997) (upholding departure to married defendant who earned the income to keep his family out of public housing, had close relationship with his two minor children, and helped support his mother, court imposed time-served sentence of eight days, followed by five years supervised release); *United States v. DeRiggi*, 893 F. Supp. 171, 182 (E.D.N.Y. 1995) ("Most family circumstances departures involve spouses, parents, or children, but these are not the only relationships cognizable under the 'family' circumstances rubric.").

[8] *See, e.g., Sclamo*, *supra,* 997 F.2d at 972; *United States v. Link*, 122 F. Supp. 2d 907, 909 (N.D. Ill. 2000) (granting downward departure for defendant with a "unique and special relationship with an emotionally fragile child who is essentially wholly dependant upon him for nurture and support").

While friends or sitters could surely assume various chores, the vital emotional support Carole supplies to others simply cannot be furnished by such a pinch-hitter.

In general, whether a defendant's responsibilities are extraordinary is a decision left substantially to the discretion of the district court, based on its unique "'vantage point and day-to-day experience in criminal sentencing.'" *Galante*, 111 F.3d at 1033 (quoting *Koon v. United States*, 135 L. Ed. 2d 392, 116 S. Ct. 2035, 2046-47 (1996)). For the reasons we have set forth, we believe Carole's documented contributions to persons spanning three families can reasonably be termed "extraordinary." *See* Argo Mem. 10-21.

**III.    The Court Should Decline to Order Restitution to Shareholders.**

Carole long ago fully disgorged to SafeNet any gains she received from backdating. She has no objection to paying restitution, where due. But her conduct did not directly cause economic loss to shareholders. Our expert Laura Stamm has demonstrated that there is no reliable evidence that Carole's offense conduct caused SafeNet's stock price to be inflated. Ms. Stamm further demonstrated that the company's May 19, 2006 stock drop cannot reliably be attributed to correction of those accounting errors. Instead, the drop is dominantly due to deep investor anxiety and risk-aversion brought about by the press release issued the prior afternoon by SafeNet, which disclosed parallel criminal and SEC investigations of the company, into options and (as to the SEC) other issues, and which said nothing about whether backdating had in fact occurred or, if it had, on what scale. *See* Stamm Rpt. ¶ 38.

The Government supplies no evidence establishing this vital element of direct causation. It offers no basis on which to conclude that Carole's offense at any time inflated the company's stock price. Nor does it offer a solid basis on which to conclude that the stock drop was attributable to the correction of the flawed accounting, as opposed to the intervening event of the

press release announcing the investigations. Instead, the Government emphasizes that in other cases, market-capitalization drops have been used as the basis of restitution orders. (G. Mem. 19-20.) But the Government glosses over the key distinction. In these cases, the nature of the financial misstatements was that they affected pro forma earnings and therefore could reasonably be found to have inflated the stock's price, such that the drop upon disclosure of the fraud could reasonably be taken to reflect a correction of the defendant's accounting misstatements. As Ms. Stamm has explained, this is not such a case.

The Government offers three arguments why its market-capitalization approach is valid, but none is persuasive. First, it argues that Carole must have had a reason to supply the false accounting, and that "[i]f such expenses were of little importance to investors, Argo would have had no reason to perpetuate the scheme." (G. Mem. 21-22.) But Carole's motivation is a distinct issue from stock price impact. Carole had an independent motivation to not report the APB 25 compensation charges, because doing so would reveal the backdating and perhaps make it impossible to continue. That does not mean that disclosure of the correct APB 25 information (which in any event the press release did not supply) would have affected the stock price.

Second, the Government argues that the misstatements were material, and that disclosure of the false statements would have exposed as untrue management's characterization of the option grants as an incentive for future performance that aligned shareholder interests with management's. We do not dispute that the misstatements were material, including because they covered up the lack of complete alignment between management and shareholder interests. *See United States v. Reyes*, 2007 U.S. Dist. LEXIS 60003, at *6-12 (N.D. Cal Aug. 7, 2007) (denying Rule 29 motion because Government had put in sufficient information to establish materiality; court later found no measurable stock-price impact). But materiality is distinct from

whether the incorrect accounting (1) was revealed and corrected on May 18 (it was not) and (2) in fact, would have affected the stock price (as Ms. Stamm has shown, it likely would not).

Third, the Government argues that, even if Carole's underlying conduct did not move and would not have moved the market, she is accountable for the general uncertainty and anxiety created by the press release. (G. Mem. 22-23.) But there are two problems with that approach, one legal, one methodological. First, the law does not permit restitution to be awarded on the basis of such a "but-for" standard of indirect causation. *See United States v. Cummings,* 189 F. Supp. 2d 67, 76 (S.D.N.Y. 2002) (Cote, J.) (discussing issue and noting that "restitution may be ordered 'for losses that [were] … *directly caused* by the conduct composing the offense of conviction'" (quoting *United States v. Silkowski,* 32 F.3d 682, 689 (2d Cir. 1994) (italics added by *Cummings*))). The causal link here was broken by the intervening act of a press release (1) which said nothing about the underlying facts but, by raising a specter of grave problems, spawned enormous uncertainty about the company's future, far more than (we submit) would have been spawned by the narrow truthful revelation that the CFO had long failed to report APB 25 expenses; and (2) which occurred at a time of earnings turmoil for the company.

Second, methodologically, even if Carole were legally accountable for the shareholder anxiety fairly traceable to her actions, the Government has supplied no sound method for quantifying the extent to which that factor contributed to the stock drop. The open-ended press release, particularly coming on the heels of prior negative news about SafeNet, reasonably could have led investors to fear that SafeNet's overall business model was a sham or that its entire management team lacked integrity. There is simply no reliable way to estimate that, had a more tailored announcement been made about Carole's conduct that did not conjure these scenarios, the market-cap drop would have been one-third as large. Additionally, as the Government

- 9 -

candidly acknowledges, a host of other factors contributed to the stock drop. (G. Mem. 20.) Given this concession, the Government must do more to untangle these factors to justify its assertion that its measure is "conservative." (G. Mem. 21.) The Second Circuit recently held, in fact, in *United States v. Rutkoske*, 506 F.3d 170, 179 (2d Cir. 2007), that loss causation principles apply to determining loss for Guideline purposes and require establishing that the harm caused by the fraud. *See also United States v. Olis*, 2006 WL 2716048 at *8-9 (S.D. Tex. Sept. 22, 2006) (holding that Government failed to disentangle the causes of the stock movement). These principles also apply in determining restitution. *See Cummings*, 189 F. Supp. 2d at 76; *United States v. Collardeau*, 2005 U.S. Dist. LEXIS 45020, at *12-19 (D.N.J. April 25, 2005).[9]

Dated:   January 24, 2008
         New York, New York

                                        Respectfully submitted,

                                By:     /s/ Paul A. Engelmayer

                                        WILMER CUTLER PICKERING
                                            HALE AND DORR LLP
                                        Paul A. Engelmayer (PE-6760)
                                        Matthew B. Holmwood (Pro Hac Vice)

                                        *Counsel for Defendant Carole Argo*

---

[9] Also militating against a restitution order is the fact that restitution is not mandatory in this case, because the offense of conviction does not arise under Title 18. Carole's only Title 18 charge was 18 U.S.C. § 2, which is not a separate crime for the purposes of determining whether the restitution acts apply. *See Cummings*, 189 F. Supp. 2d at 72-73 & n.7. The Court's discretionary power to order restitution, therefore, arises from its power to set restitution as a condition of probation or supervised release, which is discretionary. *See, e.g.*, 18 U.S.C. § 3563(b)(2); 18 U.S.C. § 3583(d). Finally, there is civil securities litigation pending, in which Carole is a defendant, in which the issue of shareholder harm, if any, may be resolved upon more substantial evidence.

**CERTIFICATE OF SERVICE**

      I, Christopher W. Carrion, Esq., hereby certify under penalty of perjury that true and correct copies of Carole D. Argo's Response to the United States' Sentencing Memorandum, was served, by hand, upon each of the following on January 24, 2008:

Deirdre Ann McEvoy
U.S. Attorney's Office, SDNY
1 St. Andrews Plaza
New York, NY 10007

Joshua Aaron Goldberg
U.S. Attorney's Office, SDNY
One St. Andrew's Plaza
New York, NY 10007

Ms. Katrina Minus-Shepard
U.S. Probation Officer
Probation Office -- United States District Court for the Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007-1312

                                                              __s/ Christopher W. Carrion_____
                                                              Christopher W. Carrion